JUDGE FAILLA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

MOON JOO YU, AMY J. YU AND HEE RAK
KIM,

                           Plaintiffs,

          - against -

PREMIERE POWER LLC, SANDRA DYCHE,
JERRY JANKOVIC, JOHN JANKOVIC, ANNA
LEE, ANNIE KIM,AND JOHN DOES 1
THROUGH 100,

                         Defendants.

-------------------------------------------------------------x

**14 CV 7588**

Civ. Index No. _____

COMPLAINT AND
DEMAND FOR JURY
TRIAL

RECEIVED
SEP 18 2014
U.S.D.C. S.D. N.Y.

     The Plaintiffs Moon Joo Yu ("Mrs. Yu"), Amy J. Yu ("Ms. Yu") and Hee Rak Kim ("Mr.

Kim") (collectively, the "Plaintiffs"), by their attorneys, Ruta Soulios & Stratis LLP, for their

Complaint against the defendants Sandra Dyche ("Defendant Dyche"), Jerry Jankovic

("Defendant Jerry Jankovic"), John Jankovic ("Defendant John Jankovic"), Anna Lee

("Defendant Lee"), Annie Kim ("Defendant Kim"), Premiere Power LLC ("Defendant Premiere

Power"), and John Does 1 through 100, inclusive (collectively, the "Defendants"), upon

information and belief, allege as follows:

## INTRODUCTION

1.  The instant action arises out of an intentional scheme to deceive, defraud and otherwise

tortiously injure Plaintiffs by means of an elaborate hoax, founded on nothing but lies and

misinformation, to solicit the investment by Plaintiffs of $1.65 million of their life savings into

a fictitious entity.

     2.     Desperate to raise money to pay off a legal judgment resulting from another

fraudulent investment scheme gone bad, Defendants Dyche, Jerry Jankovic and John Jankovic

dreamt up Premiere Power, a new investment vehicle to solicit unsuspecting investors to part with their hard-earned money. They brought in Defendants Lee and Kim to assist in identifying appropriate targets for the scam, people like Mrs. Yu and Mr. Kim – Korean-born individuals who had immigrated to this country, who had worked to make a nice life for themselves and who had, through hard work, been able to put aside some savings to retire on.

3.      Once Defendants set their sights on Plaintiffs, they did not stand a chance. The individual Defendants told them lie after lie, feeding them one misrepresentation after the next about Premiere Power, this new investment opportunity that would see the return of their investment within a short period, and a generous rate of return guaranteed.

4.      Plaintiffs were no match for Defendants and their dishonest tactics. They lacked the investment and business sophistication. Further, given that English was their second language and they were far from fluent in it, they had to rely on Defendants for translations of the relevant investment documents. Never did any of the Defendants advise Plaintiffs to seek the independent advice of a legal or financial advisor before making the decision to invest in Premiere Power.

5.      After being told lie upon lie, and being presented with documents full of false statements and promises, Plaintiffs both made the fateful decision to invest in Premiere Power, and in total, contributed $1.65 million into the sham company.

6.      Despite promises to the contrary, none of the Plaintiffs have, to date, received the return of their investment as promised.

7.      This situation is made all the worse because this is not the first time some of the individual Defendants named above have been sued in connection with this type of illegal and fraudulent activity.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to

28 U.S.C. § 1331, federal question jurisdiction, Section 27 of the Securities Exchange Act of

1933, 15 U.S.C. §78aa, and 28 U.S.C. §1367, supplemental jurisdiction over state law claims.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), and

Section 27 of the Exchange Act, as a substantial part of the events giving rise to the claim

alleged herein occurred here.

## PARTIES

10.      Plaintiff Moon Joo Yu is and was at all relevant times a resident of the State of

New Jersey, Bergen County.

11.      Plaintiff Amy J. Yu is and was at all relevant times a resident of the State of New

Jersey, Bergen County.

12.      Plaintiff Hee Rak Kim is and was at all relevant times a resident of the State of

New York, Bronx County.

13.      Upon information and belief, Defendant Dyche is and was at all relevant times a

resident of the State of New York.  Exercise of jurisdiction over Defendant Dyche is reasonable

and proper in this District for the reasons set forth in paragraph 20, *infra*.

14.      Upon information and belief, Defendant Jerry Jankovic is and was at all relevant

times a resident of the State of California, Nevada or Oklahoma.  Exercise of jurisdiction over

Defendant Jerry Jankovic is reasonable and proper in this District for the reasons set forth in

paragraphs 21 and 22, *infra*.

15.      Upon information and belief, Defendant John Jankovic is and was at all relevant

times a resident of the State of California, Nevada or Oklahoma.  Exercise of jurisdiction over

Defendant John Jankovic is reasonable and proper in this District for the reasons set forth in paragraphs 21 and 22, *infra*.

16.     Upon information and belief, Defendant Lee is and was at all relevant times a resident of the State of New Jersey.  Exercise of jurisdiction over Defendant Lee is reasonable and proper in this District for the reasons set forth in paragraphs 21 and 22, *infra*.

17.     Upon information and belief, Defendant Kim is and was at all relevant times a resident of the State of New Jersey.  Exercise of jurisdiction over Defendant Kim is reasonable and proper in this District for the reasons set forth in paragraphs 21 and 22, *infra*.

18.     Upon information and belief, Defendant Premiere Power is and was at all relevant times a limited liability company organized and existing under the laws of the State of Delaware, domiciled in the State of Delaware.  Exercise of jurisdiction over Defendant Premiere Power is reasonable and proper in this District for the reasons set forth in paragraphs 21 and 22, *infra*.

19.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants John Doe 1 through 100, are unknown to Plaintiffs at this time. Plaintiffs therefore sue said Defendants by such fictitious names and will seek leave of the Court to amend this Complaint to set forth their true names and capacities thereof, when the same has been ascertained.

## PERSONAL JURISDICTION

20.     Exercise of jurisdiction over Defendant Dyche is reasonable and proper in this judicial district because Defendant Dyche is a resident of the State of New York and because she transacts her affairs in the State of New York.

21.     Exercise of jurisdiction over the remaining Defendants is reasonable and proper in this judicial district because the remaining Defendants are domiciled in, and residents of, the

United States. For Plaintiffs' claims for violations of the Securities Exchange Act of 1934, §

10(b), 15 U.S.C.A. §78j(b); 17 C.F.R. § 240.10b–5, exercise of jurisdiction over the Defendants

is proper pursuant to 18 U.S.C. § 1965(b), as the ends of justice require the application of the

nationwide service provisions of 18 U.S.C. § 1965(b), because there is no district in which all of

the Defendants could otherwise be tried together.

22.     For Plaintiffs' New York state law claims, exercise of jurisdiction over

Defendants is proper pursuant to N.Y. C.P.L.R. 301 and 302 as Defendants, through their agents

and co-conspirators, have transacted business and engaged in tortious conduct in the State of

New York, which gives rise to Plaintiffs' claims, and there is a substantial nexus between

Defendants' purposeful availment of the New York forum and Plaintiffs' claims as set forth

more fully herein.

## BACKGROUND

### DEFENDANTS DYCHE AND JERRY JANKOVIC, IN NEED OF MONEY TO SATISFY A JUDGMENT AGAINST THEM, CREATE "PREMIERE POWER", A NEW SCAM TO TARGET UNSUSPECTING VICTIMS

23.     Defendants Dyche and Jerry Jankovic have known each other and have been

engaging in illegal scheming, to the costly detriment of their victims, since at least as far back as

2001. That is when they were involved in a purported energy plant and casino complex on a

Native American reservation in California operating under the name The 21st Century Morongo

Energy LLC "Morongo Project."

24.     The Morongo Project was a fraudulent Ponzi scheme set up by Defendants Dyche

and Jerry Jankovic solely for the purpose of defrauding investors. It was fabricated in part by

Defendants Dyche and Jerry Jankovic so that they could use the money they raised to pay off a

claim by Thomas Thompson.

25.     In 2001, Defendants Dyche and Jerry Jankovic fraudulently induced Byung Chul An and Hyang Ok An (the "Ans") to invest $1.2 million dollars in the Morongo Project.

26.     Defendants Dyche and Jerry Jankovic used the investment made by the Ans to pay off an existing claim by Mr. Thompson.

27.     Defendants Dyche and Jerry Jankovic fraudulently promised the Ans that they would receive their principal investment from the Morongo Project back within one year.

28.     Defendant Dyche falsely represented to the Ans in 2002, when they sought the return of their principal, that the Morongo Project was proceeding according to plan and that they merely had to wait for the return of their principal.

29.     Over the next few years, neither Defendant Dyche nor Defendant Jerry Jankovic contacted the Ans to update them on the status of the Morongo Project.  Nor did they return any principal or made any distributions to the Ans.

30.     In 2006, the Ans sued Defendants Dyche and Jerry Jankovic, among other individuals and entities, regarding the scheme to defraud them of the $1.2 million they invested in the Morongo Project.

31.     During the litigation, Defendant Dyche testified that Morongo had participated in the formation of Premiere Power, and that Morongo had a 5% ownership interest in Premiere Power.[1]

32.     Due to the lawsuit initiated by the Ans in 2006, Defendants Dyche, Jerry Jankovic and John Jankovic, now involved, devised a fraudulent scheme to generate money to pay off any potential judgment obtained by the Ans.  This is when the scheme for Premiere Power was devised.

---

[1] Page 14 of the PIM referenced infra and attached as Exhibit A shows that the Morongo Project only had a 2% interest in Premiere Power not 5%.

33.     To run the new "company," Defendant Jerry Jankovic dubbed himself its Chairman of the Board and the voting majority member of the company.  Defendant Dyche was a member of Premiere Power's Board of Directors and representative of the Morongo Project interest.  John Jankovic was Premiere Power's Managing Member and Chief Executive Officer.

34.     As part of their fraudulent scheme, in 2009, Defendants Dyche, Jerry Jankovic and John Jankovic enlisted Defendants Lee and Kim to help solicit potential investors for Premiere Power.

35.     Defendant Dyche, Jerry Jankovic and John Jankovic told Defendants Lee and Kim that they would get a higher percentage of ownership in Premiere Power if they worked as investment agents and obtained investors.

36.     Defendant John Jankovic sent Defendants Lee and Kim a letter in October of 2009, which stated that an investment of $5 million was being prepared for them in exchange for a two (2%) percent minority interest in Premiere Power.

**DEFENDANTS LEE AND KIM INTRODUCE MRS. YU, AN UNSUSPECTING AND UNSOPHISTICATED INVESTOR, TO THE PREMIERE POWER INVESTMENT**

37.     Mrs. Yu is a United States citizen who immigrated to the United States from South Korea in 1986.  She runs a clothing business with her husband.  Mrs. Yu has no significant experience or background in finance, investments or business outside of the field of retail manufacturing, never graduated college, and possesses limited English language skills, as her native language is Korean.

38.     Mrs. Yu first heard of Premiere Power in the fall of 2009 from Defendants Lee and Kim.  Defendants Lee and Kim, who are sisters, worked as a mortgage broker and real estate broker, respectively.  Mrs. Yu met them through a mutual acquaintance in 2008.  Defendants Lee and Kim began to tell Mrs. Yu about the Premiere Power investment.

### A.  Mrs. Yu Is Given The Hard Sell In Korea In December 2009 And Makes A Significant Initial Investment

39.     In continued pursuit of Mrs. Yu, Defendants Lee and Kim invited Mrs. Yu and her husband to get together socially in Korea in December of 2009, where they would all be traveling (for separate reasons).  Defendants Lee and Kim organized this meeting so that Mrs. Yu could be introduced to Defendant Dyche.

40.     During her time in Korea in December of 2009, Mrs. Yu and her husband met with Defendants Lee and Kim, who introduced Mrs. Yu to Defendant Dyche, as they had planned (hereinafter referred to as the "Korea Meeting").

41.     Defendants Dyche, Lee and Kim falsely told Mrs. Yu in December of 2009 during the Korea Meeting that construction on the Premiere Power project had been going on since 2003, but that they now needed money to complete the project, and that they had personally visited the power plant and had seen it being built.

42.     Defendants Dyche, Lee and Kim explained to Mrs. Yu in December of 2009 during the Korea Meeting that if she invested $1.5 million in Premiere Power, she would be able to receive at least $300,000 annually starting in the fourth year of her investment, and that amount would increase each year thereafter.

43.     During the Korea Meeting, Defendant Dyche presented Mrs. Yu with a copy of the Premiere Power Preliminary Information Memorandum dated September 9, 2009 (the "PIM") (relevant portions of which are attached hereto as Exhibit A).[2]  The PIM described an opportunity to invest in a green, clean-energy project to develop, construct and operate two power plants: (i) the first on Comanche Nation Native American tribal land near Lawton,

---

[2] There is a second Preliminary Information Memorandum dated May 10, 2010 for Premiere Power Osage LLC, another entity dreamt up by Defendants to solicit new unsuspecting investors out of their hard earned money, because the Osage project is already listed in the Premiere Power PIM and the two PIM's are almost identical.

Oklahoma (the "Comanche Project"), and (ii) the second on Osage Nation Native American tribal land near Osage, Oklahoma (the "Osage Project") (collectively, the "Projects" or "Comanche and Osage Projects").  The PIM contained numerous false documents with claims of having agreements for funding of the Comanche and Osage Projects, as well as an agreement with the Osage Tribe to develop a 110 megawatt gas-powered cogeneration plant.[3]

44.     Because Mrs. Yu's English was not very good, she was forced to rely on the overview of the PIM that Defendant Dyche provided her with, as well as the presentation that Defendant Dyche gave her about Premiere Power, both of which she provided her to Mrs. Yu during the Korea Meeting.  For example, Defendant Dyche told Mrs. Yu who would be involved in the Company, including, for example, the former Chief Executive Officer of Kmart.  She also told Mrs. Yu that Defendant Jerry Jankovic had a relationship with the relevant Indian nations allegedly involved in the project and that they had signed agreements with these tribes, and there would therefore be no problem obtaining the permits necessary to get Premiere Power Project completed.

45.     Defendant Dyche also told Mrs. Yu that Mrs. Yu's investment would be small relative to the overall investment in Premiere Power, and that others had already made very large investments.

---

[3] There is additional evidence in the PIM of deception and fraud.  For instance, Premiere claims its intention to use New Pinnacle LLC for due diligence and advisory, but New Pinnacle LLC appears to have been set up by John Jankovic the previous year and was never registered in California. Signature Business Alliance LLC (SBA) is another company named as a third party provider in Premiere's PIP. This company was set up by another Premiere minority owner, James Olson, early in 2009 and terminated in March 2010. Also, Olson had filed for bankruptcy in January 2010 and did not disclose to the bankruptcy court any income or ownership interest in SBA, Premiere or Jamar Investments (a company Premiere's PIP said Olson was "currently" a Managing Partner of.) Likewise, Premiere claims it used ESA Engineering as a service provider but this company was dissolved in 2007.

46.     Defendants Lee and Kim falsely told Mrs. Yu while in Korea in December of 2009 in the presence of Defendant Dyche that they had each invested $1 million into Premiere Power through the introduction of Defendant Dyche.

47.     Mrs. Yu met with Defendants Dyche, Lee and Kim two or three more times while in Korea in December of 2009.  Based on Defendant Dyche's presentation to Mrs. Yu and the representations made during the course of that presentation, including those based off of the PIM, along with the representations made by Defendants Lee and Kim, Mrs. Yu decided while she was in Korea to invest $500,000 into Premiere Power.  On December 9, 2009, Mrs. Yu transferred an amount in cash in South Korean currency equaling US $500,000 to Defendant Dyche in person.

48.     Subsequently, Mrs. Yu decided to invest additional funds into Premiere Power.  At the direction of Defendant Dyche, Lee and Kim, Mrs. Yu wired $80,000 on December 14, 2009 and $420,000 on December 15, 2009, respectively, to Premiere Power's bank account as part of an ultimate $1.5 million investment in the "company" by Mrs. Yu.

### B.     Mrs. Yu Is Fed More Lies, Fabricated Financial Projections And Misrepresentations And Is Persuaded To Part With Additional Funds

49.     After returning from Korea, also in December 2009, Mrs. Yu was asked to attend a presentation on Premiere Power at the law offices of Chadbourne & Parke LLP, located at 1301 Avenue of the Americas, New York, NY (hereinafter referred to as the "Chadbourne & Parke Meeting").  Defendants Dyche, Lee and Kim pressed hard for Mrs. Yu to bring other parties with her to the presentation, as they wanted other people to invest their savings in Premiere Power.  In addition to the potential investors who were present, all of Korean descent, Defendants Jerry and John Jankovic were at the presentation, as were Defendants Dyche, Lee, Kim Joseph Antonini (the former Chief Executive Officer of Kmart), and an attorney.

50.     Mrs. Yu sat through the presentation, which lasted approximately three hours. The Defendants in attendance, as named above, presented Mrs. Yu, along with the other individuals in attendance with the following: (i) a PowerPoint presentation that contained fabricated financial projections in connection with the aforementioned projects and falsely represented that these financial projections[4] had been prepared and certified as accurate by reputable accounting firms, including Deloitte LLP and Duff & Phelps; (ii) false documents purporting to be contracts with the Comanche and Osage Native American Tribal Nations in connection with the aforementioned projects.  The Defendants falsely represented that the aforementioned were related to an actual power plant project located near Huntington Beach, California and falsely represented that two energy consulting firms, ESA Energy Corp. and Powerplant Maintenance Specialists Inc., were associated with the projects along with a list of industry leaders in the power plant business who were supposedly part of the board of directors and ownership members of Premiere Power.[5]

51.     Moreover, the PIM given to Mrs. Yu which was authored by Defendant John Jankovic contained the names of various individuals purporting to be members, board members and advisors to Premiere Power who have denied such involvement with Premiere Power.

52.     In addition, during the Chadbourne & Parke Meeting, the Defendants made false and fraudulent representations to Mrs. Yu that she would receive her principal back within two years from the date of her investment, and from three to thirty years, she would receive a rate of return of thirty percent or higher.

53.     Based on Defendant Dyche, Lee and Kim's fraudulent representations about Premiere Power in Korea in December 2009 (which were confirmed by those in attendance at the

---

[4] The financial projection for a $1.5 million investment was $20,763,459 over 30 years.
[5] The list of advisors and equity holders in Premiere Power was a pure fabrication.  Most of the people had no idea that they were on the board of directors or owned any equity in Premiere Power or Premiere Power Osage.

Chadbourne & Parke Meeting), coupled with the fraudulent presentation and representations that were made by the Defendants in attendance at the Chadbourne & Parke Meeting, Mrs. Yu decided that she was prepared to invest an additional $500,000 into Premiere Power, for a total investment of $1.5 million.

54.     Despite the Defendants' fraudulent misrepresentations, the Comanche and Osage Native American Tribal Nations had never agreed to allow their land to be used for the development of the power plants.

### C.     Mr. Kim Is Targeted By Defendant Lee And Unknowingly Invests In Premiere Power

55.     Plaintiff Mr. Kim was not present at the Chadbourne & Parke LLP meeting in December 2009.  However, he learned of Premiere Power through his aunt, who had attended the meeting as an unknowing potential victim of the Defendants.

56.     Thereafter in early 2010, Defendant Lee purposely targeted Mr. Kim.  She began visiting him at his place of work to convince him to invest in Premiere Power.  Defendant Lee told Mr. Kim that within two years, the Premiere power plant would be completed and he would receive a very large return on his investment.

57.     Based upon Defendant Lee's fraudulent misrepresentations that the power plant was being built and that he would receive large returns, Plaintiff Kim invested $150,000 in Premiere Power.

58.     At no point prior to either of their decisions to invest in Defendant Premiere Power did Defendant Dyche, Lee, Kim or any other defendant suggest or advise either Mrs. Yu or Mr. Kim to consult an attorney, financial advisor or accountant in connection with their decision to invest in Premiere Power.

59.     Defendants Dyche, Lee and Kim received a broker's fee from Defendants Premiere Power, Jerry Jankovic and John Jankovic for each investor she found to invest in Premiere Power.

60.     Defendants Dyche, Lee and Kim never disclosed to Mrs. Yu or Mr. Kim that any of them were receiving a broker's fee for obtaining investors in Premiere Power.

61.     Defendants Dyche, Lee and Kim violated both federal and New York State law by acting as unlicensed broker-dealers in connection with Premiere Power.

62.     Defendants Lee and Kim received a 0.36% interest in Premiere Power for obtaining investments from Mrs. Yu, Mr. Kim and another investor Hyun Ja Kim.  Defendants Lee and Kim invested not a single dollar in Premiere Power for the percentage interest they received.

**AFTER INVESTING IN PREMIERE POWER, PLAINTIFFS RECEIVED NOTHING THEY WERE PROMISED AND GREW SUSPICIOUS OF PREMIERE POWER AND THE PEOPLE BEHIND THE SUPPOSED "INVESTMENT"**

63.     After Mrs. Yu invested her money in Premiere Power, she received a share certificate bearing her name and her daughter's name, Amy Yu, the third plaintiff in this action.[6] The share certificate shows a 0.6% interest; however, even according to the figures that were put forth in the PIM, Mrs. Yu and Ms. Yu should have received a 0.75% interest in Premiere Power in exchange for their $1.5 million investment.  Mrs. Yu was never asked, nor was she required, to sign anything, not even a subscription agreement, despite the fact that one exists.  (Refer to Sample Premiere Power LLC Subscription Agreement, attached hereto as Exhibit B.)

---

[6] Because Amy Yu's name appears on the share certificate, she is a necessary party in this action.  However, because she was not in any way a part of the decision to invest in Premiere Power, nor was she ever approached or solicited by any of the individual defendants about the Premiere Power Investment Opportunity, she is a plaintiff in name only.  The share certificate is in the name of Premier Power LLC.

64.     Since Plaintiffs' investment, they have not received any update, formal or informal, written or oral, about their investment in Premiere Power.  They have received nothing from Premiere Power to keep its investors apprised of their investments as well as company developments.  Mrs. Yu has never had her $1.5 million principal returned to her, despite assurances that she would get it back within the first two years.  And she has received no returns, despite the fact that the third year has come and gone.

65.     In the summer of 2012, Mrs. Yu began to be concerned about her investment in Premiere Power.  Since her investment, she had received no news of her investment.  Further, she had not received a K-1, something she should have received as an investor. She had also received none of the promised returns on her investment, those promises being the key to her decision to invest in the first place.

66.     Mrs. Yu approached Defendants Lee and Kim, who also claimed that they had concerns about Defendants Premiere Power, Dyche, Jerry Jankovic and John Jankovic.

67.     Some time in the fall of 2012, Mrs. Yu gave Defendant Lee approximately $50,000 to hire an attorney by the name of Rosa Lee to determine if the investment in Premiere Power was legitimate.[7]

68.     In 2013, Defendant Lee stated to Mrs. Yu that Mrs. Yu needed to sign an agreement with her that showed that Defendant Lee had funded $750,000 of the $1.5 million investment that Mrs. Yu had made in Premiere Power.  Defendant Lee said that this was essential in order for Defendant Lee to be part of a lawsuit against Defendants Dyche, Jerry Jankovic, John Jankovic and Premiere Power.

---

[7] After the hiring of Rosa Lee a letter dated February 10, 2010 sent by Defendant John Jankovic as CEO of Defendant Premiere Power to Plaintiffs Mrs. Yu and Ms. Yu in care of Defendant Dyche was discovered.  Mrs. Yu and Ms. Yu had not received this letter from Defendants Premiere Power or Dyche.  The letter made additional promises and representations that were also false.

69.     In 2013, Mrs. Yu learned that Rosa Lee had only received $10,000 of the $50,000 that Mrs. Yu had given to Defendant Lee, and that Defendant Lee had kept the remainder of the money for herself.

70.     It was at this time that Mrs. Yu realized that the entire investment was a fraud and that all of the information that had been given to her by Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim was untrue and told to her solely to induce her to invest her millions in Premiere Power.

71.     Mrs. Yu also learned in 2013 that another investor in Premiere Power, Hyun Ja Kim, who was also at the Chadbourne & Parke Meeting in December 2009, had also been told by Defendant Lee to sign an agreement stating that $150,000 of the $300,000 investment Hyun Ja Kim had made was made by Defendant Lee.

72.     Mrs. Yu also learned around this time that the Ans had obtained a judgment against Defendants Dyche and Jerry Jankovic in the Morongo lawsuit for approximately $1.2 million in compensatory damages and $1.2 million in punitive damages based upon the fraud that had been perpetrated against them.

73.     Upon information and belief, all if not a large portion of the $1.65 million invested in Premiere Power by Plaintiffs was used to settle with the Ans after they obtained their judgment against Defendants Dyche and Jerry Jankovic.

74.     To date, Plaintiffs have not received a return of any portion of their investment in Premiere Power.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 OF THE SECURITIES AND EXCHANGE COMMISSION**

**(Against All Defendants)**

75.     Plaintiffs repeat, re-allege and incorporate each of the foregoing paragraphs as though fully set forth herein.

76.     This is a claim for securities fraud brought against all Defendants for their intentional fraudulent misrepresentations made to Plaintiffs to purposely induce them to invest millions into a Ponzi scheme and sham company.

77.     Defendants had a duty to be truthful in providing material facts to Plaintiffs in connection with their efforts to solicit Plaintiffs to invest in Premiere Power.

78.     In order to induce Plaintiffs to invest in Premiere Power, Defendants made numerous untrue representations of fact which they knew to be untrue, including, but not necessarily limited to, the following:

  a.     Defendants Dyche, Lee and Kim told Mrs. Yu in December of 2009 during the Korea Meeting that construction on the Premiere Power project had been going on since 2003, but that they now needed money to complete the project, and that they had personally visited the project and seen it being built despite the fact that to this day the construction of a power plant has not been commence by Premiere Power at the Comanche or Osage tribal property.

  b.     Defendants Dyche, Lee and Kim explained to Mrs. Yu in December of 2009 during the Korea Meeting that if she invested $1.5 Million in Premiere Power, she would be able to receive at least $300,000 annually starting in the fourth year of her investment, and that amount would increase annually each year thereafter.

c.      During the Korea Meeting in December of 2009, Defendant Dyche presented Mrs. Yu with a copy of the PIM, which described an opportunity to invest in a green, clean-energy project to develop, construct and operate two power plants: (i) the first on Comanche Project, and (ii) the second on Osage Project, as well containing numerous false documents with claims of having agreements for funding of the Comanche and Osage Projects, as well as an agreement with the Osage Tribe to develop a 110 megawatt gas-powered cogeneration plant..

d.      Because Mrs. Yu's English was not very good, she was forced to rely on the overview of the PIM that Defendant Dyche provided her with, as well as the presentation that Defendant Dyche gave her about Premiere Power, both of which she provided to Mrs. Yu during the Korea Meeting in December 2009.  For example, Defendant Dyche told Mrs. Yu who would be involved in the Company, including, for example, the former Chief Executive Officer of Kmart.  She also told Mrs. Yu that Defendant Jerry Jankovic had a relationship with the relevant Indian nations allegedly involved in the project, and there would therefore be no problem obtaining the permits necessary to get Premiere Power completed.

e.      Defendants Lee and Kim falsely told Mrs. Yu while in Korea in December of 2009 in the presence of Defendant Dyche that they had each invested $1 Million in Premiere Power through the introduction of Defendant Dyche.

f.      Mrs. Yu attended the Chadbourne & Parke meeting and was given a PowerPoint presentation that contained fabricated financial projections in

connection with the aforementioned projects that falsely represented that these financial projections had been prepared and certified as accurate by reputable accounting firms, including Deloitte LLP and Duff & Phelps.

   g.  Also during the Chadbourne & Parke Meeting, Mrs. Yu was also presented with false documents that Defendants had fabricated that purported to be contracts with the Comanche and Osage Native American Tribal Nations in connection with the aforementioned projects. The Defendants falsely represented that the aforementioned were related to an actual power plant project located near Huntington Beach, California and falsely represented that two energy consulting firms, ESA Energy Corp. and Powerplant Maintenance Specialists Inc., were associated with the projects along with a list of industry leaders in the power plant business who were part of the board of directors and ownership members of Premiere Power.

   h.  Also during the Chadbourne & Parke Meeting and presentation, representations were made to Mrs. Yu that she would receive her principal back within two years from the date of her investment, and from three to thirty years, she would receive a rate of return of thirty percent or higher.

   i.  In early 2010, Defendant Lee told Mr. Kim that within two years, the Premiere power plant would be completed and he would receive a very large return on his investment.

   j.  The PIM contained the names of various individuals purporting to be members, board members and advisors to Premiere Power who have denied such involvement with Premiere Power.

18

79.     The Defendants purposely offered the aforementioned misrepresentations of fact for the sole purpose of deceiving Plaintiffs so they would and ultimately did invest $1.65 million in Premiere Power, which was a sham.

80.     As the foreseeable and intended result of Defendants' material misstatements of the previously alleged facts upon which Plaintiffs relied, Plaintiffs invested $1.65 million in Premiere Power.  In so doing, Plaintiffs reasonably relied on Defendants' material misstatements of the previously alleged facts.

81.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' intentional and purposeful fraud, Plaintiffs have been injured in an amount to be determined at trial, but no less than $1.65 million, exclusive of interest and attorney's fees.  As Defendants' actions were intentional and designed to deceive Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $5 million in punitive damages.

## SECOND CAUSE OF ACTION

### FRAUD

#### (Against All Defendants)

82.     Plaintiffs repeat, re-allege and incorporate each of the foregoing paragraphs as though fully set forth herein.

83.     This is a claim for common law fraud brought against all Defendants for their intentional fraudulent misrepresentations made to Plaintiffs to purposely induce them to invest millions into a sham.

84.     Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim, personally and on behalf of all Defendants, represented to Plaintiffs that the Premiere Power investment was a

genuine investment opportunity that would yield healthy returns in fixed time periods. They made specific representations of fact to Plaintiffs that they knew were false in order to induce Plaintiffs to invest in Premiere Power to their detriment.

85.     Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim made all of the above statements with the sole intent of inducing Plaintiffs to invest in Premiere Power.

86.     Based on Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim's fraudulent representations of material fact, Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim did in fact induce Plaintiffs to invest $1.65 million in Premiere Power.

87.     Plaintiffs relied on Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim's fraudulent representations of material fact to their detriment by investing $1.65 million in Premiere Power.

88.     Based on the foregoing, any investment made by Plaintiffs in Premiere Power was the product of fraud.

89.     Upon information and belief, Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim received commissions and/or fees as a direct result of their material misrepresentations.

90.     As a direct result of Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim's common law fraud, Plaintiffs have been injured in an amount to be determined at trial, but no less than $1.65 million, exclusive of interest and attorney's fees. As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $5 million in punitive damages.

## THIRD CLAIM FOR RELIEF

## FRAUDULENT INDUCEMENT

**(Against Defendants Premiere Power, Dyche, Jerry Jankovic, John Jankovic, Lee and Kim)**

91.     Plaintiffs repeat, re-allege and incorporate each of the foregoing paragraphs as though fully set forth herein.

92.     This is a claim for fraudulent inducement brought against all Defendants for their intentional fraudulent misrepresentations made to Plaintiffs to purposely induce them to invest millions into a sham.

93.     Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim, personally and on behalf of all Defendants, represented to Plaintiffs that the Premiere Power investment was a genuine investment opportunity that would yield healthy returns in fixed time periods.  They made specific representations of fact to Plaintiffs that they knew were false in order to induce Plaintiffs to invest in Premiere Power to their detriment.

94.     Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim made all of the above statements with the sole intent of inducing Plaintiffs to invest in Premiere Power.

95.     Based on Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim's fraudulent representations of material fact, Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim did in fact induce Plaintiffs to invest $1.65 million in Premiere Power.

96.     Plaintiffs relied on Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim's fraudulent representations of material fact to their detriment by investing $1.65 million in Premiere Power.

97.     Based on the foregoing, any investment made by Plaintiffs in Premiere Power was the product of fraud.

98.     Upon information and belief, Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim received commissions and/or fees as a direct result of their material misrepresentations.

99.     As a direct result of Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim's common law fraud, Plaintiffs have been injured in an amount to be determined at trial, but no less than $1.65 million, exclusive of interest and attorney's fees.  As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $5 million in punitive damages.

## FOURTH CAUSE OF ACTION

### CIVIL CONSPIRACY

**(Against Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim)**

100.     Plaintiffs repeat, re-allege and incorporate each of the foregoing paragraphs as though fully set forth herein.

101.     This is a claim for civil conspiracy brought against Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim arising from their corrupt agreement to defraud Plaintiffs as unsuspecting investors in Premiere Power.

102.     Defendants furthered their corrupt agreement and executed the underlying fraud on Plaintiffs, as detailed above, through the taking of several overt acts and the making of material misrepresentations to Plaintiffs, including: (i) targeting Plaintiffs as potential marks for the fraudulent investment, (i) feeding Plaintiffs misinformation on various occasions, including at the Korea Meeting in December 2009, as well as at the Chadbourne & Park Meeting in December 2009, wherein they were told they would reap windfall returns on their investment in short timeframes; (iii) Defendants Lee and Kim telling Mrs. Yu that they themselves had

invested substantial sums of money in the Premiere Power Investment for the sole purpose of encouraging Mrs. Yu to invest her hard-earned money into the sham investment; (iv) Defendant Dyche presenting Mrs. Yu with an overview, in Korean, of the PIM, which was a fabrication, including the alleged line-up of individuals involved in the Company; and (v) Defendant Lee telling Mr. Kim that the Premiere power plant would be completed within two year and he would receive a very large return on his investment.  These fraudulent statements were reflected in the PIM, the Chadbourne & Park Meeting materials, and the many oral representations that were made by Defendants to Plaintiffs.  The Defendants intentionally took these and other overt acts described herein to further their corrupt agreement and to carry out a common plan.

103.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it.

104.    Plaintiffs would not have invested in Premiere Power had they known the truth about Defendants' fraudulent statements. Accordingly, Plaintiffs' damages arising from the fraud were proximately caused by Defendants' intentional, collective participation in furtherance of their common agreement to commit fraud.

105.    As a direct, proximate and foreseeable result of Defendants' intentional conduct, Plaintiffs have suffered tremendous harm. Accordingly, Plaintiffs should be restored to the status quo ante and should be awarded damages incurred as a result of their agreement to invest, in an amount to be determined at trial but no less than $1.65 million, exclusive of interest and attorney's fees.  As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $5 million in punitive damages.

## FIFTH CLAIM FOR RELIEF

## AIDING AND ABETTING FRAUD

### (Against Defendants Lee and Kim)

106.    Plaintiffs repeat, re-allege and incorporate each of the foregoing paragraphs as though fully set forth herein.

107.    This is a claim for aiding and abetting fraud brought against Defendants Lee and Kim arising from the intentional and substantial assistance they provided to Defendants Premiere Power, Dyche, Jerry Jankovic and John Jankovic and each other to perpetrate a fraud on Plaintiffs.

108.    Defendants Lee and Kim aided and abetted Defendants Premiere Power, Dyche, Jerry Jankovic and John Jankovic in their fraud, through the taking of several overt acts and the making of material misrepresentations to Plaintiffs, including: (i) targeting Plaintiffs as potential marks for the fraudulent investment, (i) feeding Plaintiffs misinformation on various occasions, including at the Korea Meeting in December 2009, wherein they were told they would reap windfall returns on their investment in short timeframes; (iii) Defendants Lee and Kim telling Mrs. Yu that they themselves had invested substantial sums of money in the Premiere Power Investment for the sole purpose of encouraging Mrs. Yu to invest her hard-earned money into the sham investment; and (iv) Defendant Lee telling Mr. Kim that the Premiere power plant would be completed within two year and he would receive a very large return on his investment.  These fraudulent statements were reflected in the PIM, the Chadbourne & Parke Meeting materials, and the many oral representations that were made by Defendants Lee and Kim to Plaintiffs. Defendants Lee and Kim each knew of the fraud being perpetrated on Plaintiffs through their leading and active role in marketing Premiere Power them and arranging for their ultimate investment in Premiere Power. As a result of these various functions, which gave them unique

insight into Premiere Power, the true purpose of the deal, and the true value of the investment opportunity, Defendants Lee and Kim knew and learned of, and assisted in conveying, fraudulent statements to Plaintiffs.

109.    As a direct, proximate and foreseeable result of Defendants Lee and Kim's intentional conduct, Plaintiffs have suffered tremendous harm. Accordingly, Plaintiffs should be restored to the status quo ante and should be awarded damages incurred as a result of their agreement to invest, in an amount to be determined at trial but no less than $1.65 million, exclusive of interest and attorney's fees.  As Defendants Lee and Kim's actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $5 million in punitive damages.

## SIXTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

### (Against Premiere Power)

110.    Plaintiffs repeat, re-allege and incorporate each of the foregoing paragraphs as though fully set forth herein.

111.    When Defendant Premiere Power, through its agents, Defendants Dyche, Jerry Jankovic, John Jankovic, Lee and Kim, solicited and accepted Plaintiffs' $1.65 million investment in the company, they created a valid contract with Plaintiffs.

112.    Plaintiffs fully performed their obligations under the contract when they made their investment in Premiere Power.

113.    Premiere Power has failed to perform its obligations under the contract.

114.     As alleged above, Premiere Power was obligated by the contract to: (i) furnish Plaintiffs with *real* shares representing actual value in Premiere Power; and (ii) as promised by the representations made by Defendant Premiere Power's agents, the individual Defendants in this action, furnish a return of their investment to Plaintiffs within a fixed time frame, and (iii) furnish a given rate of return on their investment within a fixed time frame.

115.     Defendant Premiere has breached the contract by failing to do any of this.  Indeed, Defendant Premiere Power knew, at the outset, even when it was, through its agent, actively soliciting Plaintiffs' investments, that it would not make good on this contract.  And it has to date continued to breach the contract by failing to meet not one of its obligations under the agreement.

116.     As a direct result of Defendant Premiere Power's breach, Plaintiffs have been injured in an amount to be determined at trial, but no less than $1.65 million, exclusive of interest and attorney's fees.

## SEVENTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

**(Against Defendants Jerry Jankovic, John Jankovic and Dyche)**

117.     Plaintiffs repeat, re-allege and incorporate each of the foregoing paragraphs as though fully set forth herein.

118.     Defendants Jerry Jankovic, John Jankovic and Dyche owe a fiduciary duty to the Plaintiffs based upon their positions on the board of directors, officers and members of Premiere Power.

119.    Defendants Jerry Jankovic, John Jankovic and Dyche breached their fiduciary duty to the Plaintiffs through their numerous fraudulent and self-dealing actions.

120.    As a direct result of Defendant Jerry Jankovic, John Jankovic and Dyche's breach of fiduciary duty, Plaintiffs have been injured in an amount to be determined at trial, but no less than $1.65 million, exclusive of interest and attorney's fees.

## EIGHTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

121.    As a result of Defendants' intentionally deceptive and fraudulent behavior directed at Plaintiffs, Defendants were enriched, at the expense of Plaintiffs, the payment of the $1.65 million that Plaintiffs invested in Premiere Power, a supposedly genuine investment opportunity.

122.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiffs in light of the fact that the "investment" Plaintiffs invested in was not what Defendants purported it to be. Thus, it would be unjust or inequitable for Defendants to retain the benefit without restitution to Plaintiffs for the monies paid to Defendants for such investment.

123.    As a direct result of Defendant Dyche, Jerry Jankovic, John Jankovic, Lee and Kim's unlawful actions, Plaintiffs have been injured in an amount to be determined at trial, but no less than $1.65 million, exclusive of interest and attorney's fees.  As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $5 million in punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the

Defendants as follows:

a.  On the first cause of action, declaring Defendants' conduct complained of herein to violate the federal securities laws, and compelling Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial, but in no case less than the amount of $1.65 million;

b.  On the second cause of action, declaring Defendants' conduct complained of herein to violate New York common law, and compelling Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial, but in no case less than the amount of $1.65 million;

c.  On the third cause of action, declaring Defendants' conduct complained of herein to violate New York common law, and compelling Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial, but in no case less than the amount of $1.65 million;

d.  On the fourth cause of action, declaring Defendants' conduct complained of herein to violate New York common law, and compelling Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial, but in no case less than the amount of $1.65 million;

e.  On the fifth cause of action, declaring Defendants' conduct complained of herein to violate New York common law, and compelling Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial, but in no case less than the amount of $1.65 million;

f.  On the sixth cause of action, declaring Defendants' conduct complained of herein to violate New York common law, and compelling Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial, but in no case less than the amount of $1.65 million;

g.  On the seventh cause of action, declaring Defendants' conduct complained of herein to violate New York common law, and compelling Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial, but in no case less than the amount of $1.65 million;

h.  On the eighth cause of action, declaring Defendants' conduct complained of herein to violate New York common law, and compelling Defendants to pay Plaintiffs compensatory damages in an amount to be determined at trial, but in no case less than the amount of $1.65 million;

i.  On each and every cause of action for which punitive damages are recoverable and warranted, judgment against the Defendant named with respect to that

cause of action for punitive damages in an amount to be determined at trial, but no less than $5 million.

j.   Award Plaintiffs pre- and post-judgment interest;

k.   Award Plaintiffs reasonably attorney's fees; and

l.   Grant such other relief as this Court may deem just and appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL.**

Dated: September 18, 2014

RUTA SOULIOS & STRATIS LLP

By: _____
Joseph A. Ruta, Esq.
Ruta Soulios & Stratis LLP
1500 Broadway, 21st Floor
New York, NY 10036
Tel: (212) 997-4500
Fax: (212) 768-0649

*Attorneys for Plaintiffs*

Exhibit A

# Southwest Energy Portfolio
## Premiere Power, LLC

# Preliminary Information Memorandum

9/9/2009
By:  New Pinnacle, LLC & Signature Business Alliance, LLC
Authors:  John Jankovic & James Olson

CONFIDENTIAL

**DRAFT VERSION**

## TABLE OF CONTENT

DISCLAIMER ........................................................................................................... 2

INTRODUCTION ..................................................................................................... 3

EXECUTIVE SUMMARY ........................................................................................... 4

RISKS & OPPORTUNITIES ....................................................................................... 8

    CURRENT MARKET ............................................................................................ 8

    VENTURE RISKS................................................................................................. 8

    OPPORTUNITIES.............................................................................................. 10

VENTURE DETAILS ............................................................................................... 12

    STRATEGY........................................................................................................ 12

    LEADERSHIP .................................................................................................... 15

    OPERATIONS ................................................................................................... 28

    AFFILIATES ....................................................................................................... 31

DUE DILIGENCE ................................................................................................... 35

    PROJECT SELECTION ....................................................................................... 35

    SCHEDULE ....................................................................................................... 37

FINANCIAL SCENARIOS ........................................................................................ 39

    VENTURE FINANCING ...................................................................................... 39

    FINANCIAL ASSUMPTIONS .............................................................................. 39

    VALUATION & SESITIVITIES ............................................................................. 44

APPENDIX ............................................................................................................ 45

    ENTITY STRUCTURE DIAGRAM ....................................................................... 45

    POWER ASSUMPTIONS.................................................................................... 46

    FINANCIAL ASSUMPTIONS & DETAIL VALUATION ........................................... 47

    STANDARD TRIBAL OPERATING AGREEMENT ................................................. 49

**DRAFT VERSION**

## DISCLAIMER

Premiere Power, LLC ("The Company" or "P2") has mandated New Pinnacle, LLC ("NP") and Signature Business Alliance, LLC ("SBA") as the financial agents (the "Agent(s)") to advise and assist in the development of an energy portfolio initially in the central and southwestern United States (the "Projects"). The Company has authorized NP & SBA to issue this confidential Preliminary Information Memorandum ("PIM") to prospective investors in connection with the issuance of debt for the Projects on the terms and conditions outlined herein (the "Financing"). The PIM is intended to provide preliminary information in order to assist the recipient in deciding whether it wants to continue further consideration of the Financing for the purpose of making an offer.

All of the information, statements, opinions, forecasts, projections, comments and assumptions in this PIM, which is not comprehensive, have been supplied by or on behalf of The Company and it's affiliates, which have not been verified by the Agents or any of the Agent's affiliates. The Company has taken reasonable care to ensure that the information is true and accurate in all material respects. The information includes projections provided by or on behalf of The Company in respect of future performance. These projections reflect various assumptions made by The Company concerning anticipated results.  Neither the Agents, nor their officers, directors, employees, agents, advisors and affiliates make any representation, warranty or undertaking, written or implied, as to the accuracy or completeness of this PIM or any other information made available to any prospective participants. It should not be assumed that the information contained herein will remain unchanged after the date hereof, or that any update of the PIM or of any of the information herein will be provided to the prospective participants. The Agents do not undertake to review the financial condition or affairs of The Company or of any of its affiliates or to advise prospective participants of information except as expressly provided in the documentation relating to the Financing. The Agents makes no representation or warranty to any person with respect to all or any part of the PIM in relation to any information, statement, forecast projection opinion or comment set forth in the PIM or in any accompanying documentation.

This PIM is being furnished in order to provide background information which may assist the prospective participant in obtaining a better understanding of the business and operations of the projects, and the terms and conditions of the Financing described herein and should not be used for any other purpose. This PIM is not intended to provide the basis of any credit decision or other evaluation and should not be considered as a recommendation by the Agent that any recipient of this PIM participates in the Financing described herein. In particular, each prospective participant receiving this PIM acknowledges that, in making its decision whether to commit to the Financing described herein, it will undertake its own credit analysis and make its own decision, independent and without reliance upon the Agents and its subsidiaries and affiliates, and based on such documents and information as it, in its sole discretion, has deemed appropriate.

Neither the Agents, nor its officers, directors, employees, agents, advisors or affiliates shall have any liability, for negligence or otherwise, to any of the prospective participants or to any other person in connection with the information contained within the PIM or otherwise released to the prospective lenders in connection with the Purchase, and consequently, the Agent accepts no responsibility whatsoever, for negligence or otherwise, for any action taken or omitted to be taken by any party on the basis of any data included in or omitted from the PIM or any other information supplied by the Agent.

No representation or warranty is or will be made in respect of any information, facts, statements, circumstances or opinions relating to the energy sector or real estate, any demographic statistics, any projections, sensitivity analysis identified in this PIM.  Unless otherwise stated herein, the information provided is a product of The Company and distribution of the PIM is strictly prohibited.

**DRAFT VERSION**

## INTRODUCTION

**Premiere Power, LLC** ("The Company" or "P2") will serve as the holding entity and parent for a variety of energy, real estate and commodity business ventures.  Premiere Power, LLC is a newly formed limited liability corporation (LLC) in 2009 under the laws of the state of Delaware. The objectives of The Company are summarized as follows:

The Company will develop and operate a portfolio of power facilities initially located in the central and southwestern United States.  The Company will also serve as the operating partner for tribal trust and tribal nation power agreements, nationally.  The portfolio of power plants may include any mixture of private and Native American power facilities.  In order to cater to different demands between the central and western markets, facilities located on the western section of the portfolio may be developed as combined-cycle solar facilities and power facilities located in eastern sections of the portfolio may be combined-cycle cogeneration power facilities.

Two (2) of the initial proposed power plants, which will provide perpetual cash flow for future operating and investing activities will be located in Oklahoma with near-future expansions targeting central and western states.  Initial plants aim to provide a dual benefit to Premiere Power, LLC shareholders as owner-operating partners for 30 years and tribal partners with power infrastructure perpetually.  The balance of this PIM will focus on the two initial facilities.

**The Mission Statement** of The Company is to develop and market innovative energy facilities that will deliver cost competitive power and cogeneration commodities to our clients within the business and residential sectors of the market place, while maximizing the shareholder value of Premiere Power, LLC and our affiliate tribes.

**New Pinnacle, LLC** ("NP") is a financial services company located in Irvine, California.  NP and their affiliates have been retained for due diligence and advisory on The Company's Southwest Energy Portfolio.  NP is authorized to execute non-disclosure and non-circumvent agreements and solicit pricing and term agreements from potential buyers.  NP serves an array of select asset management, banking, energy, engineering, insurance, mortgage and lending, real estate, private equity, software and venture capital firms. Website: www.newpinnacle.net

**Signature Business Alliance, LLC** ("SBA") is a financial services company located in Tulsa, Oklahoma.  SBA and their affiliates have been retained for due diligence and advisory on the The Company Southwest Energy Portfolio.  SBA is authorized to execute non-disclosure and non-circumvent agreements and solicit pricing and term agreements from potential buyers. SBA serves a variety of clientele across asset management, entrepreneur, mutual funds, real estate and other markets.

**DRAFT VERSION**

## Executive Summary

**The Company** will be a new entity formed in 2009 as a Limited Liability Company under the state of Delaware. The Company will serve as the issuer for any and all debt and equity interests ("Financing"), which will be privately placed. The Company will also serve as the manager ("Manager") for all aspects of the power plant operations, commodity operations and the real estate developer ("Developer") for all facilities.

The Company will manage daily operations and maintenance via an experienced network of out-sourced affiliates familiar with The Company's operating structure and leadership. The professional services affiliates will be contracted to co-manage the construction of the power plants, hot house operations and to manage the various operating activities of The Company under The Company's purview.

The Company will have four initial profit centers: (1) the generation and sale of energy, (2) the generation and sale of commodities (tomatoes) from power cogeneration facilities, (3) the third business profit center, as needed, will be a real estate development and management division to ensure proper proprietary facility design and manage portfolio risks for The Company, and (4) the asset management group, which will invest in projects and trade assets to enhance the profitability of the enterprise. Additional profit centers may be included in later years to compliment the initial organization as the Board of Directors decides.

> **The Energy Profit Centers** of The Company will develop, operate and own (in part or whole) multiple "state of the art" power facilities. Initially, these facilities will be located in states across the central and western United States, with specific sites to be determined during due diligence. Where appropriate, the power facilities will be combined with solar power sites to boost power production (expected in later developments along western states) and cogeneration commodity units to utilize the heat by-product of the facility.

> **The Commodities Profit Centers** of The Company will develop and operate a "state-of-the-art" cogeneration hydroponic greenhouse, where appropriate, which uses the steam and heat from the generation of electric power to grow tomatoes that are marketed regionally. This subsidiary will seek other innovative and organic products to market in addition to tomatoes. The commodities division will utilize federal 8A programs for Native American Tribes, which provide preference to tribal commodity providers with government installations.

> **The Real Estate Development Profit Centers** of The Company will maximize current talent by employing leadership and affiliates to conduct the real estate development and management functions for each facility. The real estate development function will include project management, controls, due diligence and financing functions along

**DRAFT VERSION**

with any other development related activities not otherwise out-sourced.  As needed, this division will also serve as a real estate management group.

**The Asset Management Profit Center** also known as the holding entity for The Company, will provide on-going project due diligence and asset management.  This profit center will serve daily as a performance management, risk management and strategy group for the enterprise and will work across the other divisions and the Board of Directors on acquisition, divestiture and investment strategies to maximize the profitability of the assets and projects in the holding entity portfolio.

**The Legal Structure** of The Company is designed to facilitate operational effectiveness under a private equity-type asset management model.  The Company will serve as the holding entity for a number of real estate, power and commodity operating subsidiaries. The legal structure is designed to meet power plant regulation requirements and limit risk across facilities.  It is anticipated that each power plant operated by The Company will be owned by a separate limited liability company with The Company serving as the Managing Member and sole owner. Similarly, the commodity operating entity will exist as a separate limited liability company with The Company serving as the Managing Member and sole owner.

**The Operations Structure** of The Company will include four operating divisions (development, engineering and maintenance, facility operations and outsource operations).  The development division will support pre-project analysis, facility installation and financing.  The engineering and maintenance division will support the other divisions with facility design, engineering, construction and maintenance, as needed.  Facility operations will provide the daily on-site operations for each facility during their operating life.  The final division, outsource operations is designed to provide cost effective access to industry leading experts under a variable operations model for facility support, general business administration and outsourced business units such as IT, HR and Legal.

**The Strategy** of The Company will be to mitigate critical risks for The Company during the fixed operations term of 30 years per plant under Native American tribal trust, tribal purchasing agreements, facility design and affiliate-member contracts.  The fixed term of the power cogeneration contracts establish a fixed term agreement that provides substantial revenue potential for The Company during the 30 year period, while providing the partnering-tribe power infrastructure, which will provide power self-sufficiency for the tribe long-term. The tribal trust nature of the contracts, provides tribal land for the facility at no additional cost, which provides multiple tax, retained early investment and real estate benefits for The Company and partner-tribe.  The power purchase agreements establish fixed cap rates for gas (the balance is paid for via the tribe) and fixed margins (power escalators exist on the raw cost to ensure fixed margins).  Finally, the design of the facility as a cogeneration facility provides a parallel product strategy via the generation and sales of commodities (tomatoes) and mitigates power overflow risks, by requiring local utilities to by the overflow at competitive market rates.

**DRAFT VERSION**

**The Leadership** of The Company consists of three sections of leadership across complimentary asset management, engineering, finance, legal, operations, project management, public health and strategy leadership. The three sections of leadership are:

> The Board of Directors, which consists of the CEO and the majority and minority members of the company who have no potential conflicts or ancillary benefits from the company.

> The Advisory Members, which consist of key engineering, legal, operating and regulatory affiliates who are minority members of The Company with additional out-sourced support functions for The Company over the 30 year operating agreement. The Advisory Members are affiliates who have been key in the development of the facility design, partnerships and operating relations.

> The Advisory Non-Members, which consist of additional engineering, legal and operations affiliates who will be critical to the success of The Company over the 30 year operating agreement. The Advisory Non-Members will be under on-going support agreements to complete leadership and operations needs of The Company.

**The Finances** of The Company consists of debt, equity and retained earning strategies that will be core to the success of The Company. The holding entity will operate as an asset management group to effectively monitor the performance and risk of each facility and execute the financial strategy for the greatest benefit to shareholders.

> The Debt Strategy of The Company includes the issuance of an initial 30 year note for the funding of two gas combined-cycle cogeneration power facilities in conjunction with two Native American tribes. Funding options are designed to provide a lucrative and relatively low-risk investment for debt holders, while maintaining competitive fixed obligations for The Company.

> The Equity Strategy of The Company is designed to provide the freedom to develop facilities that are cost effective under unique, industry leading, profitable subsidiaries, while divesting any poor performing or premium priced facilities in part or whole to maximize The Company's shareholder value. The equity strategy also includes the retention of approximately 15% membership interest as a reserve account for future financing and incentives use as deemed necessary by the Board of Directors across the development and operating life of the projects.

> The Retained Earning Strategy of The Company will be to maximize long-term value for the shareholders, while balancing annual dividend payment obligations (determined annually by the Board of Directors). The retained earnings strategy will include further tribal trust (where federal tax law allows retained earnings to be re-invested on tribal land, tax exempt) and private power developments, where competitive. Additional

**DRAFT VERSION**

investments in infrastructure may include plant expansions, further cogeneration facilities and other complimentary real estate and utility related agreements.

The discounted cash flow (DCF) valuation of the 30 year operations of two tribal trust plants is estimated to be roughly $1.7 billion (discounted at 3% annually for inflation).  NPV for Net Income (NI) is estimated to be roughly $1.5 billion (discounted at 3% annually) with real cash over 30 years of operations at $2.7 billion.  The most material differences between DCF and NPV of NI are accounting timing difference and the inclusion of asset depreciation, which does not impact real cash (free cash flows).

**DRAFT VERSION**

## RISKS & OPPORTUNITIES

**The Current Market** for energy assets have corrected in recent years, resulting in competitive and often distressed pricing for gas and electricity.   Within the macro-economic factors related to this venture, the mortgage and credit crisis leading to the 2008 and 2009 recession has provided a variety of credit, commodity, energy and human resource supply and pricing corrections.   Each of these corrections are projected by the Congressional Budget Office (CBO) and Department of Energy (DOE) to be temporary, with pricing and demand projections recovering in 2011 and following years.   As a result the current market has presented a number of key risks and urgent opportunities relevant to the timing of the venture.

**VENTURE RISKS** can be categorized into two known key risk categories – market risk and development risks.   The known risks are summarized below.   Since commodity and energy markets change regularly, additional risk factors will be identified and vetted with mitigation plans on an on-going basis.   A common risk for most new ventures, competition, is mitigated up-front via a power purchase agreement, whereby the Comanche and Osage Nations agree to purchase the facilities full-time volume at a set rate (eliminating competition).

**The Development Risks** are temporary risks that are critical throughout the development phases of each plant.   These risks are less fluid than the market risks, though they can have a material impact on costs, resources and schedules.   Development items that The Company expects to remain static during the development phase include: (1) entity structure, (2) plant design, (3) key board members and operating affiliates, (4) demand for the product following development.   The static nature of these items results in a material decrease of risks for plant and commodity operations.   The anticipated development risks include:

### Development Risks

| Risk | Description | Risk Level | Mitigation |
|---|---|---|---|
| Funding | Material delays in funding may result in contract cancellations and changes in market factors disfavorable to the current real estate opportunities | 3) High | Utilize private funding options with known, pre-qualified investors.  P2 will combine assets as needed for deal backing. |
| Affiliate Contracts | Risks of negotiating effective contracts for P2 operating margin requirements | 2) Moderate | Use current affiliates from comperable operating agreements.  Contract terms have been verbally agreed and contracts are being negotiated. |
| Schedule Delays | Delays in schedule could result in the material accrual of costs and postponement of profitability | 1.5) Low - Moderate | Use of competitive pre-filtered operating affiliates, real estate and tribal land agreements. |
| Sourcing Delays | Delays in plant equipment could delay schedules and result in plant configuration changes. | 1) Low | Equipment has been identified with GE and other partners and is in queue for each plant. |
| Power Purchase Agreement | Negotiations of Power Purchase Agreements | 1) Low | Critical terms verbally agreed too under rate sheets and letters of intent.  Contract negotiations under way. |

**DRAFT VERSION**

**The Market Risks** are evolving risks that maybe critical through-out the life of the plants. These risks are more fluid than the development risks, though The Company has mitigated the most material market risks under power purchase agreements and cutting-edge design strategies. The anticipated development risks include:

### Market Risks

| Risk | Description | Risk Level | Mitigation |
|------|-------------|------------|------------|
| Change in Real Estate Value | While both commercial and residential markets nationwide are expected to continue to correct or platue during 2009, early correcting markets can increase in value earlier then late correcting assets. The proposed assets for this portfolio include early correcting assets with time sensitivity. | 3) High | P2 has agreed to terms with a tribal allottee for the acquisition of existing individual tribe land for addition to the nations trust. Second facility will use existing trust land under lease agreement. |
| Competing Projects in Markets | Competing projects could pose a material risk under delayed schedules. The cost of entry and short-development cycle are likely to deter late entrants. | 1.5) Low - Moderate | Use of pre-qualified investors and pre-selected affiliates and suppliers under an experienced staff and model. |
| Energy Price Changes | The changes of energy consumption can result in disfavorable pricing for gas and power. | 1) Low | The most conservative projections are used in the financial models. An index rate has been included in the contract with fluctuations passed through. |
| Green Technology | Current political policies are favorable to new green entrants in power. Gas power is at much lower of carbon taxing or regulation risks than coal and oil, though mild forecast are projected for risk management purposes. | 1) Low | P2s efforts use gas power generation combined with commodities and hedging. P2 will also plan to invest in green technology for future projects. |

The most material market risks have been mitigated under contracts with the buyer (partnering-tribe), contracts with critical engineering and operations personnel, and the plant design: (1) real estate supply and changes in real estate values, (2) material increases in gas prices, (3) competing for talent to engineering or operations, (4) demand for the product following development. The static nature gained via the mitigation plans results in a material decrease of risks for future plant and commodity operations.

**DRAFT VERSION**

**THE OPPORTUNITIES** for The Company under the current distressed economy are material. The Company has the opportunity and ability to begin development of facilities that will begin operations in roughly two to three years, as the economy is projected by the Congressional Budget Office and Department of Energy to recover. Additional forecast by the Federal Reserve Board of Governors projects inflation to become a primary concern in two years, following the economic recovery. The Company will be positioned to take advantage of the recovered market under optimal timing while mitigating inflationary risks to government installations and the distributed community. The following opportunities present the most material opportunities to the timing and structure of the initial power facilities.

**Cogeneration Facilities** present a material benefit to power facilities in the central US for multiple reason. First, the development of a cogeneration power facility on tribal trust land allows for the use of Federal Regulation 8A, which provides preferential sourcing of commodities from Native American tribes. Second, the cogeneration of commodities under a hydroponic power heated operation provide for optimal growing conditions for many fruits and vegetables. The heat generated from power facilities is a consistent by-product of the facility, which provides hot house climates under no additional cost. Finally, many states require local utilities to purchase power from cogeneration facilities. While The Company does not expect the tribal partners to encounter any difficulty in distributing power under pre-established competitive rates, the final benefit does mitigate an ancillary risk to both The Company and affiliate tribes.

**Tribal Trust Agreements** between Native American tribes and public companies have increased significantly over the past decade, due primarily to the reduction of permitting hurdles and ease of access to land use. Utilities on Native American land operate primarily under the Tribal Council's purview or native nation law. As opposed to lengthy state and local permitting processes, Tribal agreements are typically designed where the tribe owns the facility and the partner owns a percent of cash flow for an agreed contractual period – typically the initial life expectancy of the facility (excluding total refurbishment). The Company's leadership has a long history of working with tribal councils for utility agreements and has established numerous opportunities across the continental Unites States where those agreements can be executed.

**Energy Prices** across nation have corrected for gas, oil, coal and power since the summer of 2008. The decline in energy prices has posed material risk for many oil and gas companies and the risk of carbon taxes has further increased the strain on oil and coal companies. As a result the public financial statements of most energy companies reflect material declines in investing and many companies have consolidated or eliminated divisions hurt most by declines in commodity prices.

**DRAFT VERSION**

In contrast, The Company has accounted for the distressed price levels, erratic inflation rates and variable consumption volume within The Company's forecast. P2 will seek to capitalize on the change in market volume and price. The earliest power plant completion is scheduled for the end of year 2, post funding. Both the Congressional Budget Office and Department of Energy anticipate a material recovery in energy prices and demand by 2011 – a perfect time table for the launch of operations for The Company power plants. Similarly, inflation rates are forecasted by the Congressional Budget Office, Department of Energy, Federal Reserve Board and Blue Chip to be minimal during development (protecting development costs) and stronger leading into 2012 and beyond (which will allow for greater margin for The Company and related nations under relatively fixed rate cost structures.

**Employment for Native American Nations** and the surrounding communities will add a material benefit for the affiliate nations & tribes. The power and cogeneration facilities will provide employment opportunities for technical, managerial and line-level facility functions. The facilities are also expected to provide marginal incentives for the expansion of supporting functions such as fire, police and other community labor.

**Commodity Prices & Complimentary Operations** are also a material benefit for The Company's operations model. Similar to price corrections for all consumables in 2008 and 2009, the price of tomatoes has declined. The Company's operations model is not financially dependent on the addition of hot-house tomato operations; however, the opportunity to pair power plant operations with hot house operations adds two benefits. The model creates and combined cycle process, which is easier to obtain permitting for under most state and regulatory processes. The model also provides a simple means for a relatively clean and cost efficient addition to the cash flow model. An ancillary benefit of the combined generation facility is the diversified operations model, which is complimentary and fairly simple to maintain.

As discussed in the operations structure above, the federal 8A program will provide preferential sourcing of commodities as an additional revenue source with minimal risk. The tomatoes generated from the facilities are expected to be of higher demand than the majority of tomato production in the US, since the commodities produced at the facility are grown in a highly controlled hydroponic hot house facility with no pesticides, waxing, chemicals and climate changes – purely organic.

**DRAFT VERSION**

## VENTURE DETAILS

**THE STRATEGY** of The Company is to deploy a rapid deployment model with ease of launch under a diverse, but complimentary operations model. The model focused on implementing four key elements collectively that will maximize shareholder value and eliminate common barriers to new power plant ventures – financial, management, operating affiliates, power purchase agreements, real estate and regulation.

> **The Financing Strategy** is designed to reduce risks to investors while shortening the time for implementation and profitability. Two options exist for the financing strategy of The Company – (1) debt issuance, backed with the credit of our power purchase partner or (2) debt issuance backed with additional assets for security. Both debt options are anticipated to be under a 30 year term with fixed payments to reduce variability under the future cash flows of The Company.

> Where applicable, The Company will target the acquisition of below market value real estate assets for future facilities. The timing for the purchase and development of gifted tribal trust land (land that will be bought by The Company and gifted to the tribe under the power purchase agreement) is ideal across the United States. In one of the two initial power facilities, land will be acquired at a competitive rate (reduced materially over the past year) for addition to the nations land trust and development of the new power facility.

> **The Management Strategy** is serviced by preselecting leaders under each core function of the company before the engagement begins. By preselecting key talent, The Company has mitigated knowledge and experience risks for the enterprise and enlisted key leadership experienced in the core needs of The Company - finance, information technology, green technology, power plant operations, power plant development and maintenance, out-source management, real estate and strategy (RE: The Leadership).

> **The Operations Strategy** of The Company will compliment The Company's internal talent with an established network of operating affiliates under a variable operations model to minimize the impact of variability on The Company's cash flow. The operating affiliates for this entity are selected from The Company's history of top performing affiliates experienced in critical operating functions, who will simplify the on-going management of each division while providing immediate infrastructure for a rapid launch strategy. Each of the operating affiliates have been associated with projects under the 21st Century family of companies and were preselected for their performance in the industry and loyalty to The Company and our vision. Each affiliate operating agreement will be established under fixed cost, fixed margin, pay-for-performance or similar agreements, which will aid in managing the performance for each division of out-sourced work for The Company. As The Company increases the projects in the portfolio, additional permanent staff will compliment the fixed functions.

**DRAFT VERSION**

**The Power Purchase Strategy** of The Company will mitigate a critical risk for new power plant operations. Many planned power projects incur regulatory limitations, competitive risks or risks of volatile energy prices under purchase agreements. Additional risk can occur where established purchase agreement do not exist, which bares the greatest risk and inhibits profitability under unstable markets. To mitigate these risks The Company has developed two power purchase strategies under binding power purchase strategies – Tribal Trust Agreements and Combined Cycle Cogeneration Facilities.

> The Tribal Trust Agreements ("TTA") are implemented as Native American assets on Native American Nation land, which eliminate obstacles across local regulations, monopolies and financing hurdles. TTA agreements provide immediate assets and jobs for the partnering tribe and long-term cash flow under tribe and community consumption for The Company, via a majority partnership interest in entity cash flow (typically for 30yrs).
>
> In addition, retained earnings that are retained on tribal trust land and reinvested for expansion or complimentary projects are non-taxable via the Indian Federal Reinvestment Tax Act. This strategy will be used by management where it presents the opportunity for material benefits to shareholder value.
>
> The Combined Cycle Cogeneration Facilities ("CCCF") are implemented as power and commodity production combined operations, including power plants and hydroponic hot house commodity operations. Cogeneration operations also eliminate material barriers to entry in power purchase agreements within the utility network. It is expected that as more cogeneration facilities are developed over the next decade and regulation will increase for the launch and development of new power agreements for this facility. Thus, timing for these operations is critical (RE: "Commodities Division").

**The Real Estate and Regulations Strategies** of The Company are integrated into the Finance and Power Purchase Strategies mentioned above. The implementation of TTA facilities will facilitate immediate access to real estate without an acquisition charge (via tribal land) in some cases and create minimum regulation via tribal agreements under Native American law. Where applicable, CCCF facilities will be partnered with distressed real estate for asset backing as low cost site acquisitions to minimize real estate and financial risks.

**DRAFT VERSION**

**THE OWNERSHIP** of The Company includes equity ownership issued to private companies, the Board of Directors, managers of The Company and critical affiliates. The Board of Directors (BOD) compose an aggregated individual interest of 17% ownership of The Company.  The Advisory Council (AC) affiliates compose an additional 15% aggregated individual interest in The Company.  The balance of equity membership is composed of 15% reserved equity for future incentive and investments (as required by the BOD) and 53% of aggregated corporate membership interest.

| Members Breakdown | BOD | AC | Company % |
|---|---|---|---|
| John Jankovic | X | | 5% |
| John Slattery | X | | 5% |
| Jerry Jankovic | X | | 1% |
| Joseph Antonini | X | | 1% |
| Robert Takia, MD | X | | 1% |
| Sandra Dyche | X | | 1% |
| Stephen Brevig | X | | 1% |
| Tom Gudgel, Esq. | X | | 1% |
| Wes Watkins | X | | 1% |
| Mike Medock | | X | 5% |
| Jim Olson | | X | 5% |
| John Harrington | | X | 5% |
| Urban Electric Systems, LLC | | | 20% |
| Reserve Account | | | 15% |
| Dufkova International, LLC | | | 10% |
| 21st CEH, LLC | | | 10% |
| Grand Lake Resort Property, LLC | | | 5% |
| Security, Equity & Yields, LLC | | | 4% |
| 21st Century Morongo Energy, LLC | | | 2% |
| North Coast Properties, LLC | | | 2% |
| **Total % of Ownership:** | | | **100%** |

The entities above with ownership interest in The Company do not poses a competitive threat to The Company and each firm has been instrumental in the development of relationships and intellectual capital used for The Company's pending projects.  With exception of Morongo Energy, the companies with a membership interest have authorized the Chairman of the Board, Jerry Jankovic to represent their interests in Premiere Power, LLC.  The 21st Century Morongo Energy, LLC equity interest will be represented by Sandra Dyche or a designated proxy.

# DRAFT VERSION

**THE LEADERSHIP** of The Company encompasses a variety of talent experienced in real estate development, utility and power development, finance, asset management, sales, procurement, outsource management, information technology and operations. In addition, The Company will utilize a network of critical affiliates to manage development and daily operations while serving as the project management and operations head for each venture. The below officers of the company include executives, internal and external, with established relationships and value-added performance across the 21st Century family of companies (affiliate organization and minority member of The Company).

Leadership for The Company is divided into three groups: (1) Board of Directors, (2) Advisory Council members and (3) Advisory Council non-members. Each group is composed of membership leaders and/or managers of The Company who will compose the core decision making body for The Company.

> The **BOARD OF DIRECTORS** include the Chairman of the Board, the Chief Executive Officer and five non-management members who hold no function or authority that may pose a potential conflict of interest in leadership duties. The Board of Directors will meet quarterly for standard board affairs and as needed for critical decisions impacting shareholders, enterprise objectives or major debt-holders. The members of Board of Directors are each listed in the Board of Director bios, below.

**DRAFT VERSION**

## BOARD OF DIRECTOR BIOS: NON-MANAGING

**Premiere Power, LLC – Chairman of the Board ("Chairman"):**  Jerry Jankovic is the Chairman of the Board, the voting majority member of The Company and the Chairman and CEO of the 21st Century family of companies. Mr. Jankovic has a proven track record over more than 40 years of founding and managing successful businesses in the utility, real estate and related industries. Mr. Jankovic's core responsibilities will be to lead the board through regular meetings, provide oversight to enterprise decisions and mentor the executive team and serve as lead developer for each project.

Prior to 1971, Mr. Jankovic co-managed Yucaipa Valley Waste, a regional refuse treatment and recycling utility known today as Burrtec Waste Industries. Between 1971 and 1986, Jerry owned and operated one of the largest recreational vehicle companies in the United States, offering manufacturing, sales, distribution and service divisions. After selling his RV company in 1986, Mr. Jankovic was retained to serve as the Managing Partner for The Pyrolysis Corporation, a California based company with an innovative ecologically friendly waste-to-energy technology.

In 1989, Mr. Jankovic formed 21st Century Vapor Waste, Inc. a technology company specializing in waste to energy conversions, with projects in the US, Mexico and Spain. While managing international operations for 21st Century Vapor Waste, Mr. Jankovic had the opportunity to joint-venture with two of the largest engineering firms in the world, Metcalf & Eddy and Fomento De Construcciones Y Contratas, SA, on major utility projects in California, Mexico and Spain. These engagements were the beginning of a partnership with Metcalf & Eddy lasting through 1999.

In 2000, Mr. Jankovic formed 21st Century Eagle Energy, LLC to serve as the holding entity for the development of a 200 MW combined cycle, co-generation power plant in Southern California. This company also owns intellectual properties related to the power plants and other industries. In addition to his core utility services, Jerry has been a critical leader for an array of complimentary agricultural, commercial, hospitality and residential real estate development projects.

Mr. Jankovic was honored in 2005 by President George W. Bush as "California Businessman of the Year" for his work in power plant emission and his engineering proposal for a project to reclaim and modernize the Salton Sea. Mr. Jankovic earned his top-secret Crypto security clearance under the US Army Security Agency, Special Operations Unit (know currently as the National Security Agency).

**DRAFT VERSION**

**Premiere Power, LLC – Member of the Board of Directors ("Member"):** Joseph E. Antonini is a member of the Board of Directors and a minority member of The Company. Mr. Antonini is the current Chairman and CEO of Andretti Winery Group, Limited (AWGL) and the distinguished former Chairman and CEO of Kmart Corporation, where he worked for over 30 years.

At Kmart, Antonini rose from a management trainee at the then S.S. Kresge Company in 1964, to Chairman of the giant retail chain in 1987. He is credited with leading Kmart into a new era by launching a store renewal program of unparalleled scope in retail history. This included expansion of the retailer's specialty store concepts, along with introduction of the Kmart Super Center, both contributors to setting new sales and profit records.

Under Mr. Antonini's leadership, the company launched aggressive productivity improvement initiatives and developed a world-class quality assurance and technical design facility. The company also began its first global expansion into Mexico, Singapore, and Europe. Under Antonini's direction, Kmart also expanded in new markets including Alaska, Hawaii, Long Island, New York City, Guam and the Caribbean. In addition, Mr. Antonini expanded Kmart Corporation into the largest mutli-specialty retail group in the world, including Borders Book Group, The Sports Authority, Office Max, Payless Drugstores, Pace Warehouse Clubs and Builders Square.

Mr. Antonini has held key positions with a number of other Board of Directors, including Chairman of the National Retail Federation and the National Minority Supplier Development Council. He has served on the Board of Directors of Chrysler Corporation, Ziebart International, Polaroid Corporation, Michigan Bell, NBD Bank, Shell Oil Corporation, Economic Club of Detroit, and a Trustee for the National Italian American Foundation. Mr. Antonini received the Horatio Alger Award and was recognized as the most distinguished alumni in 1992 from West Virginia University. A native of West Virginia, Antonini holds a Bachelor of Science degree from West Virginia University.

**DRAFT VERSION**

**Premiere Power, LLC – Member of the Board of Directors ("Member"):** Wes Watkins is a minority member and member of the Board of Directors of The Company. The experience that Wes brings to business and rural development in the state of Oklahoma will be instrumental in leading the Board of Directors and The Company through regulatory requirements and community relations.

In 1974, Wes was first elected to public office when he won a seat in the Oklahoma State Senate. His success in state legislature led Wes to the US Congress. Two years later, he was elected to the US House of Representatives, where he served for four years on the Banking and Finance Committee and  as well as the Science and Technology Committee.   Wes served another10 years on the House Appropriations Committee, where he was instrumentally in increase funding for rural economic development and education programs in Oklahoma.

Mr. Watkins ran for governor in 1990 and 1994. In 1996, Wes won election again for the Third District Congressional seat of the US House of Representatives, which he had previously held from 1977 to 1991. Wes won by wide margins for re-election in 1998 and in 2000. He served on the House Ways and Means Committee since his return to Congress in 1997, and was appointed to the House Budget Committee in 2001.

Since his service with the US House of Representatives, Mr. Watkins has been instrumental in molding the business climate for the state of Oklahoma and developing further economic relationships outside the state. Wes has been a leader in education funding as well, where he has worked to support further technical training at universities like his alumni, Oklahoma State University.

Mr. Watkins is an avid alumnus of Oklahoma State University, where he earned his Bachelors and Masters degrees in Agricultural Education. Since his education at OSU, Wes has led many technological initiatives for state and local communities, which earned him entry to the OSU "CareerTech Hall of Fame" and naming rights to the OSU Technology Center in 1991.

**DRAFT VERSION**

**Premiere Power, LLC – Member of the Board of Directors ("Member"):** Dr. Robert Takla is a member of the Board of Directors and a minority member of The Company. Dr. Takla is the Medical Director and Chair of Emergency Medicine for the Saint John's Hospital Network of greater Detroit, Michigan. Robert has also served as the Medical Director for the US Region 2 North Medical Bio-Defense Network and is a frequent guest speaker for pharmaceutical conferences.

Dr. Takla began his career at the University of California, San Francisco as a research assistant for the department of physiology and nephrology and a mental health assistant at Walnut Creek Psychiatric Hospital in Walnut Creek, California. Following medical school, Robert completed his post doctorate internship and medical residency in emergency medicine with Wayne State University – The Detroit Medical Center.

In 1996, Takla assumed dual Assistant Medical Director positions with Holy Cross Hospital of Detroit and Saratoga Community Hospital of Detroit – both in emergence medicine. Dr Takla was recruited by Saint John's Northeast Community Hospital in 1999, where he became Medical Director and Clinician for emergency medicine. Robert's purview with Saint John's has grown significantly the past decade, becoming the Vice-Chief and Chair in training for Emergency Medicine in 2007 and Chair of Emergency Medicine in 2008.

In addition to Dr. Takla's medical pursuits, he has been instrumental to Saint John's, in automating their emergency operations, working with a number of medical operations out-source providers to bench mark and automate operations with higher quality of service. Takla is also, routinely recruited by major pharmaceutical companies for feedback on medication and guest speaking engagements for medications that lead the industry. Dr. Takla is also adjunct faculty at Michigan State University, School of Medicine and Wayne State University, School of Medicine where he serves as Clinical Assistant Professor for both medical schools.

Robert is an active alumnus of the University of Michigan, Ann Arbor where he completed his Bachelors of Science in biology and psychology, his Doctor of Medicine from the elite University of Michigan, School of Medicine and his Masters of Business Administration from the University of Michigan's top-tier Ross School of Business.

Robert will be instrumental to the Board of Directors in providing general feedback on public health and safety while working with the other Board members to strategically develop and operate power facilities that optimize shareholder value and lead the industry in health conscious technology.

**DRAFT VERSION**

**Premiere Power, LLC – Member of the Board of Directors ("Member"):** Tom H. Gudgel, III is a named partner of Coffey, Gudgel, McDaniel, a full service law firm in Tulsa Oklahoma.   As a minority member and member of the Board of Directors, Tom will advise on general legal considerations for the board, Oklahoma state laws and work in conjunction with Premiere Powers legal affiliates, Chadbourne & Parke, LLC and Fredricks, Peebles & Morgan, LLP for corporate and Native American legal matters.

Mr. Gudgel was admitted to the practice of law in 1990. Tom's areas of concentration include Litigation, Business Law, Estate Planning, Asset Protection, and Oil and Gas. He has represented notable companies such as Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and State Farm Fire and Casualty Company.

Tom was born and raised in Tulsa. He obtained a BA in Finance from the University of Oklahoma in 1980. Tom worked for a large independent oil and gas company prior to attending law school at the University of Tulsa College of Law. While attending law school, Tom won the Alternate Dispute Resolution Competition, was a member of the Energy Law Journal, and a member and Exchequer of Phi Delta Phi legal fraternity.

Tom has successfully handled hundreds of cases for his clients involving ERISA, insurance defense, and employment and contract disputes. Tom has taught seminars on ERISA, estate planning and asset protection. His published cases include Weldon v. Dunn, 962 P.2d 1273, 129 Ed. Law Rep. 485 (Okl. 1998) which sustained a motion for summary judgment for his clients in a negligence suit. He is a member of the American, Oklahoma, and Tulsa County Bar Associations.  Website: www.cgmlawok.com

**DRAFT VERSION**

**Premiere Power, LLC – Member of the Board of Directors ("Member"):** Sandra Dyche is currently serves as a founding principal of New York City Regional Center, LLC ("NYCRC"), is a minority member of The Company and a member of the Board of Directors.   As a founding principal of NYCRC, Ms Dyche was designated as an approved Regional Center by the United States Citizenship and Immigration Services. Ms. Dyche invests foreign investor's funds into large scale real estate projects in conjunction with New York City government agencies and top developers, helping foreign investors earn US permanent residency and create jobs and economic growth in New York City. Ms. Dyche is presently investing and developing a direct reduction iron plant with an iron ore concession in Koton Karfe, Kogi State, Nigeria.

Ms. Dyche also participated in the financing of the conversion of a 130,000 square foot warehouse into a residential condominium known as the Atalanta in lower Manhattan. In addition to her background in real estate and resource development, Ms. Dyche owned and acted as a chairperson of Hasca of America through which she established the exclusive right to market the superior high-tech abrasives and ceramics of Feldmühle of Germany. She was in charge of Feldmühle product distribution in the United States, Southeast Asia and South Korea.

Ms. Dyche was previously a business partner with her late husband, William Edmond Dyche, of Houston, Texas. Mr. Dyche was a founder and senior partner of Dyche & Wright Attorneys at Law and also founded Houston First Savings Association, which had over 60 branches in Houston, Dallas and Austin. Mr. Dyche served as a commissioner of the Texas Department of Public Safety and Highway Patrol for 13 years. Mr. and Ms. Dyche financed and developed approximately 2,000 acres of commercial and residential development known as the Mission Bend Project near Houston.

In 1988, Ms. Dyche endowed a Presidential Scholarship in Law at the University of Texas Law School Foundation.  In 1981, Ms. Dyche founded and organized the Park National Bank in Houston, Texas. Since 1981, Ms. Dyche has served on the Board of Directors of Chemical Bank, an affiliate of J. P. Morgan Chase in Houston.  As a board member, Ms. Dyche will assist Premiere Power LLC with investor relations and real estate related advisory.

Ms. Dyche is fluent in English and Korean and she is proficient in written Chinese.

**DRAFT VERSION**

### BOARD OF DIRECTOR BIOS: MANAGING

**Premiere Power, LLC – Chief Executive Officer ("CEO"):**   John Jankovic is the Chief Executive Officer, minority member and member of the Board of Directors.  John is also the majority member and President of New Pinnacle, LLC, a finance, risk and strategy advisory firm with clients in the US and Asia.  Mr. Jankovic has nearly 20yrs of finance, project and strategy leadership experience.   In addition to his executive oversight duties, John will retain direct purview of the performance, risk, strategy and treasury.

Mr. Jankovic started his career with Travelers Insurance.  Following registration as a financial advisor, John migrated into investment banking where he worked progressively across sell side analytics and advisory services.  With Cruttenden Roth (the investment banking division of E*Trade) and Smith Barney Inc., Mr. Jankovic advised a loyal portfolio of institutional clients, retirement funds and trusts.

John joined the H&R Block enterprise in 1997 and transformed his investment banking and advisory practice into a part-time consulting service, currently New Pinnacle, LLC.  Under the H&R Block enterprise, John and his team were credited with the successful integration of AMCA Mortgage into Option One Mortgage, the elimination of high risk products from the origination portfolio, numerous cross-company ventures with Wall Street and international technology affiliates, and the restructure and divestiture strategy for the $1.1billion sale of Option One Mortgage Corporation to Wilbur Ross.  In 2007, Mr. Jankovic completed his mortgage and capital markets divestiture strategy and resigned from H&R Block to launch New Pinnacle, LLC fulltime.  His purview at resignation included long-range planning, performance management, the enterprise project management office (PMO), enterprise risk management and strategy advisory to the board.  The CFO function will be split between the CEO and WTKW (re: affiliates).

Mr. Jankovic has advised numerous Fortune 500 and mid-cap companies in the areas of asset management, competitive analytics, enterprise strategy, finance, project & PMO management, corporate restructuring and risk management.  21st Century Energy Holdings, SEK Energy, Baxter Designs, Christian Architects and other manufacturing, energy, medical device, mining, real estate and software companies have been included within John's engineering clientele.  Mr. Jankovic has also consulted with JP Morgan Chase, Bear Sterns, Smith Barney, Lavishmar Capital and other banks, investment banks, hedge funds, real estate groups, private equity, venture capital and start-up firms on assets (debt, equity & exotics) in excess of $650 billion.

John received his Bachelors degree from Vanguard University, MBB in statistics from the University of San Diego and MBA from the University of Michigan, Ann Arbor (Ross).  He is a member of the Global Association of Risk Professionals (GARP), the Institute of Mathematical Statistics (IMS), the International Society for Bayesian Analysis (ISBA) and the Project Management Institute (PMI).

**DRAFT VERSION**

**Premiere Power, LLC – President, Advisory Council (PAO):**   John Slattery is a minority member and the President of the Advisory Council, managing outsourced operations. Currently, Mr. Slattery is the Energy Industry Managing Director for Hewlett Packard/EDS. John joined the EDS Energy team in 2006, focusing his efforts on the utility, oil & gas and chemical industry sectors, developing and continuing relationships with clients across a diverse energy industry footprint. Prior to joining EDS, John was a consultant and senior executive in globally-active, growth-oriented public/private fossil and nuclear utility, energy and high tech product and service companies wherein he led worldwide sales and operations (50+ countries).

Mr. Slattery served as COO/CTO of Composite Power Corporation (CPWW) where he led operations, sales, M&A, technology OEM and licensing, integration and development of power, energy, IT and telecom infrastructure projects and facilities worldwide in support of FORTUNE 500 clients' "mission critical, high nines" BPO and ITO requirements.   John served as VP Worldwide Sales and Marketing for Premium Power Corporation (fka Powercell Corporation), a recognized global leader in fuel cell, renewable energy and advanced power technology solutions for high value utility, BPO/ITO, telecom, military and C&I applications of Global FORTUNE 250 companies. Serving as COO/Managing Director and Division Manager for AGC Manufacturing, Inc., John built worldwide operations, JVs and partnerships, and sales for AGC's industry leading packaged power generation and cogeneration systems, OEM Kawasaki gas turbines, project management, and EPC services supporting development and operations of customers' global utility, power generation, energy and cogeneration BPO/ITO facilities.

At Sausse Holdings Groupe, John built and directed technology integration SBUs for high tech manufacturers and BPO/ITO service providers. For Entergy Corporation (NYSE), a leading diversified electric and gas IOU, John served in executive roles directing centralized service company support of regulated electric (106 fossil, renewable and nuclear plants) and gas utility operations, developing and directing Entergy's largest BPO/ITO SLA portfolio. John directed Entergy's deregulation efforts, developing 14 new entrepreneurial SBUs targeting FORTUNE 500 customers worldwide with newly branded product lines commercializing Entergy's BPO/ITO services, data center and network infrastructure, and proprietary technologies (IT, engineering and telecom). John began his career with Boeing's Minuteman Program, managed data centers for Norwest, and as a management consultant for The Company NA.

John holds an MBA from the A. B. Freeman School of Business at Tulane University with international studies in conjunction with Hautes Etudes Commerciales (HEC Paris). John is a former three-term city councilman and utility regulator with significant municipal utility (water, sewer and electric), Superfund Project and civil defense experience. Slattery has held a Top Secret – Crypto clearance.

**DRAFT VERSION**

**Premiere Power, LLC – President, Facility Operations ("PFO"):**  Stephen R. Brevig is the President of Facility Operations, a member of the Board of Directors and a minority member of The Company. Mr. Brevig will be responsible for the daily on-site operations for the power and commodity facilities and the daily management of The Company's General Electric account, in conjunction with the President of Engineering and Maintenance.

Brevig is currently the Managing Executive Director for Black & Veatch where he has been responsible for operating a transmission and power supply utility in the Midwest part the United States.  His responsibilities included P&L, power supply coordination and delivery, transmission operations, substation, marketing, resource and financial planning, and strategy for municipal utilities and rural electric cooperatives with interconnections to Western Area Power Administration and other IOUs.

He has worked with stakeholders for power supply, transmission delivery and managed various contracts, service and developing partnership arrangements with Generation & Transmission (G&Ts), Municipals, WAPA (PMA) and IOUs.  He has been involved in more than 10 power plant construction to operations transitions including establishing business operating systems, procedures and responsibilities, financial P&L reporting and multi-owner business systems accountability, budgeting and financial forecasting.

Steve also has participated in a leadership role in electric restructuring at a state level for over 5 years with National restructuring implications.  He has successful developed and built a telecommunications fiber SONET network business on utility transmission system and developed broadband business.

Steve has also been responsibility for all aspects of IT & Energy Management Services management to G&T included developing business and IT roadmap of the "As-Is and To-Be" technology and operating environment, platforms and requirements; define critical operating systems plan, develop new communications plan and managed transition to new platform for statewide WAN/broadband communications (350 delivery points), develop technology disaster recovery and business continuity plan for business systems.  His role also included managing day-to-day Information Systems, Energy Management and Telecommunications Division staff. In addition to restructured and transformed his staffs into service oriented business model.

Mr. Brevig obtained his Bachelors of Science in Business Administration from the University of North Dakota and his Bachelors of Science in Computer Science from Bismarck State College.

**DRAFT VERSION**

**ADVISORY COUNCIL MEMBERS** include minority members of The Company who hold external functions or interests, which prohibit their position on the Board of Directors. The Advisory Council Members will meet monthly for standard management affairs and critical operations decisions. The Advisory Council Members may be invited to Board of Directors meetings for advisory purposes in their related areas of expertise. The Advisory Council Members will be included in membership voting requiring all members of The Company, but will not vote at Board of Director meetings.

**ADVISORY COUNCIL, COMPANY NON-MEMBERS** include a team of key advisors to the Board of Directors who are non-members of the company. The Advisory Council Non-Members will be under agreements for services under specific areas of support for The Company. The Advisory Council Non-Members will meet with the Board of Directors and the managers of The Company as needed for the delivery of The Company's regular business. The Advisory Council Non-Members are listed in the Affiliate section of this document.

| AC Member | Membership | Function | Experience |
|---|---|---|---|
| James Olson | 5% | Financing & RE Development | President, SBA, LLC (Financing Advisory, Investor Affairs, Development Advisory) |
| Mike Medock | 5% | Industry Engineering | President, ESA Engineering (Power & Utility Engineering) |
| John Harrington | 5% | Tribal Affairs & Governance | Indian Affiars, Tribe Leadership |
| Oliver J. Armas, Esq. | 0% | Corporate Law | Partner, Chadbourne & Parke, LLC (Corporate legal affairs) |
| Tom Fredricks, Esq. | 0% | Native American Law | Partner, Fredricks & Pelsinger, LLC (Native American law) |
| Andrew Morton | 0% | Power Plant OS Operations | Director, General Electric (Power Plant Division) |
| Richard Engel (via Mike Medock) | 0% | Power Maintenance | President, PMSI (Power Projects & Maintenance) |
| Various | 0% | Plant Feasibility & Industry Advisory | Account Manager, Black & Veatch (facility feasibility) |

**DRAFT VERSION**

### ADVISORY COUNCIL, COMPANY MEMBER BIOS

**Signature Business Alliance, LLC – Chief Executive Officer ("SBA"):** Jim Olson is CEO of SBA, advisor to the Board of Directors and a minority member of The Company. Mr. Olson will provide critical advisory support for real estate development, venture financing and investor relations. Mr. Olson has a proven track record of founding and managing successful businesses in the investment banking and related financial services industries.

Jim launched his career in 1968 under the Executive Training program at First National Bank of Saint Louis, Missouri. From 1970 thru 1972 Mr. Olson served in a Controller function for two Fortune 200 companies headquartered in Chicago and Minneapolis.

In 1974 Mr. Olson founded an advisory firm and broker-dealer securities firm ICB Management Group with a national client base. During the next 12 year period he provided advisory services to non-profit organizations nationally and raised over $200 million as the principal for numerous security offerings.

Between 1987 and 1991, Mr. Olson served as management for Acquisitions & Development of Century Healthcare Company in Tulsa, OK. The Century Healthcare Company owned and operated the nation's largest chain of adolescent residential treatment centers. The company was sold to a major public healthcare chain in 1991.

In 1992, Mr. Olson was co-founder of Excel Energy Technologies, a Tulsa, OK based business, which owns a patented technology for controlling total building environments. The company formed a joint venture with Public Service Company of Oklahoma and was sold to a major public energy company in 1998.

Mr. Olson is currently the Managing Partner for two large mixed use real estate developments, the Managing Partner of Jamar Investments, a real estate development advisory company and the President of Signature Business Alliance, LLC, a private equity advisory firm.

Jim received his Bachelors degree in finance from Drury College and MBA in finance from Washington University, Saint Louis.

**DRAFT VERSION**

**Premiere Power, LLC – President, Engineering and Maintenance ("PEM"):**   Michael Medock is a minority member of The Company and the President of engineering and maintenance for The Company.  Michael will be responsible for the plant construction, engineering and maintenance functions with the support of General Electric (GE), ESA Engineering, and PMSI as needed.   Mr. Medock is one of the leading energy engineering experts in North America, with a vast portfolio of projects, patents and expert testimonies.  Michael is the current President of ESA Energy, LLC and SVP of engineering projects for Power-plant Maintenance Specialists Incorporated (PMSI), in Orange County, CA. www.esaenergy.com & www.pmsipower.com

Mr. Medock has over 35 years of experience directing successful engineering and construction companies with programs for utility companies and construction firms.  He has managed over 60 electric power projects ranging from 3 MW to over 2500 MW using fossil (coal/gas/oil) and alternative fuels such as solar, gasification, biomass and waste-to-energy, as well as nuclear installations.

Over the past 35 years, Mr. Medock has managed over $25 billion of utility projects of all types.  His scope of responsibilities includes, but is not limited to, estimating, scheduling, engineering, procurement, construction and operations.  The type of projects he has designed, constructed and managed are numerous.

In addition to the above wide range of responsibilities, Mr. Medock has also served as the authorizing agent before the California Energy Commission in certification of several large power plants. The majority of his history is based in the California utility industry which is one of the most demanding regulatory states in the country.

In addition to a long history of successful assignments, Mr. Medock has been a frequent speaker at utility industry functions through the United States and worldwide.  He has authored numerous articles on Energy and Environment and is recognized as an authority in the field of electrical power generation. One of Mr. Medock's plants, located in Huntington Beach, CA was rated one of the cleanest thermal plants in the United States.

# DRAFT VERSION

**THE OPERATIONS** of The Company, which will be a newly formed limited liability company in 2009, will serve as both the developer and manager for all operations. The Company will consist of (1) a Corporate Holding group and four divisions including (2) development advisory, (3) engineering and maintenance, (4) facility operations and (5) the Advisory Council and outsourced operations. Several professional services affiliates will be contracted to co-manage the construction of the facilities and manage various activities of The Company as outlined in the below sections.

The Company also will serve as the "holding company" for a number of operating entities and the issuer of all debt and equity interest. It is anticipated that each power plant operated by The Company will be owned by a separate limited liability company with Premiere Power, LLC as the sole Member and Managing Member.



**Operations Structure Image** (Appendix 1: larger image)

**DRAFT VERSION**

Premiere Power, LLC: Southwest Energy Portfolio | Confidential

## Premiere Power, LLC

| | Corporate Holdings | Development Advisory | Engineering & Maintenance | Facility Operations | Outsource Operations |
|---|---|---|---|---|---|
| **Management** | **John Jankovic**<br>Chief Executive Officer | **James Olson**<br>SBA (Outsourced) | **Mike Medock**<br>President, Engineering | **Steve Brevig**<br>President, Facility Operations | **John Slattery**<br>President, Advisory Council |
| **Operating Description** | Corporate Holdings is both the corporate operations of the company and the asset management division. The division will provide investment analysis, performance management, risk management, strategy and valuation support for The Company. | Development Advisory is the project analysis, real estate advisory and project financing group that will support the financing and development advisory requirements for power plant, cogeneration and general real estate projects for The Company. | Engineering and Maintenance provides all construction, facility design, engineering and on-going maintenance support requirements for The Company. This division will lead maintenance in conjunction with the Outsourced Operations division. | Facility Operations will provide on-site leadership for all power, commodity cogeneration and utility operations of The Company. This division will lead daily operations in conjunction with General Electric and the Outsourced Operations division. | Outsourced Operations will provide daily leadership for the network of outsourced affiliates across each of the other divisions. The division will also lead the general Administration, AP/AR, Contracts, HR, IT and Procurement functions for The Company. |
| **Division Functions** | **Functions:**<br>Advisory to the Board<br>Board Member<br>Risk Management<br>Enterprise Strategy<br>Asset Transactions<br>Investment Analysis<br>Performance Mgmt<br>Asset/Project Valuation<br>Project Due Diligence<br>Treasury | **Functions:**<br>Advisory Council Mmbr<br>Development Advisory<br>Financier Relations<br>Project Analysis<br>Project Financing<br>Project Relations<br>Real Estate Analysis | **Functions:**<br>Advisory Council Mmbr<br>Construction<br>Engineering<br>Plant Design<br>Cogeneration Design<br>Feasibility<br>Plant Advisory<br>Maintenance | **Functions:**<br>Board Member<br>Distribution<br>Plant Operations<br>GE Account Mgmt<br>Cogeneration Ops.<br>On-site Administration<br>Power Transmission<br>Regulator Relations<br>Facility Advisory<br>Daily Tribe Relations | **Functions:**<br>Advisory Council Mgmt<br>Board Member<br>Accounting<br>Accounts Payable<br>Accounts Receivable<br>Contracts & Licensing<br>Compliance<br>General Administration<br>Information Technology<br>Outsource Mgmt<br>Procurement<br>Security |
| **Affiliates Supporting Division** | **Affiliates:**<br>Chadbourne & Parke<br>Clayton Woodrum<br>Deloitte & Touche<br>Debt Holders<br>Duff & Phelps<br>Equity Holders<br>Various Banks<br>Various Asset Mgmrs | **Affiliates:**<br>21st Century EH<br>Black & Veatch<br>ESA Engineering<br>OneCap<br>SBA<br>Various Financiers<br>Various RE Brokers<br>Various Developers<br>Various Tribes | **Affiliates:**<br>Black & Veatch<br>ESA Engineering<br>General Electric<br>PMSI | **Affiliates:**<br>Comanche Tribe<br>General Electric<br>Local Distributors<br>Osage Tribe<br>Local Utilities<br>Regulators<br>Southern Planes Elect. | **Affiliates:**<br>21st Century EH<br>Black & Veatch<br>Chadbourne & Parke<br>Comanche Tribe<br>Fredricks, etc. Esq.<br>General Electric<br>Hewlett Packard/EDS<br>Osage Tribe<br>Southern Plains Elect.<br>SBA<br>Weager & Co, Law<br>Various Banks<br>State & Federal Regs. |

**DRAFT VERSION**

*Group 1:* **Corporate Holdings** will operate as corporate operations and an asset management group for the purposes of analyzing and prioritizing the projects, assets and objectives for The Company. The group will include all investment, performance management, risk management and reporting functions of The Company. For purposes of The Company's operations, the corporate functions will include all non-development functions and all functions not directly related to the operations and maintenance of the power and hydroponic facilities such as accounting, finance, executive administration, legal, risk management, strategy and treasury. Corporate Holdings will outsource legal functions to CP and accounting to WTKW to manage variable functions under Premiere's network of experienced professionals.

*Group 2:* **Development Advisory** will consist of the real estate and facility development functions of The Company. For purposes of The Company's projects, the development functions will include all pre-operations contracts, design, documentation, due diligence, feasibility, licensing, planning and project management functions in coordination with the construction and financing affiliates.

*Group 3:* **Engineering & Maintenance** will consist of the construction, design, engineering and maintenance functions for the facilities. Engineering and maintenance will be supported with partially internal talent that is complimented with more robust out-sourced affiliates. The engineering and maintenance out-source providers have successfully supported the 21st Century enterprise and affiliate projects for over two decades.

*Group 4:* **Facility Operations** will consist of all raw and manufactured materials for the plants (COGS), and on-site operating, distribution and transmission functions for the power and commodity profit centers of The Company. The COGS items will include gas and equipment procurement. Operations, distribution and transmission will include contractual operations and maintenance agreements with General Electric to support the direct, day-to-day management and maintenance of the power plants.

*Group 5:* **Advisory & Outsourced Operations** will consist of all administrative, business operations and regulatory functions of The Company. Included in the division will be Human Resources, Out-source account management, Procurement, Operating Contracts and Legal, Information Technology, Security Monitoring and Compliance. This division will also house the Advisory Council executive advisory team that will be organized leaders from each of The Company's core affiliates to provide regular feedback to The Company's management and the Board of Directors for current and proposed operations.

**DRAFT VERSION**

**THE AFFILIATES** of The Company have been preselected based on performance under previous projects. The Company believes the selected affiliates offer advantages for their assigned functions compared to alternatives. Each of the below power and development affiliates have supported 21st Century projects previously and remain preferred vendor-affiliates. The commodity affiliates will be new additions to the operations, selecting local affiliates where tribal purchases do not acquire all commodities. Pricing for both tribal and local affiliates will be competitive for commodity operations to enable ease of entry. Each division of The Company will be supported with internal and outsourced operations as noted below.

**Black & Veatch (BV)** was founded in 1915, with specialties in infrastructure development in energy, water, telecommunications, federal, management consulting and environmental markets. The firm has more than 100 offices worldwide and is ranked on the Forbes "500" largest private companies in the United States.

BV has more than 9,600 professionals, operating in 70 countries on six continents. Its main office is in Kansas City, Missouri. As an engineering firm, they rank 4th in the world in power plant development. They rank 1st in the top environmental first abroad according to the Engineering News Record (2008). BV leads the industry in value creation for each of its stakeholders – clients, professionals, shareholders and business partners.

Premiere Power will benefit from its partnership with BV and will depend on their expertise for feasibility studies as well as engineering design consulting services on each of the power plants constructed. One of the key experts at BV will provide direct supervision for all professionals assigned to deliver services to Premiere Power.

**Hewlett Packard / Electronic Data Systems (HP/EDS)** is one of the largest and most respected IT Service companies in the world. HP/EDS specialize in managing security and billing for major companies around the world. The merger of HP with EDS sets this company in a class by itself. It can help its clients achieve "cutting edge" technology while providing the behind the scenes operating controls and management required to maximize profits.

HP/EDS competes with companies like IBM, Accenture and CSC. In every case, HP/EDS comes out on top in terms of delivering lower costs, improving operating efficiency and business growth. The company has a holistic approach to business technology which brings together expert knowledge, proven methodologies and global resources to achieve better business outcomes. The company is #9 on the Fortune 500 list by revenues and dedicates $3.5 billion (U.S.) annually to its research and development of new products, solutions and technologies.

**DRAFT VERSION**

Premiere Power will benefit from partnership and the direct management services of this company's professional expertise. The senior manager for all utility operations of HP/EDS will supervise the group of professionals assigned to Premiere Power and will assure the maximum success for all facets of the business.

**General Electric (GE)** management professionals will provide expert maintenance for generators under the management of ESA Engineering.   For years, GE has been the industry leader in "state of the art" generators for electric power generation along with the many other products and services it provides.  Based in Fairfield, CT, the company had sales last year (2008) of $182.5 billion and operating income of $19.1 billion.  They will partner with Premiere Power to assure the highest efficiency for the generating operation.

For each of Premiere Power's electric power plants, the company will use the LM6000, which is one of the most efficient gas run generators.  The LM6000 provides 54,610 shaft horsepower (40,700 kW).  It is rated to provide more than 43 MW with a thermal efficiency of 42%, making it one of the most efficient in the world.  Premiere Power has chosen this generator and the relationship with GE because of a long operating relationship and because they will provide 48 hour replacement should any of their equipment fail to operate.   This type of support assures Premiere Power it will have the best performance efficiency possible.

**ESA Engineering (ESA)** (www.esaenergy.com) specializes in the type of electric power plants The Company will be building.  The principal, Michael Medock has over 35 years of experience in engineering and construction of electric power plants.  He has managed over 60 electric power plant projects ranging from 3 MW to over 3100 MW using fossil (coal/gas/oil) and alternative fuels such as solar, gasification, biomass and waste-to-energy, as well as nuclear installations.  Mr. Medock has managed over $25 billion of utility projects and has a long-standing relationship with GE, having taught in their industry seminar training sessions relating to the use of GE equipment in electrical power generation.  He is considered an expert in the utility industry having authored several publications on energy and the environment.  One of his plants, located in Huntington Beach, CA was rated one of the cleanest thermal plants in the United States.

**DRAFT VERSION**

PMSI (www.pmsipower.com) is one of the top businesses in the world for maintenance of large utility operations. They provide comprehensive repair and maintenance services for electrical generation operations throughout the United States. In the utility industry, PMSI is considered the leader. Companies such as Bechtel and AEP frequently call on PMSI for assistance in upgrading or construction of large power generating projects.

PMSI is a privately owned and have been operating for over 20 years. Their owner and principal, Richard Engel, will manage all services required by Premiere Power and will work closely with ESA in construction of its power plants.

**Chadbourne & Parke, LLC (CP)** (www.chadbourne.com) is a New York based top tier law firm with 12 domestic offices and 8 international hubs, serving clients in all international markets. Founded in 1902, Chadbourne is a leader in the following practices: bankruptcy and restructuring, corporate, energy & climate change, insurance, intellectual property, litigation, project finance, real estate, tax and trust and estate. CP is recognized as one of the leading law firms in the renewable energy industry. More specifically, it has specialized in the evolution of the independent power industry. They have participated in the financing and structuring of all types of renewable energy projects ranging from wind, solar, geothermal, biomass, biofuels and ethanol, landfill gas and hydroelectric industries. In just this segment of the firm's business, there are more than 60 lawyers who specialize in the energy niche.

CP will not only represent Premiere Power on its construction and ramp up issues relating to its power plants, but the firm will support the on-going corporate legal needs of the company. The Premiere Power account will be managed by Oliver J. Armas, Partner.

**Fredricks Peebles & Morgan, LLP (FP&M)** is one of the leading law firms specializing in Native American issues. The founding partner for the firm is Thomas Fredericks. FP&M will represent Premiere Power on all contract issues related to the tribal laws and the structuring of the power plant ventures. Mr. Fredricks has served as both legal counsel and administrator for several Native American groups. He has worked for the Department of Interior as Assistant Secretary for Indian Affairs and is considered an expert in Indian Gaming issues.

FP&M will represent Premiere Power in negotiations and contract review, working closely with the company counsel Chadbourne & Parke, LLC.

**DRAFT VERSION**

**Woodrum, Kemendo, Tate & Westemer (WKTW)** (http://www.wktw.net) is one of the leading Certified Public Accounting firms located in the state of Oklahoma.  WKTW is a full-service accounting firm with services in tax planning and reporting, trust and estate tax, litigation support, financing and new ventures, accounting and bookkeeping, estate planning, valuations, divorce, fraud prevention and asset protection strategies. Clayton Woodrum will manage the Premiere Power account for outsourced accounting and bookkeeping purposes with standard annual audits and periodic quarterly audits.  WKTW will work with HP/EDS, who will manage A/P & A/R and Premiere Power, LLCs corporate holdings group, who will manage treasury functions directly.

**DRAFT VERSION**

## DUE DILIGENCE

**The Project Selection** for both the real estate backed power plants and the tribal trust power agreements will be determined during due diligence. Preliminary expectations for real estate backed power projects include one plant in each of the following states: Arizona, Nevada and New Mexico. Final site selection will be based on real estate prices, proximity to customers, serviceability of the site for affiliates, site related power purchase agreements and other factors identified during due diligence deemed to be material to the development schedule and five year NOI and ROE. The tentative

**The Electric Power Plant** project sites include the below opportunities, which will be vetted and modified as needed during due diligence. The Company has contracted the utility engineering firm of Black & Veatch to complete feasibility studies on two specific tribal sites for "state-of-the-art" electric power plants. The Company will provide management for all plant operations, part internally and part via our out-source affiliates.

> **Plant #1-** The first plant to begin development and operations will be located in the vicinity of Lawton, Oklahoma on Comanche Nation tribal trust land. The Comanche Nation is a self-governed entity with "nation" status under the US federal government. For the purposes of the power facility The Company will develop, the Comanche Nation has waved their self-govern rights to allow the site to be governed under federal law. The Comanche Nation facility will include roughly 75 acres of land and a 110k MW power plant with a cogeneration commodity site. The facility will house space for an adjacent 110k MW power plant to be built, if needed and will follow the site specifications below. Real estate for the facility will be acquired from an individual Comanche allottee and registered under the Comanche Nation tribal trust.

> **Plant #2-** The second plant to begin development and operations will be located in Oklahoma on existing Osage Nation tribal trust land. The Osage Nation is a self-governed entity with "nation" status under the US federal government. For the purposes of the power facility The Company will develop, the Osage Nation has waved their self-govern rights to allow the site to be governed under federal law. The Osage Nation facility will include roughly 75 acres of land and a 110k MW power plant with a cogeneration commodity site. The facility will house space for an adjacent 110k MW power plant to be built, if needed and will follow the site specifications below.

The strategy of The Company will be to package the initial power plants with a cogeneration hydroponic tomato hot-house on-site. The mix will be roughly 75% power plant cost to 25% hot-house cost. The real estate will be entirely owned by the partnering tribe and the power and cogeneration facility will launch as the property of The Company, changing ownership to the tribe under a sale-leaseback agreement over a period of 30 years. The partnering nation will agree to fixed margin power contracts, typically starting at or near the current market rate.



At the close of the 30 year term, the partnering nation will have full ownership and operating rights to the power and cogeneration facilities or engage an additional 10-year term at the market rate.

**110MW Combined Cycle Cogeneration Power Facility Layout (provided by ESA Engineering, LLC)**

The power plants are gas powered power plants with "state of the art" technology to optimize the productivity of power to gas ratio, with minimal carbon footprint (see image below).  The engineering team The Company will employ, ESA Engineering, is among the most experienced and most honored team in the design, construction and maintenance for "state of the art" gas powered facilities (and comparable technology).

# DRAFT VERSION

Premiere Power, LLC: Southwest Energy Portfolio | Confidential

**The Schedule** for due diligence is conservatively planned to encompass a 2 ½ year period, from strategy and due diligence (mostly completed) through operations ramp-up for both facilities. The below schedule reflects the macro stages from pre-development through early operations with the following sections:

Orange: Pre-development
Green: Financing
Light Blue: 1st Facility
Dark Blue: 2nd Facility

| ID | Task Name | Start | Finish | Duration |
|----|-----------|-------|--------|----------|
| 1 | Strategy & Due Diligence | 1/5/2009 | 6/9/2009 | 22.4w |
| 2 | 1st Tribe Contracts | 3/2/2009 | 6/30/2009 | 17.4w |
| 3 | 2nd Tribe Contract | 4/1/2009 | 6/30/2009 | 13w |
| 4 | Investor Contract & Funding | 6/1/2009 | 7/31/2009 | 9w |
| 5 | Affiliate Contracts & Retainers | 6/19/2009 | 8/31/2009 | 10.4w |
| 6 | Facility 1: Permits | 8/3/2009 | 2/1/2010 | 26.2w |
| 7 | Facility 1: Engineering | 8/3/2009 | 8/1/2011 | 104.2w |
| 8 | Facility 1: Procurement | 8/3/2009 | 8/3/2011 | 104.6w |
| 9 | Facility 1: Power Construction | 2/1/2010 | 8/3/2011 | 78.6w |
| 10 | Facility 1: Cogeneration Construction | 2/1/2011 | 8/1/2011 | 26w |
| 11 | Facility 1 Operations Ramp-up | 8/1/2011 | 2/1/2012 | 26.6w |
| 12 | Facility 2: Permits | 2/1/2010 | 7/30/2010 | 26w |
| 13 | Facility 2: Engineering | 2/1/2010 | 2/1/2012 | 104.6w |
| 14 | Facility 2: Procurement | 2/1/2010 | 2/1/2012 | 104.6w |
| 15 | Facility 2: Power Construction | 8/2/2010 | 2/1/2012 | 78.6w |
| 16 | Facility 2: Cogeneration Construction | 8/1/2011 | 2/1/2012 | 26.6w |
| 17 | Facility 2 Operations Ramp-up | 2/1/2012 | 8/1/2012 | 26.2w |

**Pre-development** includes project due diligence, the power purchase contracts with each tribe and execution of affiliate and outsource partner contracts and retainers. Due to the retainer requirements of affiliates, the execution of affiliate contracts will follow the power purchase contract and funding stages.

**Financing** is the issuance of debt to support development operations and the infrastructure costs for the physical development of two initial power facilities. This phase runs partially parallel to the two contract sections and partially in tandem to condense the schedules while meeting deliverable stage requirements.

**DRAFT VERSION**

**Facility 1** is expected to begin development stages within 30 days of funding.  To provide for proper attention to each project by our development, engineering and advisory groups, facility one and facility two have been placed on schedules 6 months off from each other.  Both development projects are scheduled conservatively for 24 month development schedules with facility 1 running from month 1 through month 24.

**Facility 2** is expected to begin development state roughly six months after facility one begins development.  Both development projects are scheduled conservatively for 24 month development schedules with facility 2 running from month 7 through month 30.

# DRAFT VERSION

## FINANCIAL SCENARIOS

**The Venture Investing** for the two initial facilities includes a debt issuance in the form of a fixed term, fixed rate note to cover the two initial power facilities. The debt will be credit rated under the bond rating of the partner tribe as stipulated in the power purchase agreement. Expectations for interest rates on the note range from 6% to 10%, depending on the market and credit rating for each nation/tribe at issuance. The Company has projected a 30 year term for the note. The financials, herein, reflect the financing, investing and operating cash flows for start-up under the two initial projects only. Additional investment proposals will be prepared separately for projects that may be financed following the Comanche and Osage power cogeneration facilities.

The majority of self-governed tribes and self-governed Native American Nations (like the Comanche and Osage) working with The Company and The Company's affiliates are credit rated "BB" or higher. Where a tribe or nation does not have a "BB" or higher credit rating, The Company and the partnering body will package additional assets for as debt security for the facility financing package, known as asset backing.

**The Financial Assumptions** of the venture include the most conservative financial assumptions under both current and recovering economic markets. The cost assumptions have been stressed to reflect conservative forecasts for The Company over development and the initial 30 years of operating life (excluding any possible extensions to the facilities). The following financial assumptions follow the template of information on the Comanche and Osage facility valuation.

### Operating Activity Assumptions:

**The Power Revenue** for The Company under both the Comanche and Osage Nation power purchase agreements will be fixed during the thirty (30) year life of operations. The Company contractually owns all cash flow from facility operations during the 30 years of operations. The net fixed Base Rate for the facilities will be at or near $.16/KWhr with escalators that provide an additional 20% of the margin between the market rate and base rate (an estimated 20% of 2% inflation is factored in at 1.004/yr after year 5). The net base rate of $.16 = $.17/KWhr - $.01/KWhr consumed by transmission and distribution for the Comanche Nation and $.155 = $.16/KWhr - $.05/KWhr for the Osage Nation (excess T&D is passed through).

The power purchase agreements each require a contractual purchase minimum of 110,000KW on 8,256 hours annually, 688 hours monthly. An option to expand the facility to 220,000KW exists, which would double the revenue potential of the facility. However, the conservative rate of 110MW is used in the forecast and valuation of each facility.

**DRAFT VERSION**

Premiere Power, LLC: Southwest Energy Portfolio | Confidential

**The Cost of Goods Sold for Power (COGS)** includes (1) natural gas costs, (2) land and facility related costs, (3) operations and management costs and (4) insurance.

**1 – Natural Gas Costs:** The cost of power generation for The Company under both the Comanche and Osage Nation power purchase agreements will vary under a fixed index rate for the thirty (30) year life of operations. The index rate, $5.50/MM btu, reflects the fixed cost for gas that The Company will absorb, with any charges in gas prices above or below the fixed index rate being passed to the Comanche and Osage Nations.

**2 – Land & Facility Costs:** An additional cost that will be borne by each facility for the right to operate and sell on native nation land is a facility sale program where the facility will be under a delayed sale at the commencement of year 31 of operations. The sale will be an option for the nation with an opt-out option that engages a 10-year extension on the PPA at the market rate. As collateral for the potential purchase of the facility, a profit rebate program has been established for the related nation. During profitable years for the facility, an annual rebate to the nation is issued under the terms of the PPA. The PPA requires the rebate and lease account are managed by a third-party bank under the name of the nation (re: Comanche PPA in Appendix).

Due to land constraints on existing trust land, the land for the Comanche Nation and Osage Nation facilities will be purchased for roughly $1.8 million each and gifted to the nations as required for trust treatment under federal law. Both land use agreements will operate at a lease of 15% of the land value annually.

**3 – Operations & Management Costs:** Addition costs included into COGS for the power facilities are on-site operating and management (OM) expenses, estimated by ESA Engineering from previous projects to be roughly $18 million / year adjusted annually for a 3% inflationary increase.

**4 – Insurance Costs:** An estimated $1.8million / year is expected for insurance related costs. The insurance costs, which increases slower than the rate of inflation historically has been increased by 2%.

**DRAFT VERSION**

Premiere Power, LLC: Southwest Energy Portfolio | Confidential

**The Cogeneration Revenue** for The Company under both initial facility power purchase agreements will vary based on commodity rates in the community.   The base forecasted rate from ESA Engineering for historic pricing in the region is $27.50/ton.  The forecasted ramp up time from 0 to the 65 tons / month constant rate is six months for each facility. While inflation and changes in the competitive markets will resulting in higher pricing per ton of the 30 year operations period, the $27.50 has been forecasted as a constant to remain conservative.  The revenue projections for organic tomatoes compared to non-organic vary significantly, with favor to organic produce. The current market for tomatoes are below forecasts, with corrects expected to meet forecast.

**The Cogeneration COGS** for The Company under both initial facility power purchase agreements will vary based on changes in labor, seed and other raw materials for organic tomato and comparable production.   The average historic cost rate for tomato production in similar facilities averaged 67.5%. The Company has assumed the historic average as the average cost of production across the 30 year operations period.

**The Developer Costs** for the two initial projects include develop planning, licensing, project management, brokering fees to the development advisory, SBA, and business formation, legal and general developer costs.  The net developer charge for both projects is estimated at $10M under a 30 month schedule.

**The Sales, General & Administrative (SG&A)** costs for The Company include (1) office and travel expense, (2) non-management board compensation, (3) legal reserve and legal related expenses, (4) management expense.

> **1 – Office and Travel** expense includes an estimated $90k per month for office space, administrative costs, office supplies, travel expenses and related costs. The monthly cost increases in the cash flow by 3% annually as an adjustment for inflation.

> **2 – Non-Management Board Compensation** is scheduled as $100k per year per board member for each year of development and one year following development. The Company has sought highly skilled executives for the Board of Directors to lead The Company through early hurdles while focusing on a long-term highly profitable project portfolio for perpetual income.  Adjustments are scheduled on an annual cycle following the first year of operations at a 3% increase, when The Company meets or exceeds performance expectations.

**DRAFT VERSION**

**3 – Legal Reserve and Legal Expenses** include a $1 million legal reserve accrued in year 1 of development to ensure adequate funds are available in the case of any disputes or unexpected legal expenses.  The annual 30 year legal expense forecast includes $1 to $1.5 million for contracts, legal advice on current assets and future projects, general business advice, tax law and any other related legal matters.

**4 – Management Compensation** begins in the first scheduled month of operations as an aggregate $1 million for all leadership and general expense not located at the power facilities.  Management expense increases by 1% of Net Operating Income to reward leadership in more profitable periods, afford support functions and align the majority of management compensation with the performance of The Company.

**The Contingency Cost** includes a $5 million contingency for any unexpected delays in schedule, changes in rates or other variables that may impact the development cost requirements.  These funds have been added to the forecast despite the conservative nature of all cost and revenue assumptions to protect the development phase of both projects.

**The Depreciation Charge** of facility equipment includes the net cumulative cost of power and cogeneration facilities under the Comanche and Osage projects.  The Company is awaiting a vote by the US Congress for the extension of a bill which will allow The Company to depreciate all facility costs over a seven year accelerated depreciation period.  However, a 30 year depreciation model has been used in the current forecast to remain conservative with all assumptions.

**Investing Activity Assumptions:**

**The Property, Plant and Equipment (PP&E)** includes forecasts for the development and maintenance of the power facility and the development of the cogeneration facility (cogeneration maintenance is included in the cogeneration COGS estimate).  Each power facility is estimated by ESA Engineering, a leader in power plant development, to cost $154,500 million per 110k KW facility.  Each power facility is expected to have a 50 year life before another complete fabrication.  During the 30 year life of the facility, The Company has forecast $1 million in materials maintenance costs per ten years.  The cogeneration facility adjacent to the power facility has been forecast by ESA Engineering to cost $24 million per 110k KW power site.

**DRAFT VERSION**

## Financing Activity Assumptions:

**The Financing** assumptions include the most conservative forecasts from early discussions with note underwriters.  For the purposes of The Company's initial forecast and valuation, the following assumptions have been used:

| | |
|---|---|
| **Note Term:** - - | 30 years |
| **Note Rate:** - - | 10%, fixed |
| **Financed Amount (FA):** | $470 million |
| **Annual Payment Amount:** | $49 million |
| **Net 30 Year Payments:** | $1.47 billion |
| **Cumulative Interest:** | $1 billion ($700million, @ 3% inflation) |
| **Investor Profitability Ratio** | 3.13 = $1.47B / $470M = (30yr Payments / FA) |

Additional changes may occur during underwriting of the note, including interest rate reductions via PPA credit ratings, collateral or government guarantees.

**DRAFT VERSION**

**The Valuation** of The Company uses a discounted cash flow (DCF) valuation model.  DCF measures the free cash flow of the company (free from any liabilities of commitments) and computes a discount over time to identify the net present value (NPV) of the cash flow.  The most material difference between the NPV of Net Income (NI) and DCF is depreciation.  Since depreciation is not a real cash transaction, it has been removed from the cash flow to identify real cash transactions and the cumulative cash flow from The Company under the Comanche and Osage projects, discounted over time to present value (discounted at 3% annually for inflation).

In addition to the DCF value, The Company cash flows have been discounted by a hurdle rate, a rate that The Company expects any project to surpass annually to become a viable alternative to other fair market assets.  The hurdle rate for this valuation is 10% annually.  Most equity valuations used by the Investment Banking industry use the DCF model for "fair market valuations."  The future value (FV) of cash flow is also provided to understand the cumulative real cash transactions (cash flow not discounted for inflation).

<u>Valuation:</u>

| | |
|---|---|
| Discounted Cash Flow (DCF), @ 3% discount: | **$1.7 billion over 30 yrs** |
| Discounted Cash Flow (DCF), @ 10% hurdle: | $746 million over 30 yrs |
| Real Cash Flow (no discount on FCF): | $2.77 billion over 30 yrs |

<u>Key Financial Ratios:</u>

| | |
|---|---|
| Profitability Index (Aggregate Cash / Debt): | **(2.77B / 500M) = 5.5, risk mitigated return** |
| Ave. EBIT Margin (EBIT / Sales): | 38%  (62% of Sales = COGS + SG&A + Depr + Tax) |
| Ave. EBIT Debt Coverage (Payment / EBIT): | 37%  (Note payments at 10% are only 37% of EBIT) |
| Ave. NI / EBIT Ratio: | 46%  (46% of EBIT becomes NI, 44% is Free CF) |
| Ave. Current Ratio* (aka Quick Ratio): | 1.4 (Current Assets / Current Liabilities w/ note pmt) |
| | *does not include cumulative cash from RE or interest |

**Sensitivities for Changes to the Valuation** includes adjustments for changes in depreciation schedules and changes to critical cost and revenue assumptions outlined below.  Each change assumes that all other factors remain the same, unless otherwise stated.

- **Depreciation:** if depreciation changes to a seven year accelerated depreciation model, The Company estimates an additional $30 million will be added to 3% DCF, as savings on taxes and other related items that adjust according to changes in NI.  Under The Company power purchase agreement with the Comanche and Osage Nations, a real estate sale-lease back program begins in year 8, which will limit depreciation to the first five years of operations.

**DRAFT VERSION**

- **Gas Prices:** for The Company are indexed at $5.50/MM btu, with changes above and below the rate passed on to the Comanche & Osage Nations.  No impact to the valuation will be incurred with changes in gas prices.

- **Interest Rate:** a 1% change in interest rate on the note will equate to roughly $11 million less in loan amount (roughly $459 million vs. $470 million) and an interest payment savings of over $200 million over the 30 years.  If all credit and market factors align for a 6% interest rate, the loan amount could be reduced to $428 million on cumulative interest payments of $500 million (50% savings) and a DCF valuation of $1.3 billion (@ 3% inflation).

- **Cogeneration COGS:** a change, up or down, in cogeneration COGS by 10% may result in a change in DCF by $50 million.

- **Facility Expansion:**  an expansion to <u>either</u> power facility by 110k KW under the same operating volume will result in an estimated net addition to DCF of $500 million if financed under 10% interest or an estimated $750 million if financed internally from retained earnings.

- **Margin Changes Due to Inflation:**  may result in greater margin as revenues increase at faster rates than costs under the known constraints and economic variables (all other variable constant).  To remain conservative, inflation has been factored into The Company's revenue at a minor addition of $.0025 in Y16 & Y26.  However, The Company is negotiating for 20% of margin increases due to inflation, which may result in substantially higher profits for The Company ($.02 increase = another $18M/year/plant).

# APPENDIX

**Appendix 1: Entity Structure Diagram**

**DRAFT VERSION**



**Appendix 2: Power Assumptions**

**DRAFT VERSION**

Premiere Power, LLC: Southwest Energy Portfolio | Confidential



**ESA HOLDINGS INCORPORATED**
25602 Alicia Parkway
Laguna Hills, California  92653

**ELECTRICAL GENERATING FACILITY**
Financial Analysis Summary 110 MW Combined Cycle
ESA CONFIDENTIAL

| Description | Case 1 | Case 2 | Case 3 | Case 4 |
|---|---|---|---|---|
| Total KW | 110,000 | 110,000 | 110,000 | 110,000 |
| Installed Cost | $ 154,000,000 | 154,000,000 | 154,000,000 | 154,000,000 |
| Operating Reserve | $ 15,077,624 | 15,077,624 | 15,077,624 | 15,077,624 |
| Total Investment Cost | $ 169,077,624 | 169,077,624 | 169,077,624 | 169,077,624 |
| Total Draw For:     Months 1 to 6 | $ 25,361,644 | $ 25,361,644 | $ 25,361,644 | $ 25,361,644 |
| Total Draw For:     Months 7 to 12 | $ 50,723,287 | 50,723,287 | $ 50,723,287 | 50,723,287 |
| Total Draw For:     Months 13 to 31.5 | $ 92,992,693 | $ 92,992,693 | $ 92,992,693 | $ 92,992,693 |
| Total Draw For:     Months 1 to 31.5 | $ 169,077,624 | 169,077,624 | 169,077,624 | 169,077,624 |
| Operating Hours | 8,256 | 8,256 | 8,256 | 8,256 |
| Price Of Electricity US $/Kw | 0.0900 | 0.1200 | 0.1500 | 0.1700 |
| Annual Electrical Gross Revenue | 81,734,400 | 108,979,200 | 136,224,000 | 154,387,200 |
| Price Of Fuel US $/MM Btu | 5.50 | 5.50 | 5.50 | 5.50 |
| Annual Fuel Cost | $ (42,683,520) | $ (42,683,520) | $ (42,683,520) | $ (42,683,520) |
| O & M Cost | $ (18,163,000) | $ (18,163,000) | $ (18,163,000) | $ (18,163,000) |
| Insurance | $ (1,848,000) | $ (1,848,000) | $ (1,848,000) | $ (1,848,000) |
| Net Yearly Revenue | $ 19,039,880 | $ 46,284,680 | $ 73,529,480 | $ 91,692,680 |
| Ten Year Revenue Before Interest | $ 190,398,800 | $ 462,846,800 | $ 735,294,800 | $ 916,926,800 |
| Interest Payment - 7.644% Start End Of Year 4 Year 1 to 3 Permitting, Design, Construction | Zero Percent | Zero Percent | Zero Percent | Zero Percent |
| End of Year 4 and 1 Year Of Interest | $ 12,924,294 | $ 12,924,294 | $ 12,924,294 | $ 12,924,294 |
| Total Interest Payments End of Year 4 thru 10 | $ 77,545,762 | $ 77,545,762 | $ 77,545,762 | $ 77,545,762 |
| Net Ten Year Revenue Before -Tax Income | $ 112,853,038 | $ 385,301,038 | $ 657,749,038 | $ 839,381,038 |

| Discounted Cash Flow (DFC) = NVP of FCF | inflation discount rate of 3% | $1,709,212 |
|---|---|---|
| | discount hurdle rate of 10% | $746,752 |

| Real Cash Flow (Real Cash) =  FCF w/o Discount | | $2,768,461 |
|---|---|---|

| Investment Analysis (reflects 2-110MW projects*) | |
|---|---|
| Total Return on 1%: | Total = 27685 |
| NPV of $2M Invested *(Discounted 2%/yr)* : | NPV @ -2%/yr = 8522 |
| 32yr IRR (where .10 = 10%): | IRR on $2M = 0.14 |

*See subsidiary tabs for expansion plans.

**All Forecasts are Based on the First Project Only, After Development**

| | $500,000 | $1,000,000 | $1,500,000 | $2,000,000 | $5,000,000 |
|---|---|---|---|---|---|
| Investment Amount: | | | | | |
| Ownership Percentage: | 0.25% | 0.50% | 0.75% | 1.0% | 2.50% |
| Funding Equity: | 1,250,000 | 2,500,000 | 3,750,000 | 5,000,000 | 12,500,000 |
| Est. Total 30Yr Return: | 6,921,153 | 13,842,306 | 20,763,459 | 27,684,611 | 69,211,529 |
| Est. Ave. Annual Return: | 223,263 | 446,526 | 669,789 | 893,052 | 2,232,630 |
| Est. Ave. Annual Return%: | 45% | 45% | 45% | 45% | 45% |

### *Premiere Power, LLC*

September 17, 2009

Carol Leese
Chief Executive Officer
Osage, LLC
Energy Development Project

Ladies and Gentlemen:

Premiere Power, LLC, a Delaware limited liability company (the "Operator"), is pleased to make a non-binding proposal (the "Proposal") to the Osage Nation for the development, construction and operation of a 110 megawatt gas-powered cogeneration plant with an affiliated commodity site (the "Plant").

Under the Proposal, the Operator would lease the site land to the Operator pursuant to a ground lease (the "Ground Lease"). The Operator would build the facility on such site (using parts and services from GE, Black & Veatch, PSMI and other reputable vendors), and would enter into a power purchase agreement (the "PPA") with the Osage, LLC that would terminate 30 years after the commencement of the Plant's commercial operations. The Operator would retain all cash flows from the PPA, less operating expenses, rental payments under the Ground Lease, and a rebate that the Operator would pay to the Osage Nation at the end of each year.

In addition, the Operator proposes to enter into a purchase option agreement with the Osage, LLC (the "Option Agreement"), under which the Osage, LLC would have the option to purchase the Operator's interest in the Plant at the end of the term of the PPA. If the Osage Nation elect not to make such purchase, it would be required to enter into a new 10-year power purchase agreement with the Operator on then-current market terms.

The rebate that the Operator would pay to the Osage, LLC at the end of every year would be deposited into an account owned by the Osage, LLC but controlled by a third-party bank pursuant to an account control agreement (the "Control Agreement"). The Control Agreement would provide that a reserve will be retained in the account for the following purposes: (i) to reimburse the Operator for any losses it may incur during the first five years of the Plant's operations, (ii) to make the payment for the Plant under the Option Agreement, in the event that the Osage, LLC elects to purchase the Plant, and (iii) to make payments for power under the PPA that are past due. After the first five years of commercial operations, any amount (including interest) in excess of such reserve will be distributed to the Osage, LLC.

Summaries of the principal terms of the Ground Lease, the PPA, the Control Agreement and the Option Agreement (together, the "Agreements") are set forth in the attached Exhibit A.   Upon your acceptance of the Proposal, we will begin drafting definitive Agreements containing such terms, together with other detailed provisions that are customary for transactions of this nature.

We would expect the drafting and negotiation of the Agreements to take up to 30 days from the date of your acceptance of this Proposal.  During such 30-day period, in consideration for our drafting of the Agreements, you agree that the Osage, LLC will not, and it will cause its affiliates not to, engage in any discussions with any other party, or solicit or agree to or respond to any other proposal, regarding the development of any power plant.  This paragraph supersedes our prior agreement regarding exclusivity.

Other than the previous paragraph, which shall be binding on the Osage, LLC, this letter is not intended to be a legally binding agreement.  The parties shall not be subject to any obligations in respect of the Proposal unless and until definitive Agreements are executed by the parties, in which case such definitive Agreements shall control all aspects of the Proposal and supersede the terms described in this letter.  This Proposal is subject to the completion of all financial, legal, regulatory and other due diligence and the receipt of all necessary permits, third-party consents and financing.

We look forward to a long and mutually rewarding relationship with the Osage, LLC. Please indicate your acceptance of the Proposal by signing below.

Very truly yours,

PREMIERE POWER, LLC

By: _____

Name: Jerry Jankovic
Title: Chairman

By: _____

Name: John Jankovic
Title: Chief Executive Officer

Accepted:

OSAGE, LLC

By: _____

Name: Carol Leese
Title: Chief Executive Officer

EXHIBIT A

SUMMARY OF TERMS

**Ground Lease**

| | |
|---|---|
| Land: | 75-acre site located in or near Osage County.  The land is to be leased by the Operator from the Osage, LLC. |
| Term: | From the date that the land is acquired by the Osage, LLC to the expiration of the Term, as defined below. |
| Rent: | To be paid in monthly installments in accordance with Schedule I. |
| Landlord Obligations: | The Osage, LLC will be required to recognize the land as tribal trust land and take such other actions as may be required for the land to obtain such status. The Osage, LLC will be required to provide the land with access to local utilities. |

**Power Purchase Agreement**

| | |
|---|---|
| Term: | 30 years, starting on the date that the Plant's commercial operations commence (the "Term"). |
| Base Price: | $.16/kWhr (the "Base Price") will include the first $.005/kWhr of distribution and transmission costs. |
| Increases: | At the beginning of each year of the Term, the Base Price will be subject to an adjustment equal to 20% of the excess of the then-current fair market value for power over the Base Price under the PPA. |
| Cost Adjustment: | The Base Price will be subject to upward and downward fuel cost adjustments based on a base gas cost of $5.50 / MM btu. |
| Rebate: | At the end of each year of the Term, the Operator will pay to the Osage |

Nation a rebate in the amounts set forth on Schedule I.  This rebate will be paid into an account owned by the Osage, LLC, but controlled by a third-party bank (the "Control Account").  Such account will be subject to the Control Agreement described below.

Minimum Purchase:     The Osage, LLC will be required to purchase a minimum of 688 MWhr per month.

Payment Terms:     All payments to the Operator will be made in cash within 30 days of the month in which power is purchased.

Credit:     The Osage, LLC will be required to demonstrate a BB credit rating or better with a nationally recognized credit rating agency.


**Option Agreement**


Option Price:     $71.4 millions.

Exercise:     The option would be exercisable at any time in the final year of the Term, but no later than three months prior to the expiration of the Term.

Payment:     If the option is exercised, payment would be made at the closing directly from the Control Account.

Representations and Warranties:     The Plan will be delivered "as is" without any representations or warranties, except with respect to title to the Plant.

PPA:     If the Osage, LLC does not exercise the option, the Osage would be required to enter into a new 10-year power purchase agreement with the Operator that would take effect immediately upon the expiration of the Term.  Such agreement would be on then-market terms.  The Osage, LLC would also be required to extend the Ground Lease for the term of such new power purchase agreement.

**Control Agreement**

| | |
|---|---|
| Account: | A collateral security account owned by the Osage, LLC but controlled by a nationally-recognized bank acceptable to the Osage, LLC and the Operator (the "<u>Bank</u>"). |
| Funding: | All rebates paid by the Operator to the Osage, LLC under the PPA will be made directly to the Control Account. |
| Permitted Investments: | The Osage, LLC would be entitled to direct the Bank to invest the account's funds in AAA investments and similar high-quality securities. |
| Release for Operating Losses: | If, in any year under the Term, the Operator's expenses (including, without limitation, fuel costs, the rebate under the PPA, the rental payments under the Ground Lease and labor and administrative costs) exceed the Operator's proceeds from the PPA, the amount of such excess will be released from the Control Account and paid to the Operator. |
| Release for PPA Payments | In the event that the Osage, LLC fails to make any payments owed to the Operator under the PPA, when due, the Bank will release and pay to the Operator the amount of such payments. |
| Release if the Option is Exercised: | In the event that the Osage, LLC exercises its option to purchase the Plant upon the completion of the Term, the purchase price under the Option Agreement would be released by the Bank and paid to the Operator. |
| Release to the Osage, LLC: | No amounts will be released to the Osage, LLC during the first five years of the Term. Thereafter, the Control Account will have a minimum balance, in each year of the Term, in the amount shown on Schedule I. Any amount (including interest) in excess of such minimum may be released to the Osage, LLC. At the end of the Term, after any payment is made under the Option Agreement for the Plant (if the Osage, LLC elects to purchase the Plant), any amounts remaining in the Control Account will be released to the Osage, LLC. |

Exhibit B

# PREMIERE POWER, LLC
## Subscription Agreement

THE MEMBERSHIP SHARES REPRESENTED BY THIS LIMITED LIABILITY COMPANY SUBSCRIPTION AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH SHARES MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

I, Ms. Anna Lee and Ms. Annie S. Kim, the undersigned, hereby subscribe for a _____ percent (_____%) membership interest ("SUBSCRIBED INTEREST") in PREMIERE POWER, LLC, a Delaware limited liability company, and agree to pay _____ Dollars ($_____) ("SUBSCRIPTION FEE"), for this interest.

I understand that Two Million Dollars (2,000,000.00) is the subscription fee for one percent (1%) membership ownership in PREMIERE POWER, LLC on the below agreed date and that the minimum subscription fee is One Hundred Thousand Dollars for (0.05%) membership interest.

I represent and warrant to PREMIERE POWER, LLC, and its members that:

1.      My financial condition is such that I would be able to bear the loss of my entire investment. I am an accredited Investor in that I presently have net assets in excess of One Million Dollars ($1,000,000.00) and/or individual income in excess of Two Hundred Thousand Dollars ($200,000.00) per year.

2.      Either: (a) I have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of this investment, or (b) I have consulted with and obtained advice from my financial advisors regarding this investment and they have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of this investment.

3.      I expressly warrant that I am purchasing this interest in PREMIERE POWER, LLC SOLELY FOR INVESTMENT FOR MY OWN ACCOUNT AND NOT FOR REDISTRIBUTION. Further, I agree not to transfer or assign this subscription or any interest in it and, if this subscription is accepted by PREMIERE POWER, LLC, I will not sell or assign my membership interest in PREMIERE POWER, LLC in the absence of an effective registration under applicable federal and state securities laws or a written opinion of the general counsel of PREMIERE POWER, LLC that the sale or assignment is exempt from such registration; and any

such sale will only be after compliance with applicable provisions of the PREMIERE POWER, LLC Operating Agreement.

4.     I acknowledge that I have had ample time and opportunity to consult with legal counsel and an investment counselor concerning the advisability of subscribing to this venture. Further, I am aware of the speculative nature of this investment and of the various risk factors involved including, but not limited to, risks associated with product sales, potential increase in production, marketing and transportation cost, contract negotiations, limitations on cash flow, rising interest rates and the unavailability of adequate financing.

5.     I acknowledge that the membership interest hereby subscribed for has not been and will not be registered under the federal securities laws or the securities laws of any state or the United States.

Upon the payment of said SUBSCRIPTION FEE in cash to PREMIERE POWER, LLC in payment and exchange for the SUBSCRIBED INTEREST, the undersigned authorizes and directs PREMIERE POWER, LLC, to issue said SUBSCRIBED INTEREST.

I agree to wire transfer the SUBSCRIPTION FEE into the account of PREMIERE POWER, LLC at least 24 hours prior to closing, which is scheduled for _____, ____, 2009.  Such account is maintained at Bank of America, Account No 501008499219, ABA Routing Number 026009593, North Las Vegas, Nevada.

Dated as of the _____ day of _____, 2009.


Signed, _____

Ms. Anna Lee_____, Subscriber

SSN: _____

Or Comparable Foreign ID / Tax ID:
_____

Signed, _____

Ms. Annie S. Kim_____, Subscriber

SSN: _____

Or Comparable Foreign ID / Tax ID:
_____