UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

                             Plaintiff,

                         v.

JOHN JANKOVIC,

                           Defendant.

------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** March 21, 2017

15 Civ. 1248 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Between 2009 and 2011, Defendant John Jankovic ("Defendant") was the Chief Executive Officer ("CEO") of Premiere Power, LLC ("Premiere"), which was touted as an energy company. Premiere had no revenues. It did, however, raise nearly $2,000,000 in interim financing from investors. Sandra Dyche, who brokered investments for Premiere, raised $1,500,000 of this money from a single investor, Moon Joo Yu. But not all of Yu's investment actually went to Premiere: Instead, Dyche siphoned $1,000,000 from Yu's investment to cover legal expenses Dyche and others had incurred in connection with a lawsuit against another failed energy company, 21st Century Morongo Energy, LLC ("Morongo"). Premiere raised the remainder of its interim financing from a group of investors who attended the company's December 22, 2009 investors meeting (the "Investors Meeting"), during which Defendant distributed a Preliminary Information Memorandum ("PIM") that contained multiple misstatements about Premiere.

In 2015, Plaintiff Securities and Exchange Commission (the "SEC") initiated this civil enforcement action against Defendant. The SEC argues that in the process of actually (or ostensibly) raising money for Premiere, Defendant violated (i) Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and (ii) Sections 17(a)(1), (a)(2), and (a)(3) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1)-(3).

Pending before the Court is the SEC's motion for summary judgment. In opposition, Defendant argues, *inter alia*, that he lacked the requisite mental state to be liable for any of the offenses the SEC has charged. Liability under Section 10(b), Rule 10b-5, and Section 17(a)(1) requires proof of scienter. Section 17(a)(2) and (3) only require proof of negligence. Defendant insists that he possessed *no* culpable mental state. And to this end, he asserts that he relied in good faith on representations that other individuals who worked for Premiere — including Dyche, Thomas Gudgel, and Jerry Jankovic (Defendant's father) — made to him about the contents of the PIM, and about the disclosures Premiere made to its investors.

What this case boils down to, then, is a state-of-mind question: What was Defendant's mental state when he made misstatements and omissions to Premiere's investors? Construing the evidence in the light most favorable to Defendant, there is a genuine dispute of material fact as to whether Defendant acted with scienter, and that dispute precludes the Court from entering summary judgment on the SEC's Section 10(b), Rule 10b-5, and Section 17(a)(1) claims. But the undisputed facts of this case establish that Defendant

was negligent.[1]  In consequence, the Court will grant summary judgment in

favor of the SEC on its Section 17(a)(2) and (3) claims.  Accordingly, and for the

reasons set forth below, the Court grants in part, and denies in part, the SEC's

motion for summary judgment.

## BACKGROUND[2]

Defendant's alleged misconduct falls into two categories.  First, the SEC

faults Defendant for not disclosing to one of Premiere's investors, Yu, that part

---

[1]  To be clear, abundant evidence in the record suggests that Defendant's current explanations for his conduct at Premiere are incomplete, if not false, and that the SEC's portrayal of Premiere as a fraud begotten to remedy a prior fraud is more accurate. However, the Court does not need to consider this evidence, which could engender factual disputes, to resolve the motion.  Defendant's own testimony and proffered evidence is sufficient, and it is this evidence that comprises the "undisputed facts" referred to in this Opinion.

[2]  This Opinion draws on facts from the SEC's Local Civil Rule 56.1 Statement of Material Facts As to Which There Is No Genuine Issue to Be Tried ("Pl. 56.1" (Dkt. #44)), Defendant's Counterstatement to the SEC's Undisputed Facts and Additional Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1" (Dkt. #56)), and the SEC's Local Civil Rule 56.1 Statement of Material Facts As to Which There Is No Genuine Issue to Be Tried and Counterstatement to Defendant's Additional Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 Reply" (Dkt. #61)).  The Court also cites to the Declaration of Beth C. Groves in Support of the SEC's Motion for Summary Judgment ("Groves Decl." (Dkt. #49)) and the exhibits attached thereto ("Groves Decl., Ex. [ ]"); and the Supplemental Declaration of Beth C. Groves in Support of the SEC's Motion for Summary Judgment ("Groves Supp. Decl. (Dkt. #60)) and the exhibits attached thereto ("Groves Supp. Decl., Ex. [ ]").  References to documents contained in Exhibit 2 to the Groves Declaration will list only the relevant page numbers, and will omit the prefix "SEC-PREMIERE-E-."

Defendant has complicated this Court's review of the record in the manner in which he has objected to nearly every factual assertion the SEC makes in its Local Rule 56.1 statement.  Many of Defendant's objections are perfunctory, boilerplate attacks on the admissibility of the SEC's statements.  (Def. 56.1 ¶¶ 14-17, 37, 42).  Defendant also disputes dozens of the SEC's factual assertions on the ground that they are "misleading."  (Id. at ¶¶ 5-9, 14-17, 19-21, 23-25, 28-33, 36-39, 42-44, 46-47, 49-51, 54-56, 58-59, 61-62, 68, 74, 77).  But in the vast majority of these instances, Defendant has not adduced "additional material facts" that actually refute the SEC's factual statements.  S.D.N.Y. Local Civil R. 56.1(b).  And in turn, the Court does not interpret the balance of Defendant's objections as indicative of genuine factual disputes between the parties.

Further, although the Court will not engage specifically with most of Defendant's objections, Defendant should not interpret the Court's silence as tacit approval of his litigation tactics, nor of the merit of his evidentiary objections.  One of Defendant's

of her $1,500,000 investment in Premiere would be used to cover legal costs from the Morongo litigation.  Second, the SEC identifies a number of allegedly material misstatements in the PIM, which Defendant assisted in preparing and disseminated at the Investors Meeting.

These two breeds of alleged misconduct have overlapping timelines:  Yu, for example, attended the Investors Meeting, though at that point she had already invested in Premiere.  Consequently, the Court will recount this case's history thematically rather than chronologically, because this approach better captures the two strains of fraud that Defendant abetted and perpetrated.  The Court will first take account of Yu's investment against the backdrop of the Morongo lawsuit.  It will then consider the PIM, the Investors Meeting, and the investments Premiere received after the Investors Meeting.  And because this Opinion ultimately turns on Defendant's mental state, the Court will take care to address Defendant's account of what he did and did not know as this case's operative events unfolded.

---

recurring objections, however, does warrant attention here.  Included in Exhibit 2 to the Groves Declaration is a copy of the PIM.  Defendant, noting that this document is marked "DRAFT," alleges that it cannot be authenticated as "the actual document that was provided to any potential or actual Premiere investors."  (Def. 56.1 ¶¶ 6, 9, 31-32, 38-41, 45, 48, 53, 57, 60, 63).  Defendant is incorrect.  Exhibit 2 is in fact an email authored by *Defendant* on July 31, 2013, enclosing as an attachment the PIM.  In the text of that email, Defendant describes the attached PIM as follows:  "Please find attached the PIM we used for presentations with the Investors in 2009."  (Groves Decl., Ex. 2 at 10327).  The email goes on to explain that the PIM was reviewed by investors at the December 22, 2009 Investors Meeting that is a central part of this litigation.  (*Id.*).  Defendant's suggestion that Exhibit 2 cannot be authenticated is contradicted flatly by his own representations.

A.    **Factual Background**

   1.    **The Morongo Litigation and Yu's Investment in Premiere**

In 2001, Dyche and Jerry Jankovic founded Morongo as an Arizona LLC. (Groves Decl., Ex. 10). Like Premiere, Morongo was an energy company with the stated goal of developing a power plant on Indian territory. (*Id.*). And like Premiere, Morongo produced more litigation than energy. In 2006, two individuals who invested a combined $1,200,000 in Morongo — Byung Chul An and Hyang Ok An (the "Ans") — sued Dyche, Jerry Jankovic, Morongo, and others in New York State Supreme Court. (*Id.*, Ex. 11). In their complaint, the Ans sought recovery against Jerry Jankovic and Dyche under, *inter alia*, common-law theories of fraud, negligent misrepresentation, and conversion. (*Id.* at ¶¶ 66-91). On August 30, 2007, a default judgment was entered against several of the defendants in that matter, including Jerry Jankovic and Morongo (but not Dyche). (*Id.*, Ex. 12).

Sometime in 2009, Defendant learned from his father that Morongo had been sued by its investors. (Groves Decl., Ex. 3 at 30:19-31:19, 173:8-21). And by the date of the Investors Meeting (December 22, 2009), Defendant understood that his father was a named defendant in that action. (*Id.*, Ex. 4 at 32).

2009 was also the year that Defendant, Jerry Jankovic, and Gudgel formed Premiere as a Delaware LLC. (Groves Decl., Ex. 1). By Defendant's account, Premiere was in the "power and utilities" business, and part of its business model included building a power plant "[o]n tribal land" in Oklahoma.

(*Id.*, Ex. 4 at 7:18-9:9).  During Defendant's tenure with the company, Premiere did not issue a formal operating agreement to create an official Board of Directors.  (Def. 56.1 ¶ 13).  The PIM, however, identified Jerry Jankovic as Premiere's Chairman, and identified Gudgel as a member of Premiere's Board of Directors and "a named partner of ... a full service law firm in Tulsa, Oklahoma." (Groves Decl., Ex. 2 at 10344, 10348).  In his summary-judgment submissions, Defendant refers to Gudgel as "Premiere's [G]eneral [C]ounsel." (Def. 56.1 ¶ 83).  However, although Defendant evidently believed that Gudgel filled this role for Premiere (*see* Groves Decl., Ex. 3 at 21:18-20), Gudgel himself never believed that he was the company's General Counsel (Groves Supp. Decl., Ex. 50 at 22:17-24:25).

Between July and December 2009, Defendant worked as a consultant for Premiere.  (*See, e.g.*, Groves Decl., Ex. 18 at 31:5-8).  By the date of the Investors Meeting (and possibly before then), Defendant was Premiere's CEO. (*Id.*, Ex. 3 at 45:13-46:14).

It was Defendant's belief that, in the company's initial stages, Premiere needed to raise $2,000,000 in interim financing (although that target increased over time).  (Groves Decl., Ex. 4 at 48:23-50:8).  Dyche, a member of Premiere's Board of Directors, "was involved in raising" this money; Defendant has described Dyche as a "broker" for Premiere.  (Def. 56.1 ¶ 12; *see* Groves Decl., Ex. 3 at 92:22-93:1, 153:11-16).  Dyche also spoke the Korean language. (Groves Decl., Ex. 3 at 85:12-13, 94:15-24).  It was Dyche who solicited Premiere's first investor, Yu, to contribute $1,500,000 towards Premiere's

interim-financing goal.  (Groves Decl., Ex. 39, ¶¶ 12-13).  On December 9, 2009, Yu signed a Subscription Agreement, which indicated that Yu would receive a 0.60% ownership interest in Premiere in exchange for her $1,500,000 investment.  (Groves Decl., Ex. 19; Def. 56.1 ¶ 22).  Defendant received Yu's Subscription Agreement via email on December 13, 2009.  (Groves Decl., Ex. 19).

Yu made her investment in three equal tranches: (i) "[o]n December 9, 2009, ... Yu gave Dyche $500,000 in cash[,]" (Pl. Reply 56.1 ¶ 99); (ii) "[o]n December 14 and 15, 2009," Yu wired $500,000 to Premiere's Bank of America account in two separate installments (*id.*; Groves Decl., Ex. 20 at 2); and (iii) "[s]ometime after December 15, 2009, Yu gave Dyche another $500,000," although Yu "does not recall the method [by] which the payment was made and cannot locate any document to track the payment" (Pl. 56.1 Reply ¶ 100).

Not all of Yu's $1,500,000 investment actually went to Premiere. Instead, Dyche used $1,000,000 of Yu's investment to pay "for legal fees" incurred in the Morongo litigation and, more troublingly, to contribute towards a $2.3 million settlement in that case.  (Groves Decl., Ex. 22, ¶ 11).  Dyche, Defendant admits, "stole" this $1,000,000.  (Def. 56.1 ¶¶ 28, 38, 74).

Just what Defendant knew about Dyche's plan is a matter of considerable debate between the parties.  There is no question that, in 2009, Defendant understood that Dyche planned to give part of Yu's investment to the Ans, the plaintiffs in the Morongo case.  And on September 15, 2009, Defendant sent an email to Jerry Jankovic and Thomas Gudgel attaching a

7

draft letter (nominally written by Jerry Jankovic) that was addressed to the Ans.  (Groves Decl., Ex. 13; *see also id.*, Ex. 14).  The letter asked the Ans to "drop any and all legal actions against [Morongo], Jerry Jankovic, [and Dyche]" in exchange for "a 2% ownership interest in Premiere."  (*Id.*, Ex. 13; Def. 56.1 ¶ 20).  The letter explained that Morongo and Premiere would facilitate this transaction through a share swap:  Under a "new ownership structure," 500,000 shares of Morongo, which were then held by an affiliated entity, 21st Century Energy Holdings, LLC, would be "exchange[d] ... for 2,000,000 shares ... of Premiere."  (Groves Decl., Ex. 13).  And on December 10, 2009, Defendant sent Gudgel and Dyche an email, copying Jerry Jankovic, that stated in relevant part:  "Sandra, your proposed buy-out of the An interest will serve the same purpose as the An settlement[.]"  (*Id.*, Ex. 16).

By Defendant's account, Yu's Subscription Agreement tipped him off to the fact that something may have been amiss with Yu's investment.  After all, Yu's Subscription Agreement indicated that she was receiving a 0.60% stake in Premiere in exchange for $1,500,000 — but in fact, Yu had wired only $500,000 into Premiere's bank account.  (Groves Decl., Ex. 3 at 111:12-12:4).  Defendant spoke with Gudgel about this "gap" between the Subscription Agreement and Yu's actual investment in Premiere, and then the two called Dyche.  (*Id.* at 111:19-12:18, 113:15-17).  Dyche told Defendant and Gudgel that she would handle Yu's $1,500,000 investment as follows:  "[$]500,000 would come into Premiere," Dyche would "hang on to [$]500,000[,] [a]nd ...

there was [$]500,000 still sitting offshore" that Yu was "trying to liquidate." (*Id.* at 112:5-12).

In explaining her plans for this second $500,000 block — the money Dyche planned to "hang on to" — Dyche told Defendant and Gudgel "that she was going to use it to buy the Ans['] shares." (Groves Decl., Ex. 3 at 112:19-22). Importantly, Defendant cannot recall whether Dyche told him that she was going to purchase the Ans' shares in Morongo or in Premiere. (*See id.* at 112:23-13:2, 161:20-65:5; *see also* Def. 56.1 ¶ 23 ("Dyche told [Defendant] that she planned on having $500,000 of the Yu's investment be used to purchase Premiere shares owned by the Ans (Premiere shares in the name of Morongo) … instead of using those funds to purchase new shares directly from Premiere.")).

During this December 2009 phone call, Defendant and Gudgel explained to Dyche "that she needed to update" Yu's Subscription Agreement and "make sure that [Yu] understood what [she] was buying." (Groves Decl., Ex. 3 at 113:3-19). Defendant expected that Dyche "would … have a transparent conversation" with Yu to explain that $500,000 of her investment would be going to the Ans. (*Id.* at 113:20-15:3; *see also id.* at 115:21-16:13). And Defendant expected that in engineering this transaction with the Ans, Dyche would "follow ethical guidelines" to ensure that it proceeded "the same as any other stock purchase[]." (*Id.*, Ex. 4 at 79:13-21).

Neither expectation materialized. Dyche did not fix the "gap" in Yu's Subscription Agreement or communicate with Yu about the An buyout before the Investors Meeting. And Defendant spoke with Dyche ahead of the Investors

Meeting to "remind[] her that" the discrepancy in Yu's Subscription Agreement "needed to be resolved." (Grove Decl., Ex. 3 at 119:9-19). But Dyche did not resolve this issue. Even though Yu attended the Investors Meeting, Dyche did not tell Yu at the meeting that she planned to use Yu's money to purchase the Ans' shares. (*Id.*, Ex. 18 at 143:6-44:15, 145:14-23).

Defendant did not speak with Yu at the Investors Meeting, either. (Groves Decl., Ex. 18 at 143:25-44:6). Relatedly, Defendant did not discuss the Morongo litigation at all during the Investors Meeting. (Groves Decl., Ex. 3 at 99:5-7). Nor did Defendant follow up with Dyche after the Investors Meeting to make sure that she resolved the "discrepancy" between Yu's Subscription Agreement and Yu's actual investment in Premiere. (*Id.*, Ex. 18 at 145:24-46:9).

To the contrary, Defendant perpetuated this "discrepancy." "In January 2010," Defendant signed a Certificate of Ownership indicating that Yu and her daughter held a 0.60% interest in Premiere. (Groves Decl., Ex. 23; Def. 56.1 ¶ 76).[3] Defendant characterizes the certificate's reference to Yu holding a 0.60% interest, when only $500,000 of her investment had actually gone to Premiere, as "an inadvertent error." (Def. 56.1 ¶ 76; *accord* Groves Decl., Ex. 4 at 157:15-58:23 ("Unfortunately, [that] was an error, and I just didn't catch it.")). And on February 10, 2010, Defendant wrote a letter to Yu that also referred to her "0.60% membership in Premiere." (*Id.*, Ex. 24). Defendant

---

[3]     It is the Court's understanding that Amy Yu did not invest her own money in Premiere, although her name appears on the Certificate of Ownership alongside her mother's. (*See Yu* v. *Premiere Power LLC*, No. 14 Civ. 7588 (KPF), Dkt. #1, ¶ 63 n.6)

claims that he is "horrified that" this error "slipped through."  (*Id.*, Ex. 4 at 160:14-19).

### 2.    The PIM, the Investors Meeting, and the Investments Premiere Received After the Investors Meeting

On December 22, 2009, Defendant, Dyche, Gudgel, and other representatives from Premiere held the Investors Meeting in the offices of a prominent New York City law firm.  (Groves Decl., Ex. 4 at 23:7-24:11; Def. 56.1 ¶ 30).  At the meeting, Defendant distributed copies of the PIM to the investors in attendance, although Defendant insists that it was Dyche who gave "the PIM to the individuals who actually invested in Premier[e]."  (Def. 56.1 ¶ 31).  Defendant admits, however, that he took the lead in addressing investors at the Investors Meeting, and that he delivered a PowerPoint presentation that mirrored the PIM's content.  (Groves Decl., Ex. 4 at 24:16-25:6, 25:15-26:10).

The PIM contained numerous misstatements.  Page Two of the PIM warranted that Premiere "ha[d] taken reasonable care to ensure that the information" in the PIM was "true and accurate in all material respects." (Groves Decl., Ex. 2 at 10330).  But many of the PIM's representations were untrue and inaccurate, and a few of those representations merit attention here:

    i)     The PIM listed a former Oklahoma Congressman (the "Congressman") as a member of Premiere's Board of Directors. (Groves Decl., Ex. 2 at 10346).[4] The PIM also claimed that this Congressman held a 1% equity interest in Premiere.  (*Id.* at 10342).  That Congressman

---

[4]    Because the individuals and entities discussed in this section of the Opinion appear not to have been involved in the fraud at Premiere, the Court does not identify them by name.

"ha[d] never agreed to serve" on Premiere's Board.  (*Id.*, Ex. 28, ¶ 4).  In July 2009, Defendant contacted this Congressman by e-mail and telephone to discuss "joining Premiere's Board of Directors." (Def. 56.1 ¶ 43). As of the day of the Investors Meeting, however, Defendant had received no confirmation from the Congressman that he would be joining Premiere's Board.  (*Id.* at ¶ 44).  It is Defendant's contention that he relied on Jerry Jankovic's representations that he would "manag[e] Premiere's relationship with" the Congressman. (*Id.* at ¶¶ 43-44).  Defendant also claims that Jerry Jankovic told him that the Congressman "had agreed to be on Premiere's Board of Directors." (*Id.* at ¶ 43).

ii)   The PIM identified the Managing Executive Director of an energy company (the "Managing Director") as a member of Premiere's Board of Directors and the company's "President, Facility Operations." (Groves Decl., Ex. 2 at 10352).  Like the Congressman, the Managing Director was purported to hold a 1% stake in Premiere.  (*Id.* at 10342).  But although the Managing Director had had "hypothetical" "discussions with Jerry Jankovic about" joining Premiere, he "never committed to serving ... as a member of" Premiere's Board, and never agreed "to serv[e] ... as an executive of" the company.  (*Id.*, Ex. 31, ¶¶ 4, 7-8).  Defendant understood that the Managing Director wished to serve as a Premiere "Board advisor[]" and receive an "interest" in the company, but that the Managing Director would only become an official member of the Board "once [Premiere's] permanent financing was in place." (Def. 56.1 ¶¶ 49-50).

iii)  The PIM stated that an Oklahoma accounting firm (the "Oklahoma Accounting Firm") would handle Premiere's "outsourced accounting and bookkeeping." (Groves Decl., Ex. 2 at 10361).  That firm, however, never agreed to work with Premiere. (*Id.*, Ex. 36, ¶¶ 3-9).  Here too, it is Defendant's contention that he relied on Jerry Jankovic's representation that this "information was accurate." (Def. 56.1 ¶¶ 57-58).

iv)   Finally, the PIM identified a nationally known accounting firm ("National Accounting Firm") as an

"Affiliate" of Premiere's "Corporate Holdings" division. (Groves Decl., Ex. 2 at 10357).   But the National Accounting Firm never had a relationship of any sort with Premiere. (*Id.*, Ex. 34, ¶ 3).   Defendant asserts that the PIM listed the National Accounting Firm as an Affiliate "at the direction of Dyche and Jerry Jankovic based on an independent relationship that Defendant understood they had formed with" that entity.   (Def. 56.1 ¶ 56).

Defendant disclaims responsibility for these errors.  He admits that he was "one of the authors of" the PIM, along with Dyche, Gudgel, and Jerry Jankovic.  (Groves Decl., Ex. 3 at 77:13-18; *id.*, Ex. 9 at 6).  Indeed, the first page of the PIM lists Defendant as an "Author[]" of the document.  (*Id.*, Ex. 2 at 10328).  And Defendant ensured that the parts of the PIM he wrote himself — like his personal biography and "some of the pro forma information" — were accurate.  (*Id.*, Ex. 3 at 86:2-15).  Defendant also claims that in the process of drafting the PIM, he consulted with the New York City law firm that hosted the Investors Meeting.  (*Id.* at 87:1-88:11).

But Defendant also contends that much of the information in the PIM "was given to" him by other Premiere executives.  (Groves Decl., Ex. 18 at 103:20-104:7).  Defendant — who became Premiere's CEO just before the Investors Meeting — claims that he "trust[ed]" Dyche, Gudgel, Jerry Jankovic, and others "to provide accurate information" for the PIM.  (*Id.* at 104:11-19).

One more point about the Investors Meeting bears mention here. Defendant recalls that he (and other Premiere representatives) spent one hour of the meeting addressing the assembled investors, and that "[a]bout half that time" consisted of Dyche translating the presentation into Korean.  (Groves

Decl., Ex. 18 at 131:23-132:11).  When Defendant concluded his presentation, he left the room "for up to three hours" while Dyche spoke with the investors. (*Id.* at 133:23-134:3).

The Investors Meeting bore fruit for Premiere.  On December 23, 2009, Hyun Ja Kim and Jae Duk Kim executed a Subscription Agreement indicating that they would purchase a 0.12% stake in the company in exchange for $300,000, and "wrote a check to Premiere for" the full amount of their investment that same day.  (Def. 56.1 ¶¶ 64-66).  And in March 2010, another investor, Hee Rak Kim, invested $150,000 in Premiere in exchange for a 0.06% interest in the company.  (*Id.* at ¶¶ 69-71).

Premiere's investments were processed as follows:  In December 2009, Defendant handled Premiere's wire transfers through its Bank of America account.  (Groves Decl., Ex. 3 at 45:3-12).  Premiere's bank statement for that month shows three deposits: (i) an $80,000 deposit from Yu on December 14; (ii) a $420,000 deposit from Yu on December 15; and (iii) a $300,000 "counter credit" on December 30, which Defendant believes reflects Hyun Ja Kim's and Jae Duk Kim's investment.  (*Id.* at 292:17-94:21; *id.*, Ex. 20 at 1).  These were the first payments Premiere received.  (*Id.*, Ex. 3 at 295:19-21).  The December bank statement also reflects several outgoing wire transfers:  some to Defendant, some to Jerry Jankovic, and some to other individuals and entities. (*Id.*, Ex. 20 at 3-4).  And Premiere's March 2010 bank statement reflects a $150,000 "counter credit" on March 16, which Defendant believes corresponds to Hee Rak Kim's investment.  (*Id.*, Ex. 3 at 296:16-97:2; *id.*, Ex. 20 at 7).  This

14

March 2010 statement indicates that on March 18, 2010, $100,000 was wired out of Premiere's account and into an account held by Morongo. (*Id.*, Ex. 20 at 7; *see also id.*, Ex. 3 at 297:3-98:22).

Defendant's "active role" with Premiere "ceased in summer of 2011." (Groves Decl., Ex. 4 at 11:18-21). He left Premiere, officially, on January 1, 2012. (*Id.*, Ex. 18 at 25:23-24). One of the reasons Defendant stopped working for Premiere was his belief that he "did not have proper transparency and control of the company during [his] tenure." (*Id.* at 48:9-12). For that, he blames his father, Jerry Jankovic. (*Id.* at 48:13-24). In particular, one "important issue" that Defendant felt Jerry Jankovic did not explain clearly was the "restructuring of shares between him and … Dyche for past companies they were involved in[,] [a]nd plans about how they were going to settle with the Ans." (*Id.* at 49:5-50:15). Premiere, Defendant concedes, "never generated any revenues or dividends." (Def. 56.1 ¶ 73).

## B. Procedural Background

On September 18, 2014, Moon Joo Yu, Amy Yu, and Hee Rak Kim sued Premiere Power, Dyche, Defendant, Jerry Jankovic, and others. (*Yu* v. *Premiere Power LLC*, No. 14 Civ. 7588 (KPF), Dkt. #1). Their complaint alleges that Defendant, Jerry Jankovic, Dyche, and Premiere violated, *inter alia*, Section 10(b) and Rule 10b-5. (*Id.* at ¶¶ 75-81). That case is marked as related to the instant case, assigned to the undersigned, and still ongoing.

On February 20, 2015, the SEC initiated the instant action by filing its Complaint against Defendant, Jerry Jankovic, and Premiere. (Dkt. #1).

Because neither Jerry Jankovic nor Premiere appeared in this matter, on October 9, 2015, the Court entered default judgments against both parties. (Dkt. #35, 36).

On July 27, 2016, the SEC filed its motion for summary judgment and supporting papers.  (Dkt. #43; *see also* Dkt. #47-49).  Defendant responded on August 30, 2016 (Dkt. #54-56), and briefing concluded when the SEC submitted its reply on September 14, 2014 (Dkt. #59-61).

## DISCUSSION

### A.   Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

Rule 56(a) instructs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Pace* v. *Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 262 (S.D.N.Y. 2016) (quoting *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003)).

Thus, "[a] motion for summary judgment may properly be granted … only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law."  *Rogoz* v. *City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor* v. *Elec. Boat Corp.,* 609 F.3d 537, 545 (2d Cir. 2010)).  In determining whether summary judgment is merited, "[t]he role of a court … is

16

not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *NEM Re Receivables, LLC* v. *Fortress Re, Inc.*, 173 F. Supp. 3d 1, 5 (S.D.N.Y.) (internal quotation marks and citation omitted), *reconsideration denied,* 187 F. Supp. 3d 390 (S.D.N.Y. 2016).

A party moving for summary judgment "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986)). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC* v. *Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). And "[a] dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (quoting *Anderson*, 477 U.S. at 248).

If a summary-judgment movant satisfies his initial burden, then "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks and citation omitted). To make this showing, a summary-judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574,

586 (1986).  Rather, that opponent must adduce "evidence on which the jury could reasonably find for" him.  *Anderson*, 477 U.S. at 252.

"In deciding a motion for summary judgment, 'a district court generally should not weigh evidence or assess the credibility of witnesses.'"  *Walker* v. *Carter*, — F. Supp. 3d —, No. 12 Civ. 5384 (ALC), 2016 WL 5390893, at *10 (S.D.N.Y. Sept. 26, 2016) (quoting *Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011)).  But "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account."  *Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (internal citation omitted) (quoting *Anderson,* 477 U.S. at 252).  When this narrow circumstance arises, a court considering a summary-judgment motion "may make credibility determinations."  *Walker*, 2016 WL 5390893, at *10.

## B.  The Court Grants in Part and Denies in Part the SEC's Motion for Summary Judgment

Again, the SEC seeks summary judgment on all of its claims against Defendant:  Section 10(b), Rule 10b-5, and Section 17(a)(1) through (3).  The principal points of contention are two:  First, the parties disagree over whether Defendant's misstatements and omissions were material (a necessary element of all of these offenses).  And second, they dispute whether Defendant acted with scienter, negligence, or no culpable mental state at all.

The Court concludes that Defendant's misstatements in the PIM, and his misstatements and omissions concerning Yu's investment, were material as a matter of law.  Whether Defendant can be held liable under Section 10(b), Rule 10b-5, and/or Section 17(a) therefore turns on his state of mind when he made these misstatements and omissions.

Although it presents a close question, there are genuine disputes of material fact as to whether Defendant acted with scienter.  In turn, the Court cannot enter summary judgment Prevent on the SEC's claims under Section 10(b), Rule 10b-5, and Section 17(a)(1).

However, the undisputed facts of this case establish that Defendant was negligent.  It was negligent for Defendant to disseminate the PIM, which was filled with erroneous statements, without first verifying the veracity of the PIM's contents.  And it was negligent for Defendant to fail repeatedly to explain to Yu how her investment would be used.  Because the undisputed facts of this case also establish the other elements of Section 17(a)(2) and (3) liability, the Court grants summary judgment in favor of the SEC on these claims.

1.   **Genuine Disputes of Material Fact Concerning Defendant's Mental State Prevent the Court from Entering Summary Judgment on the SEC's Claims Under Section 10(b), Rule 10b-5, and Section 17(a)(1)**

a.   **Applicable Law**

Section 10(b), Rule 10b-5, and Section 17(a)(1) share similar substantive elements.  The Court will first provide a general outline of these offenses, then address in greater detail two of their shared elements, *viz.*, materiality and scienter.

### i.    Substantive Elements of Section 10(b), Rule 10b-5, and Section 17(a)

Under Section 10(b), it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (footnote omitted).  Likewise, Rule 10b-5 makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, ... [t]o employ any device, scheme, or artifice to defraud, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, ... or [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To establish a defendant's liability under Section 10(b) or Rule 10b-5, the SEC must prove that the defendant "[i] made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; [ii] with scienter; [iii] in connection with the purchase or sale of securities." *SEC* v. *Sourlis*, — F.3d —, Lead Docket No. 14-2301-cv(L), 2016 WL 7093927, at *2 (2d Cir. Dec. 6, 2016) (quoting *SEC* v. *Pentagon Capital*

*Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013)).  "The SEC, unlike a private plaintiff, is not required to prove reliance when it brings enforcement actions under the securities laws."  *SEC* v. *KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006); *accord SEC* v. *Penn*, — F. Supp. 3d —, No. 14 Civ. 581 (VEC), 2016 WL 7413518, at *5 (S.D.N.Y. Dec. 21, 2016); *cf. Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 37-38, 48 (2011) (identifying "reliance upon [a] misrepresentation or omission" as an essential element of a Section 10(b) and Rule 10b-5 claim where the plaintiffs sought relief under the Private Securities Litigation Reform Act of 1995 (quoting *Stoneridge Inv. Partners, LLC* v. *Sci.- Atlanta, Inc.,* 552 U.S. 148, 157 (2008)).

Finally, Section 17(a)(1) renders it

> unlawful for any person in the offer or sale of any securities ... or any security-based swap agreement ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly ... to employ any device, scheme, or artifice to defraud.

15 U.S.C. § 77q(a)(1).  "With respect to [Section] 17(a)(1), essentially the same elements must be established in connection with the offer or sale of a security [as for Section 10(b) and Rule 10b-5 liability]."  *KPMG LLP*, 412 F. Supp. 2d at 371 (quoting *SEC* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)). However, "[t]he requirements for a violation of Section 17(a) apply only to a sale of securities," *Pentagon Capital*, 725 F.3d at 285, while Section 10(b) and Rule 10b-5 speak to "the purchase or sale of any security," 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5.

21

### ii.    Materiality and Scienter Under Section 10(b), Rule 10b-5, and Section 17(a)

For purposes of Section 10(b), Rule 10b-5, and Rule 17(a)(1), "[a] statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important' or, in other words, 'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the total mix of information available.'" *SEC* v. *Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 349 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *SEC* v. *DCI Telecomms., Inc.*, 122 F. Supp. 2d 495, 498 (S.D.N.Y. 2000)).  Put another way, whether "a misstatement or omission" is material turns on "[w]hether the defendant['s] representations, taken together and in context, would have misled a reasonable investor."  *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)).  Further, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (quoting *Basic Inc.* v. *Levinson,* 485 U.S. 224, 231-32 (1988)).

There is an important distinction between misstatements and omissions of fact:  "A[n] omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts."  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 11 (S.D.N.Y. 2016) (quoting *In*

*re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)), *appeal withdrawn* (June 7, 2016).  Such a duty to disclose can arise when there exists "[a] fiduciary relationship or other relationship of trust and confidence" between plaintiff and defendant, or where the defendant has "unique access to information."  *SEC* v. *DiBella*, 587 F.3d 553, 563 (2d Cir. 2009) (quoting *Powers* v. *British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995)).  Neither Section 10(b) nor Rule 10b-5, however, obligates corporations "to disclose a fact merely because a reasonable investor would very much like to know that fact."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013) (quoting *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008)), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (summary order).

Because "'[m]ateriality is a mixed question of law and fact,' … only if an omission or misstatement is 'so obviously important or unimportant to a reasonable investor that reasonable minds cannot differ on the question of materiality is the issue appropriately resolved as a matter of law by summary judgment.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009) (quoting *In re All. Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 188 (S.D.N.Y. 2003)).

Turning to the mental-state requirement of these statutes, a defendant makes a misstatement or omission with scienter if he acts (i) "with the 'intent to deceive, manipulate, or defraud,'" *Sourlis*, 2016 WL 7093927, at *2 (quoting *SEC* v. *Obus*, 693 F.3d 276, 286 (2d Cir. 2012)), or (ii) with "reckless disregard for the truth," *BG Litig. Recovery I, LLC* v. *Barrick Gold Corp.*, 180 F. Supp. 3d

316, 322 (S.D.N.Y. 2016) (quoting *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).  "[R]eckless disregard for the truth" means "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC* v. *Frohling*, — F.3d —, No. 13-3191-cv, 2016 WL 7093925, at *2 (2d Cir. Dec. 6, 2016) (internal quotation mark omitted) (quoting *Obus*, 693 F.3d at 286).

"[T]he Second Circuit has left no doubt that scienter issues are seldom appropriate for resolution at the summary judgment stage." *SEC* v. *Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) (collecting cases).  As a corollary to this, "[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *SEC* v. *Johnson*, No. 03 Civ. 177 (JFK), 2005 WL 696891, at *3 (S.D.N.Y. Mar. 24, 2005) (quoting *Press* v. *Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir. 1999)).

### b.    Analysis

The Court's analysis of the SEC's Section 10(b), Rule 10b-5, and Section 17(a)(1) claims turns on Defendant's scienter.  For this reason, the Court will not conduct a wholesale analysis to determine whether the SEC has established every other substantive element of these offenses.  But the Court will begin by assessing the materiality of the proffered misstatements and omissions, because that assessment also bears on the Court's resolution of the Section 17(a)(2) and (3) claims.

This part of the Opinion, then, cuts in two directions. The undisputed facts of this case establish that Defendant's misstatements and omissions were material. They do not, however, establish that Defendant made these misstatements and omissions with scienter. And in turn, the Court cannot enter summary judgment in favor of the SEC on its Section 10(b), Rule 10b-5, or Section 17(a)(1) claims.

### i. Defendant's Misstatements and Omissions Were Material as a Matter of Law

To review, Defendant's misstatements and omissions fall into two camps; the Court will address them sequentially. First, the PIM that Defendant was involved in writing, compiling, and disseminating contained numerous misstatements about Premiere. Second, Defendant omitted to tell Yu how Premiere planned to use a sizable portion of her investment, and made misstatements to Yu about her ownership in Premiere. Reasonable minds could not differ as to whether these misstatements and omissions were material. Consequently, the Court finds as a matter of law that they were material.

*The PIM.* The PIM's misstatements were legion — a non-exhaustive list follows. The PIM claimed that a former Congressman had agreed to serve on Premiere's Board. The Congressman had not. The PIM identified the Managing Director, an energy-industry executive, as a Premiere employee and Board Member. The Managing Director filled neither role. The PIM stated that the Oklahoma Accounting Firm would assist with Premiere's "accounting and bookkeeping." The Oklahoma Accounting Firm never agreed to do work for

Premiere.  And the PIM identified the National Accounting Firm as a Premiere "Affiliate."  But Premiere and the National Accounting Firm never entered into any sort of professional relationship.  Put simply, the "litany of misrepresentations" in the PIM "is striking."  *SEC* v. *Constantin*, 939 F. Supp. 2d 288, 306 (S.D.N.Y. 2013).

These misstatements were not "'puffery,' which does not give rise to securities violations." *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  Nor were they "half truths," which do.  *SEC* v. *Syron*, 934 F. Supp. 2d 609, 629 (S.D.N.Y. 2013) (quoting *S.E.C.* v. *Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds sub nom. Gabelli* v. *S.E.C.*, 133 S. Ct. 1216 (2013)).  They were lies. And their import is clear enough:  They lent to Premiere an imprimatur of legitimacy.  The PIM — parts of which Defendant wrote, parts of which he compiled, and the front page of which identified Defendant as an "Author[]" — claimed that Premiere had forged professional relationships with a politician, energy-industry executives, and outside accounting firms.  And the PIM claimed that some of these individuals, like the Congressman and the Managing Director, had skin in the game in the form of equity stakes in Premiere.  Those misstatements made Premiere appear legitimate when, in fact, it was not.

The effect of these misstatements went beyond the four corners of the PIM.  At the Investors Meeting, in addition to distributing copies of the PIM, Defendant delivered a PowerPoint presentation modeled after the PIM.

Defendant thus reiterated and reinforced the PIM's misstatements, in real time, by speaking directly to investors about the PIM's contents.

Reasonable minds could not differ as to whether the misstatements in the PIM were material.  The misstatements legitimized Premiere, a start-up energy company.  They plainly would have been significant to a reasonable investor considering an investment in Premiere.

Defendant tries to resist this conclusion by arguing "that none of the allegedly fraudulent information in the PIM would have altered [Yu's] investment decision." (Def. Br. 19-20).  This argument is irrelevant, because the SEC is not required to demonstrate that any investor relied on Defendant's misstatements in order to establish Defendant's liability under Section 10(b), Rule 10b-5, or Section 17(a).  *KPMG*, 412 F. Supp. 2d at 375.  Defendant's argument is thus non-responsive to the dispositive question of whether a reasonable investor would have considered the PIM's misstatements material.

In sum, "[t]here can be no doubt that the[] misrepresentations" in the PIM, "individually and collectively ... would have affected [a] reasonable investor's choice whether to invest in" Premiere.  *Constantin*, 939 F. Supp. 2d at 307.  The Court thus finds that the PIM's misstatements were material as a matter of law.

*Yu's Investment.*  The Court reaches a similar conclusion with respect to Defendant's omissions and misstatements concerning Yu's $1,500,000 investment.  Defendant does not address the SEC's argument that his omissions and misstatements on this score were material; the Court thus

27

considers Defendant's rebuttal to that argument abandoned.  *See, e.g.*, *Henry v. Metro. Transp. Auth.*, No. 07 Civ. 3561 (DAB), 2014 WL 4783014, at *12 n.4 (S.D.N.Y. Sept. 25, 2014).  Nonetheless, because these misstatements and omissions bear on the Court's analysis of the SEC's Section 17(a)(2) and (3) claims *infra*, it will explain their materiality here.

Consider first what Defendant omitted to tell Yu.  On December 13, 2009 — over two weeks before the Investors Meeting — Defendant received Yu's Subscription Agreement, which indicated that Yu would receive a 0.60% stake in Premiere in exchange for a $1,500,000 investment.  Around the same time, Yu wired $500,000 to Premiere's bank account.  Realizing that there was a "gap" or "discrepancy" between the actual amount of Yu's investment ($500,000) and the total investment amount listed on her Subscription Agreement ($1,500,000), Defendant called Dyche.  Dyche explained to Defendant that she intended to retain $500,000 of Yu's money to buy the Ans' "shares."

But Defendant — Premiere's CEO — never communicated any of this to Yu.  Even when he was in the same room as Yu at the Investors Meeting, Defendant did not tell Yu that fully one-third of her investment in Premiere would not, in fact, be going to Premiere.  Nor did Defendant tell Yu that there was an "error" in her Subscription Agreement.  To suggest (and Defendant does not) that this information would not have been material to a reasonable investor would beggar belief.

28

Defendant claims that he and Gudgel implored Dyche to speak "transparently" to Yu about her investment in Premiere.  Indeed, this is a key part of Defendant's argument that he lacked a culpable mental state when he failed to explain to Yu how her investment would be spent.  But Defendant's insistence that Dyche speak with Yu also underscores the materiality of this information.  Defendant believed that Yu should know how $500,000 of her investment would be allocated; this was information, in other words, that Defendant thought a reasonable Premiere investor should know.

Neither party addresses whether Defendant had a duty to disclose this information to Yu, although the Court has little trouble concluding that he did. A duty to disclose under Section 10(b), Rule 10b-5, and Section 17(a) may arise where a securities-law defendant has "unique access to information." *DiBella*, 587 F.3d at 563 (quoting *Powers,* 57 F.3d at 189).  Just so here.  Defendant "possess[ed] superior knowledge not available to [Yu] and kn[ew] that [Yu was] acting on the basis of mistaken knowledge." *Rizzo* v. *MacManus Grp., Inc.*, 158 F. Supp. 2d 297, 302 (S.D.N.Y. 2001).  Defendant, but not Yu, understood that Dyche planned to give $500,000 of Yu's money to the Ans.  And Defendant, but not Yu, understood that Yu's Subscription Agreement was inaccurate because only one-third of Yu's investment was deposited in Premiere's bank account. Defendant thus had a duty to disclose to Yu the information he knew about Dyche's plan for Yu's investment.

Defendant also made affirmative material misstatements to Yu.  Recall that in January 2010, Defendant signed a Certificate of Ownership affirming

that Yu held a 0.60% interest in Premiere ("an inadvertent error," Defendant

says).  (Groves Decl., Ex. 23; Def. 56.1 ¶ 76).  And Defendant repeated this

misstatement on February 10, 2010, when he sent a letter to Yu that

referenced her 0.60% stake in Premiere (a "horrif[ying]" mistake, Defendant

claims).  (Groves Decl., Ex. 4 at 160:14-9; *id.*, Ex. 24).  Like Defendant's

aforementioned omissions, these misstatements erroneously assured Yu that

Premiere had upheld its end of a $1,500,000 bargain.  But Premiere had not,

and Yu was none the wiser.

In sum, the Court concludes as a matter of law that Defendant's

misstatements and omissions in connection with Yu's investment were

material.

### ii.     Genuine Disputes of Material Fact Preclude the Court from Concluding That Defendant Acted with Scienter

The undisputed facts of this case establish that Defendant's

misstatements and omissions were material.  In contrast, although this

presents a very close question, the Court has construed the evidence in the

light most favorable to Defendant, and finds that genuine fact disputes

preclude it from holding as a matter of law that Defendant possessed scienter.

Accordingly, the Court denies the SEC's motion for summary judgment with

respect to its Section 10(b), Rule 10b-5, and Section 17(a) claims.

To start, there are genuine disputes of material fact as to whether

Defendant possessed scienter when he made (and perpetuated) the PIM's

misstatements.  The crux of Defendant's argument that he lacked scienter is

that he "relied in good faith on the factual information he received" from other Premiere executives. (Def. Br. 16). Defendant additionally argues that he "obtained Premiere's general counsel's involvement in all aspects of Premiere's business, including any issues involving the PIM." (*Id.* at 18). There are many reasons to doubt Defendant's reliance defenses — the Court will explore them *infra* when explaining why Defendant was negligent. But for purposes of assessing scienter, these defenses raise factual disputes that preclude the Court from determining that Defendant "intend[ed] to deceive, manipulate, or defraud" Premiere's investors. *Sourlis*, 2016 WL 7093927, at *2 (citation omitted).

A closer question is whether Defendant manifested a "reckless disregard for the truth." *Frohling*, 2016 WL 7093925, at *2 (citation omitted). Nonetheless, the Court is wary of the many cases in this Circuit cautioning district courts to avoid resolving scienter issues on summary judgment. *See, e.g.*, *Cole*, 2015 WL 5737275, at *5. Given Defendant's espoused belief that he was unaware that many of the PIM's misstatements were false, the Court declines to hold that Defendant recklessly disregarded the truth.

Questions of fact also preclude the Court from concluding that Defendant acted with scienter when he failed to inform Yu that part of her investment would go to the Ans. That Defendant made material misstatements and omissions to Yu about her ownership stake in Premiere, and about Dyche's plan for using $500,000 of Yu's investment, is crystalline. Less clear is the extent to which Defendant understood Dyche's intentions. Although Defendant

now concedes that Dyche stole Yu's money, he asserts that he operated under a more benign belief during his time as Premiere's CEO.  By Defendant's account, Dyche repeatedly told Defendant that she would engineer a buy-back or liquidation of the Ans' "shares."  And there is at least an open question as to whether Defendant understood that Dyche would structure this buy-back as a legitimate transaction.  In turn, the Court cannot conclude that Defendant acted with scienter in making his misstatements and omissions to Yu.

### 2. The Undisputed Facts of This Case Establish That Defendant Violated Section 17(a)(2) and (3)

#### a. Applicable Law

Under Section 17(a)(2) and (3):

> It shall be unlawful for any person in the offer or sale of any securities … or any security-based swap agreement … by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly[:]
>
> * * *
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(2)-(3).  "Scienter is not required to prove a defendant violated these provisions." *SEC* v. *Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).  "A showing of negligence is sufficient." *Id.*  The Court will first consider what

constitutes actionable negligence under these provisions, then address their other substantive elements.

"[W]hat standard of care governs a negligence claim under Section[] 17(a)(2)-(3)" remains an open question in this Circuit. *Ginder*, 752 F.2d at 569. But courts in this Circuit have not strayed far from a black-letter, "reasonable person" standard in defining "negligence" under Section 17(a)(2) and (3). *See, e.g.*, *Cole*, 2015 WL 5737275, at *6 ("[U]nder these provisions, the definition of negligence is 'the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances.'" (quoting Instructions of Law to the Jury at 13, *SEC* v. *Stoker,* No. 11 Civ. 7388 (JSR) (S.D.N.Y. July 31, 2012), Dkt. #89)); *In re Reserve Fund Sec. & Derivative Litig.*, No. 09 Civ. 4346 (PGG), 2013 WL 5432334, at *12 n.7 (S.D.N.Y. Sept. 30, 2013) (quoting jury instructions that likewise defined standard of care under Section 17(a)(2) and (3) as "the degree of care that a reasonably careful person would use under like circumstances"). Authority from outside the Second Circuit points in the same direction. *SEC* v. *Schooler*, No. 3:12-CV-2164-GPC, 2015 WL 3491903, at *10 (S.D. Cal. June 3, 2015) ("Negligent conduct [under Section[] 17(a)(2) and (3)] is defined as a 'fail[ure] to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation.'" (quoting *SEC* v. *True N. Fin. Corp.,* 909 F. Supp. 2d 1073, 1122 (D. Minn. 2012))); *SEC* v. *St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1293 (D. Colo. 2013) (quoting *True N. Fin. Corp*, 909 F. Supp. 2d at 1122) (providing identical definition of standard of care under Section

17(a)(2)).  *Cf. SEC* v. *Dain Rauscher, Inc.*, 254 F.3d 852, 853-54, 856 (9th Cir. 2001) ("standard of care" for assessing negligence of underwriter charged with violating Section 17(a) "is not defined solely by industry practice, but must be judged by a more expansive standard of reasonable prudence").  For his part, Defendant contends that "an ordinary negligence standard applies to violations under subsections (a)(2) and (a)(3)" of Section 17.  (Def. Br. 20).

Turning to the statute's other elements, the Second Circuit has observed that apart from the fact that Section 17(a) "appl[ies] only to a sale of securities," the elements of Section 17(a)(2) and (3) "are the same as Section 10(b) and Rule 10b-5."  *Pentagon Capital*, 725 F.3d at 285.  But there is at least one difference between Section 17(a)(2) and (3):  (a)(2) requires proof that the defendant "obtain[ed] money or property," while (a)(3) does not.[5]  *Compare* 15 U.S.C. § 77q(a)(2), *with id.* § 77q(a)(3).

"The courts in this [D]istrict disagree as to whether a defendant must personally gain money or property from the fraud in a [Section] 17(a)(2) case, or

---

[5]     Although neither party raises this issue, at least one Judge in this District has observed that "a defendant may be liable under both Section 17(a)(2) and Section 17(a)(3) based on allegations stemming from the same set of facts as long as the SEC [proves] that the defendant[] 'undertook a deceptive scheme or course of conduct that went beyond the misrepresentations.'"  *SEC* v. *Stoker*, 873 F. Supp. 2d 605, 614 (S.D.N.Y. 2012) (quoting *Stoker*, 865 F. Supp. 2d at 467).  Defendant is liable under both subsections for a different reason:  So numerous are Defendant's material omissions and misstatements that the Court can conjure multiple permutations of them.  For example, Defendant's omissions and misstatements to Yu about her $1,500,000 investment are actionable under Section 17(a)(2).  The parallel fraud Defendant committed — making misstatements in the PIM and at the Investors Meeting that ultimately netted $450,000 for Premiere — establishes Defendant's liability under Section 17(a)(3).  And this arrangement also works in reverse.  Confident that the breadth of Defendant's misconduct supports his liability under both Section 17(a)(2) and (3), the Court will focus on that misconduct in the aggregate, rather than attempt to place Defendant's misdeeds in either a Section 17(a)(2) or (3) bucket.

whether it is sufficient if the defendant obtained money or property on behalf of his employer." *SEC* v. *DiMaria*, — F. Supp. 3d —, No. 15 Civ. 7035 (GHW), 2016 WL 4926200, at *10 (S.D.N.Y. Sept. 15, 2016) (citing *Syron*, 934 F. Supp. 2d at 637-39, and *SEC* v. *Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012)). Because Defendant loses even under the more stringent interpretation of "obtain" — i.e., he "personally gain[ed] money" from his frauds, *id.* — the Court will adopt that reading of Section 17(a)(2) here.

To be sure, Section's 17(a)(2)'s text "clearly creates liability where a defendant 'indirectly' obtains money or property." *Syron*, 934 F. Supp. 2d at 639. "[T]he proceeds of [a] fraud" cognizable under Section 17(a)(2) "may make their way to the defendant in a 'highly roundabout,' or indirect, manner." *DiMaria*, 2016 WL 4926200, at *10 (quoting *Syron*, 934 F. Supp. 2d at 639). And the statute does not obligate the SEC to demonstrate that a Section 17(a)(2) defendant "received some sort of additional 'fraud bonus' on top of" the compensation he earned from his employer. *SEC* v. *Tourre*, No. 10 Civ. 3229 (KBF), 2014 WL 61864, at *4 (S.D.N.Y. Jan. 7, 2014). But it "is essential" that the SEC prove that a defendant has "obtained … money or property himself" in order to establish his liability under Section 17(a)(2). *Syron*, 934 F. Supp. 2d at 640.

### b.     Analysis

With the materiality of Defendant's misstatements and omissions a *fait accompli*, the Court considers whether Defendant was negligent when he made

them.  The Court concludes that he was, and accordingly enters summary judgment in favor of the SEC on its Section 17(a)(2) and (3) claims.

### i.    The Undisputed Facts of This Case Establish That Defendant Violated Section 17(a)(2)

Section 17(a)(2) makes it unlawful "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact."  15 U.S.C. § 77q(a)(2).  Here, the Court focuses on the two Section 17(a)(2) elements the parties dispute:  (i) whether Defendant was negligent and (ii) whether he "obtained money or property."  The Court resolves both in the SEC's favor.

### (1)    Defendant Was Negligent

First, the undisputed facts of this case establish that Defendant was, at minimum, negligent when he made his misstatements and omissions to Premiere's investors.  The Court will first consider his negligence with respect to Yu's investment, and then consider Defendant's negligence with respect to the PIM.

*Yu's Investment.*  Defendant knew that only one-third of the $1,500,000 Yu believed she invested in Premiere was actually invested in the company.  His failure to explain this to Yu, or ensure that Dyche did, was negligent.

Understanding why this is so requires the Court to take stock of what Defendant knew and what Yu did not.  To start, Defendant knew about the Morongo litigation as early as September 2009.  That month, he emailed to his father and Gudgel a draft letter proposing a settlement offer to the plaintiffs in that action, the Ans.  And on December 10, three days before receiving Yu's

Subscription Agreement, Defendant emailed Dyche and Gudgel, writing that Dyche's "proposed buy-out of the An interest [would] serve the same purpose as the An settlement[.]."  (Groves Decl., Ex. 16).

On December 13, 2009, Defendant received Yu's Subscription Agreement.  Soon thereafter, Defendant recognized that the Subscription Agreement contained a "gap":  It reflected a $1,500,000 investment in exchange for a 0.60% ownership interest in Premiere, when Yu had wired only $500,000 to Premiere's bank account.  When Defendant spoke to Dyche about the "discrepancy," she explained that she planned to keep $500,000 of Yu's money, and then give it to the Ans.

Defendant urged Dyche to tell Yu about her plan with regard to this $500,000 chunk of Yu's investment.  Dyche did not.  And then, after learning that Dyche had not raised this issue with Yu during the Investors Meeting, Defendant did nothing to pursue this issue further.  Of course, Defendant also attended the Investors Meeting.  But he did not speak with Yu about her investment during the meeting.  Nor did he bring up Morongo during the Investors Meeting.

The issue remained unresolved in 2010.  In January, Defendant executed a Certificate of Ownership confirming Yu's 0.60% interest in Premiere.  He chalks that figure up to "an inadvertent error."  (Def. 56.1 ¶ 76).  Defendant repeated that error on February 10, 2010, when he sent Yu a letter reiterating that she held a 0.60% stake in Premiere.  Defendant describes himself as

"horrified that" the letter contained this mistake. (Groves Decl., Ex. 4 at 160:14-19).

Even were the Court to accept the somewhat dubious premises that (i) Defendant expected Dyche to communicate honestly with Yu; and (ii) Defendant believed that any "buy out" of the Ans would be an above-board transaction, Defendant was still negligent. Would a reasonable person have done more to tell Yu where her money was going? Would a reasonable person have repeatedly, mistakenly told Yu that she held a 0.60% interest in Premiere — a figure that reflects precisely a $1,500,000 investment in the company, the very amount Yu believed she had contributed? Would a reasonable person have ensured that Dyche communicated her plans to Yu?

There is only one possible answer to these questions: yes. The undisputed facts of this case, viewed in the light most favorable to Defendant, establish a pattern of errors made, compounded, and overlooked. Those facts arguably bespeak something more sinister than negligence. For the purposes of Section 17(a)(2), the Court is confident that they suffice to establish Defendant's liability.

Defendant's counterarguments elide the distinction between Section 17(a)(2) and (3), as well as the two classes of misstatements and omissions Defendant made during his tenure at Premiere. (Def. Br. 21-22). With regard to Defendant's misstatements and omissions about Yu, Defendant appears to argue that he lacked negligence for three reasons. First, he claims that he relied on Dyche to rectify this situation. (Def. Br. 21). The foregoing account

should make plain that Defendant's reliance was patently unreasonable, given Dyche's repeated failure to speak with Yu and Defendant's ability to do so himself.

Second, Defendant argues that he "kept the company's general counsel involved at all stages of his involvement specifically to avoid doing anything improperly." (Def. Br. 24). The Court assumes that the "general counsel" to whom Defendant refers is Gudgel. In any case, Defendant's blanket advice-of-counsel defense lacks merit. "The Second Circuit has made clear that reliance upon advice of counsel is a defense only if an individual '[i] made complete disclosure to counsel, [ii] sought advice as to the legality of his conduct, [iii] received advice that his conduct was legal, and [iv] relied on that advice in good faith.'" *SEC* v. *Wyly*, 950 F. Supp. 2d 547, 565 (S.D.N.Y. 2013) (quoting *Markowski* v. *SEC,* 34 F.3d 99, 104-05 (2d Cir. 1994)). But "[a] defense of reliance on advice of counsel is available only to the extent that it might show that a defendant lacked the requisite specific intent." *SEC* v. *Cavanagh*, No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *27 (S.D.N.Y. July 16, 2004). Here, even assuming Defendant could satisfy all four elements of an advice-of-counsel defense — and the Court does not believe he can — Defendant cannot escape the conclusion that he acted negligently. Even armed with an attorney's advice, it is unquestionably negligent for the CEO of a company *not* to tell its biggest investor that only one-third of her money had been deposited in the company's accounts. Defendant's advice-of-counsel defense falls flat.

Finally, Defendant appears to argue that his act of signing Yu's Certificate of Ownership in January 2010 cannot support his liability under Section 17(a), because this "error occurred only after the alleged misstatement or omission of fact." (Def. Br. 22). This misses the mark. Yu's Certificate of Ownership *itself* contained a misstatement: It informed Yu that she held 0.60% of Premiere. The Certificate of Ownership was part of a running scheme of misstatements and omissions that pre- and postdated Yu's investment in Premiere. The Certificate of Ownership — like Yu's Subscription Agreement and the letter Defendant mailed Yu in February 2010 — reiterated falsely that Yu had received what she paid for.

In sum, Defendant was negligent when he made his misstatements and omissions to Yu.

*The PIM.* This basis for Defendant's liability under Section 17(a)(2) is easier to grasp. The PIM, which was nominally authored by Defendant, was riddled with material misstatements. Defendant, Premiere's CEO, wrote parts of the PIM and therein compiled information given to him by other Premiere executives. He did not verify the accuracy of the written work that was not his own. Defendant then distributed the PIM at the Investors Meeting and delivered a presentation based on its contents. These acts were negligent.

Subject to the caveat about Defendant's brief that the Court raised *supra* at 38, Defendant seems to assert three counterarguments. First, he claims that he "was merely a curator of the PIM and reasonably relied on information provided to him." (Def. Br. 21). But it cannot be the case that a reasonable

person would accept dozens of pages of content, assemble that content into an investment guide, and then distribute that guide to investors without first ensuring that this content was accurate.  And it also cannot be the case that a reasonable person would deliver to a room of investors a presentation modeled on this unverified content.  More to the point, Defendant attempts to exonerate himself by citing his reliance on, among others, Jerry Jankovic and Dyche.  At the time Defendant assembled the PIM, he knew that Jerry Jankovic and Dyche were defendants in a fraud lawsuit brought by investors in a company remarkably similar to Premiere.  Defendant's reliance on these two individuals to provide him with accurate information for an investment pitch book was negligent.

Second is Defendant's advice-of-counsel argument.  (Def. Br. 21).  The Court has already explained that it holds no weight.

Finally, Defendant argues that he was not negligent because at the Investors Meeting, "when Dyche gave her presentation to the Korean investors in Korean, Defendant left the meeting since he could not understand what she was saying[.]"  (Def. Br. 21).  This claim does not explain why the PIM was filled with materially misleading misstatements.  Nor does it erase the effects of the PowerPoint presentation Defendant delivered at the Investors Meeting.

In sum, Defendant did not take reasonable care to ensure that the PIM was accurate.  This was negligent.

### (2)   Defendant Obtained Money from His Negligent Misstatements and Omissions

It is clear that Defendant obtained money as a result of his frauds. Recall that in December 2009, Premiere received in its Bank of America account $800,000 in investments from Yu, Hyun Ja Kim, and Jae Duk Kim. Defendant then wired some of that money to himself.  Defendant thus "obtained" this money within the meaning of Section 17(a)(2).

Defendant insists that he obtained nothing as a consequence of Yu's investment, because "the SEC has set forth no evidence that *Defendant* actually *obtained* the $1,000,000 that was diverted away from Premiere." (Def. Br. 21).  This argument does not speak to the money Defendant obtained from Hyun Ja Kim and Jae Duk Kim, whom he also defrauded.  Further, it assumes that the $1,000,000 Dyche stole from Yu can be disaggregated from the $500,000 that Yu actually invested in Premiere.  The problem for Defendant is that the *entirety* of Yu's investment accrued to Premiere as a result of Defendant's (and Dyche's) misstatements and omissions.

Before Yu wired $500,000 to Premiere's bank account, Defendant knew that Dyche was contemplating a "buy-out of the" Ans that would be tantamount to an "An settlement."  But Defendant *never* disclosed this fact to Yu — not when she wired $500,000 into Premiere's bank account, not when she attended the Investors Meeting, and not in any of his written communications to Yu in 2010.  Through a series of misstatements and omissions, Defendant both received and retained $500,000 from Yu.  Then he wired part of Yu's investment to himself.  In other words, Defendant "obtained"

money as a result of defrauding Yu, just like he "obtained" money from

defrauding Premiere's other investors.

### ii.   The Undisputed Facts of This Case Establish That Defendant Violated Section 17(a)(3)

A defendant violates Section 17(a)(3) by "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(3).  The undisputed facts of this case establish beyond peradventure that Defendant committed this offense.

As the Court has repeated several times, Defendant participated in parallel frauds during his time at Premiere.  Defendant's misstatements and omissions — in the PIM, in his Investors Meeting presentation, and in the numerous documents that were sent to Premiere's investors — stretched on for months.  These misstatements and omissions led multiple investors to give Premiere nearly $2,000,000.  Whether deemed a "practice" or a "course of business," Defendant's tactics "operate[d] as a fraud or deceit upon" the Premiere investors who trusted his representations.  Defendant thus violated Section 17(a)(3).

### CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART, and DENIES IN PART, the SEC's motion for summary judgment.  The Clerk of Court is ORDERED (i) to terminate Docket Entry 47 and (ii) docket this Opinion in *Yu* v. *Premiere Power LLC*, 14 Civ. 7588 (KPF), as well as the docket for this case.

On July 18, 2016, this Court stayed *Yu* v. *Premiere Power LLC*, 14 Civ. 7588 (KPF), pending resolution of the SEC's motion for summary judgment in this matter.  Accordingly, that stay is hereby LIFTED.  The parties in that case and the instant case are ORDERED to file a joint status letter (in the dockets of both cases) **on or before April 3, 2017**.  The status letter should explain whether the parties wish to engage in any form of alternative dispute resolution.

SO ORDERED.

Dated:      March 21, 2017
            New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge