UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                 :

MOON JOO YU and HEE RAK KIM,     :
                                   :

                   Plaintiffs,    :

                                   :

               v.                :     14 Civ. 7588 (KPF)
                                   :

PREMIERE POWER LLC, SANDRA DYCHE, :    OPINION AND ORDER
JERRY JANKOVIC, JOHN JANKOVIC,   :
ANNA LEE, ANNIE KIM, THOMAS HORACE :
GUDGEL III, and JOHN DOES 1 THROUGH :
100,                              :

                    Defendants. :
                                   :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 17, 2018

KATHERINE POLK FAILLA, District Judge:

      Plaintiffs Moon Joo Yu and Hee Rak Kim brought this action in

September 2014 alleging that Premiere Power LLC and several of its directors

and officers, including Defendants Sandra Dyche ("Dyche") and John Jankovic

("Jankovic") (collectively, "Defendants"), had defrauded them out of $1.65

million.  Defendants have filed two substantially identical motions seeking

summary judgment on the bases that (i) Plaintiffs' securities fraud claims were

not filed within the two-year limitations period and (ii) Plaintiffs have failed to

demonstrate that they relied on Defendants' statements when they decided to

invest in Premiere.

      Plaintiff Yu argues that she was only on notice of the fraudulent scheme

in late 2012 and that her claims, which she filed on September 18, 2014, are

not time-barred.  She further claims that, at a minimum, there is a genuine

dispute of material fact as to whether she relied on Defendants' statements. The Court agrees, and denies Defendants' motions for summary judgment as to Plaintiff Yu.

Plaintiff Hee Rak Kim does not oppose Defendants' motions for summary judgment, choosing instead to withdraw his Securities Act Section 10(b) and Rule 10b-5 claims. Accordingly, the Court does not address further his federal claims. However, the Court will retain pendent jurisdiction over Plaintiff Kim's state-law claims, as those claims arise under the same operative facts as other federal claims in this case.

## BACKGROUND[1]

### A.    Factual Background

The Court discusses the underlying facts in this case only to the extent necessary to resolve the instant motion, as the Court previously engaged in

---

[1] For ease of reference, the Court refers to Defendant Sandra Dyche's memorandum of law in support of her motion for summary judgment as "Dyche Br." (Dkt. #152); to Defendant Sandra Dyche's Local Civil Rule 56.1 Statement of Material Undisputed Facts as "Dyche 56.1" (Dkt. #157); to Defendant Sandra Dyche's reply brief as "Dyche Reply" (Dkt. #161); to Defendant John Jankovic's memorandum of law in support of his motion for summary judgment as "Jankovic Br." (Dkt. #155); to Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #160); and to Plaintiffs' Counterstatement to Defendants' Local Civil Rule 56.1 Statement of Material Undisputed Facts as "Pl. 56.1" (Dkt. #159). References to transcripts are presented as follows: to John Jankovic's depositions, dated October 28, 2015, and January 29, 2016, as "Jankovic Dep." (Dkt. #158-6); to Sandra Dyche's deposition, dated February 16, 2016, as "Dyche Dep." (Dkt. #158-4); to Defendant Anna Lee's deposition, dated April 20, 2016 as "Lee Dep." (Dkt. #158-9); and to Plaintiff Moon Joo Yu's depositions, dated May 26, 2016 and June 29, 2016, as "Yu Dep." (Dkt. #151-4).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.*

2

more exhaustive factual recitations, both in this case and in a related case.
*See SEC* v. *Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *2-6
(S.D.N.Y. Mar. 21, 2017); *Yu* v. *Premiere Power LLC*, No. 14 Civ. 7588 (KPF),
2015 WL 4629495, at *1-4 (S.D.N.Y. Aug. 4, 2015).

### 1.  Jankovic's Role at Premiere

John Jankovic founded Premiere Power LLC ("Premiere") in 2009 with his
father, Jerry Jankovic, and Thomas Gudgel ("Gudgel").  (Pl. 56.1 ¶ 1).  Between
July and December 2009, Jankovic worked as a consultant for Premiere.
*Jankovic*, 2017 WL 1067788, at *3.  In December 2009, Jankovic became
Premiere's Chief Executive Officer ("CEO"), a position he held until late 2011.
(Pl. 56.1 ¶ 115).

Premiere's stated mission was to develop and operate power plants and
on-site hydroponic tomato hot-houses on Native American land.  (Pl. 56.1 ¶ 2).
But Premiere also had another mission, one that it failed to disclose to
investors: to raise money to cover expenses arising from a 2006 lawsuit against
Jerry Jankovic, Sandra Dyche, and a company they had formed in 2001, 21st
Century Morongo Energy, LLC ("Morongo").  (*Id.*).  The Morongo litigation
involved claims against, *inter alia*, Jerry Jankovic and Dyche for fraud,
negligent misrepresentation, and conversion.  *Jankovic*, 2017 WL 1067788,
at *2.

---

at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement
of material fact[ ] must be followed by citation to evidence which would be admissible,
set forth as required by Fed. R. Civ. P. 56(c).").

On December 22, 2009, Jankovic, Dyche, and others at Premiere hosted a meeting for existing and prospective investors (the "Investors Meeting"), during which Jankovic distributed copies of a Preliminary Information Memorandum (the "PIM"). *Jankovic*, 2017 WL 1067788, at *2. The PIM was intended "to provide preliminary information in order to assist the recipient in deciding whether it wants to [invest]." (Dkt. #86-1). Its cover page listed Jankovic as one of its two authors (*id.*); indeed, according to Dyche, Jankovic was the lead author (Pl. 56.1 ¶ 119). At the Investors Meeting, Jankovic spent at least one hour addressing those in attendance, with Dyche translating into Korean. *Jankovic*, 2017 WL 1067788, at *2.

The PIM contained numerous misstatements, including the following:

i) The PIM listed a former Oklahoma Congressman as a member of Premiere's Board of Directors and claimed that this Congressman held a 1% equity interest in Premiere. That Congressman never agreed to serve on Premiere's Board.

ii) The PIM identified the Managing Executive Director of an energy company as a member of Premiere's Board of Directors. Like the Congressman, the Managing Director was purported to hold a 1% stake in Premiere. Though the Managing Director had discussed the possibility of joining Premiere, he never committed to serving as a member of Premiere's Board.

iii) The PIM stated that an Oklahoma accounting firm would handle Premiere's outsourced accounting and bookkeeping. That firm, however, never agreed to work with Premiere.

iv) Finally, the PIM identified a nationally known accounting firm as an "Affiliate" of Premiere's "Corporate Holdings" division. But the National Accounting Firm never had a relationship of any sort with Premiere.

4

*Jankovic*, 2017 WL 1067788, at *5.  At the Investors Meeting, Jankovic delivered a PowerPoint presentation that mirrored the PIM's content, repeating many, if not all, of its misstatements.  *Id.*  Jankovic did not mention the Morongo litigation, nor any intention to use investor funds to cover legal fees arising from that litigation.  *Id.* at *4.

As Premiere's CEO, Jankovic was aware that Dyche, Annie Kim ("Kim"), and Anna Lee ("Lee") were working to find investors for Premiere.  Jankovic also knew that Dyche, Kim, and Lee would receive brokers' fees for the sale of Premiere membership units to investors, including Plaintiff Yu.  (Pl. 56.1 ¶ 121).

### 2.    Dyche's Role at Premiere

Dyche, a native Korean speaker, was a member of the Board of Directors of Premiere.  (Pl. 56.1 ¶ 5).  When she joined the Board of Directors, she received a percentage ownership of Premiere.  (Dyche Dep. 112:2-6).  Dyche actively solicited funds on Premiere's behalf and, according to Jankovic, worked as a "broker" for Premiere.  (Jankovic Dep. 46:9-13).  Dyche helped solicit Yu's $1.5 million investment.  *Jankovic*, 2017 WL 1067788, at *3.

In exchange for obtaining investors, Dyche received membership interests in Premiere.  (Dyche Dep. 203:13-204:9).  According to Jankovic, Dyche hired Lee and Kim to work as brokers "on behalf of Premiere."  (Jankovic Dep. 272:17-273:11).  Jankovic's understanding was that Lee and Kim, who first introduced Yu to Premiere, "were working for Sandra [Dyche]" (*id.* at 272:24-25), and their primary role was to "introduc[e] [investors] to Sandra" (*id.*

5

at 100:8-17).  In exchange, they received ownership interest in Premiere.  (*Id.* at 226:4-7).  Dyche, Lee, and Kim all attended the Investors Meeting on December 22, 2009.  (*Id.* at 128:14-129:23).  Dyche spoke to investors in Korean before, during, and after the meeting.  (Pl. 56.1 ¶ 38).

### 3.    Yu's Decision to Invest in Premiere

#### a.    Dyche, Lee, and Kim Introduce Yu to Premiere

Yu first learned about Premiere in the fall of 2009 from Lee and Kim. (Dyche 56.1 ¶ 10).  Lee "explained [to Yu] about this investment repeatedly," "told [Yu] a lot about this investment," and told Yu that "[Lee and Kim] invested in that business too."  (Yu Dep. 22:23-23:2, 24:15-21).  Lee highlighted Dyche's involvement to encourage Yu to invest; she also told Yu that if Yu invested $1.5 million, Yu would enjoy strong returns on her investment.  (*Id.* at 24:15-21; 44:2-8, 13-15).  Based on Lee's initial descriptions, Yu thought that she would ultimately decide to invest in the company.  (*Id.* at 23:18-21, 29:3-15, 28:3-7, 44:25-46:13).

Yu met with Dyche, Lee, and Kim in early December 2009 at a Seoul coffee shop.  At that point, Yu had not finalized her decision to invest in Premiere.  (Yu Dep. 22:15-22).  Dyche, Lee, and Kim promised Yu that if she invested in Premiere, she would receive $300,000 in profit in addition to her initial investment of $1.5 million "within two to three years after [her initial] investment," as well as an annual dividend of more than $300,000 for the next thirty years.  (*Id.* at 14:12-17, 15:9-11, 15:25-16:19, 80:8-11, 131:22-133:25). At the meeting, Dyche also provided Yu with an English version of the PIM.  (*Id.*

at 18:14-20).  Though Yu could not read English, she noticed a chart in the PIM that displayed potential returns over 30 years.  (*Id.* at 35:23-36:3, 37:19-23).  Because "[Yu] just trusted [Lee] and [Dyche]" and "[Dyche] explained about the booklet," Yu did not ask for a translated copy.  (*Id.* at 20:21-21:10, 37:19-23).

### b. Yu's Investments

Yu invested a total of $1.5 million in four payments.  (Pl. 56.1 ¶ 9).  Yu gave Dyche $500,000 on December 9, 2009.  (*Id.* at ¶ 25).  She then wired directly to Premiere an additional $80,000 and $420,000 on December 14 and 15, 2009.  (*Id.* at ¶ 26).  Yu made a final investment of $500,000 in cash, which she gave to Dyche sometime in December 2009.  (*Id.*).  It is unclear exactly when Yu gave Dyche the last $500,000; Jankovic's understanding, as of December 22, 2009, was that Yu had yet to make the final payment and "anticipated liquidating another $500,000 to eventually be invested directly in Premiere but that liquidation had yet to occur."  (*Id.* at ¶ 9).  Yu maintains that she did not decide to invest the final $500,000 until after the Investors Meeting.  (*Id.* at ¶ 30; Yu Dep. 62:11-63:3).

### c. Yu's Growing Concerns Over Her Premiere Investment

After investing in Premiere, Yu did not receive any updates directly from Premiere.  (Pl. 56.1 ¶ 40).  Nor did she receive a Schedule K-1 (i.e., IRS Form 1065), as investors typically do.  (*Id.* at ¶ 41).  She also never received any of the payments that Dyche had promised during their meeting in early December 2009.  (*Id.* at ¶ 87).  At some point, Yu began to worry that there was

"something wrong" with Premiere and that the company might "ha[ve] some problem." (Yu Dep. 277:20-278:4). Key to resolving the instant motions is to identify when that worry occurred and how it evolved.

Yu's doubts began "around the time when [she was] expecting [her] $300,000 in profits from Premiere" (Yu Dep. 274:17-22), though she does not recall precisely when that was (*id.* at 278:2-4). During her deposition, Yu first asserted that she was "promised to get [her] profit within two to three years after [her] investment" (*id.* at 14:15-17), which would correspond to sometime between December 2011 and December 2012. Then, in response to defense counsel's questioning, Yu stated that she expected to receive her first payment "[t]wo years" after her investment (*id.* at 15:15), or by January 2012. She further stated, "I don't recall, clearly, but my memory says in two years, but eventually they changed 'two years' to 'two to three years,' so I am not sure now." (*Id.* at 15:25-16:4). Finally, after being asked to clarify, Yu said that she expected to receive her first payment during "[t]he first year after that two-year investment period" (*id.* at 16:15-16), suggesting that she expected to receive her first payment sometime between December 2011 and December 2012.

Yu's growing doubts led her to ask Defendant Lee, at some point in early 2012, when she should expect to receive her first payment of $300,000. (Yu Dep. 134:16-24). Lee told her that "it will be a little bit late." (*Id.*). By June 2012, Yu was concerned that she would never receive a profit. (*Id.* at 134:5-15). She talked about it "continuously with [Lee]," who suggested to Yu that they "should sue together." (*Id.* at 84:5-12). By August 2012, Yu was

8

deeply concerned about her investments (*id.* at 136:16-19, 137:11-17); even so, at that point, she continued to trust Lee (*id.* at 136:13-15, 137:11-17).

In the fall of 2012, Yu gave Lee approximately $50,000 to hire an attorney, Rosa Lee, to investigate Premiere. By September 18, 2012, Rosa Lee had sent a letter to the New Jersey Attorney General's Office stating that "[i]ndividuals involved in this transaction were harmed in the aggregate of about two million dollars." (Dkt. #158-8). The letter describes the circumstances under which Lee and Kim met Dyche, who in turn introduced them to Premiere and encouraged them to invest in the company. (*Id.* at 2). It concludes by noting that Lee and Kim "cannot reach Dyche by telephone or by email" and that "Ms. Lee, Ms. Kim, and the investors have not received any correspondence from Premiere Power." (*Id.* at 4).

## B.    Procedural Background

On September 18, 2014, Plaintiffs Yu and Kim brought this action against Dyche, Jankovic, and others at Premiere. (Dkt. #1). Dyche and Jankovic were served with the Complaint on October 16, 2014, and September 27, 2014, respectively. (Dkt. #10, 12). Plaintiffs filed a First Amended Complaint on March 6, 2015 (Dkt. #52); they filed a Second Amended Complaint on November 12, 2015 (Dkt. #86).

On June 16, 2017, Defendants Dyche and Jankovic filed two substantially identical motions for summary judgment. (Dkt. #150, 154). On August 11, 2017, Plaintiffs filed an opposition brief. (Dkt. #160). On

August 25, 2017, Defendants Dyche and Jankovic filed reply briefs.  (Dkt.

#161, 164).

**DISCUSSION**

**A.    Applicable Law**

**1.    Motions for Summary Judgment Under Rule 56**

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23

(1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A

genuine dispute exists where "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Fireman's Fund Ins. Co.* v. *Great Am.*

*Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation

marks and citation omitted).  A fact is "material" if it "might affect the outcome

of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  "When ruling

on a summary judgment motion, the district court must construe the facts in

the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant."  *Dallas*

*Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (internal

citation omitted).

**2.    Time Limitations for Securities Fraud Claims**

Securities fraud claims brought under Section 10(b) of the Securities

Exchange Act of 1934 are subject to the earlier of a two-year statute of

limitations or a five-year statute of repose.  *See* 28 U.S.C. § 1658(b).[2]  Either

actual or inquiry notice suffices to trigger the statute of limitations.  *Newman*

v. *Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003).  Furthermore, the

"limitations period commences not when a reasonable investor would have

begun investigating, but when such a reasonable investor conducting such a

timely investigation would have uncovered the facts constituting [the]

violation."  *City of Pontiac Gen. Emps. Ret. Sys.* v. *MBIA, Inc.*, 637 F.3d 169, 174

(2d Cir. 2011).  That holds true "irrespective of whether the actual plaintiff

undertook a reasonably diligent investigation."  *Merck & Co.* v. *Reynolds*, 559

U.S. 633, 653 (2010).

A duty of inquiry arises "when the circumstances would suggest to an

investor of ordinary intelligence the probability that she has been defrauded."

*Dodds* v. *Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).  And, as the

Second Court has explained, "a fact is not deemed 'discovered' until a

reasonably diligent plaintiff would have sufficient information about that fact to

plead it in a complaint ... with sufficient detail and particularity to survive a

12(b)(6) motion to dismiss."  *City of Pontiac*, 637 F.3d at 175; *see also Fed.*

*Housing Fin. Agency* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 319-20

(S.D.N.Y. 2012), *aff'd,* 712 F.3d 136 (2d Cir. 2013).  Because scienter

constitutes an element of Section 10(b) and Rule 10b-5 violations, the statute

of limitations period for claims brought thereunder does not begin to run until

---

[2]     Here, the only relevant statutory period is the two-year statute of limitations, as
        Plaintiffs filed well within the five-year statute of repose period.

the plaintiff actually discovers, or a reasonably diligent plaintiff would have discovered, facts sufficient to plead scienter. *City of Pontiac*, 637 F.3d at 174.

A reasonably diligent investor would begin an investigation when information is "specific enough to provide [that] investor with indications of the probability (not just the possibility)" of fraud. *Staehr*, 547 F.3d at 430 (citations omitted). For information to trigger the duty of inquiry, it must "relate[] directly to the misrepresentations and omissions the Plaintiffs allege in their action against the defendants." *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005) (citation and emphasis omitted). It "need not detail every aspect of the alleged fraudulent scheme," and "[a]n investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Staehr*, 547 F.3d at 427 (internal quotation marks omitted). Instead, "a totality-of-the circumstances analysis applies." *Id.* Inquiry notice "may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." *Id.*

### 3.    Reliance Under Section 10(b) and Rule 10b-5

Plaintiffs bringing claims under Section 10(b) and Rule 10b-5 promulgated thereunder must plead that defendants "[i] made misstatements or omissions of material fact; [ii] with scienter; [iii] in connection with the purchase or sale of securities; [iv] upon which plaintiffs relied; and [v] that plaintiffs' reliance was the proximate cause of their injury." *Lentell*, 396 F.3d at 172 (internal quotation marks and citation omitted). The reliance element of

a Section 10(b) cause of action ensures that there is a proper connection between the alleged misrepresentation and plaintiff's injury. *Halliburton* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014). As the Supreme Court has stated, "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 243 (1988).

Not all reliance suffices to demonstrate liability under Section 10(b). *See, e.g.*, *Mazuma Holding Corp.* v. *Bethke*, 21 F. Supp. 3d 221, 231 (E.D.N.Y. 2014). Rather, plaintiffs must show that reliance was reasonable under the circumstances. *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 439 (S.D.N.Y. 2001). The reliance may be on written or oral statements, or on deceptive conduct. *See, e.g.*, *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (noting that specific oral or written statement, as well as deceptive conduct itself, may suffice to establish reliance in a securities fraud action). A plaintiff must also show that defendant made the statement on which plaintiff relied: The "maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011).

## B. Analysis

### 1. A Genuine Dispute of Fact Exists as to When Plaintiff Yu Was on Notice of Defendants' Allegedly Fraudulent Conduct

Defendants urge this Court to find, as a matter of law, that Plaintiff Yu's securities fraud claims are time-barred because (i) "[b]y no later than January

13

2012, the likelihood that Yu had been defrauded in her investment would have been obvious to any reasonable investor" and (ii) "[a]ny reasonable investor who conducted such an investigation in January 2012 would have discovered facts to plead securities fraud sufficient to survive a motion to dismiss." (Jankovic Br. 2 (emphasis omitted)). In their view, Plaintiff Yu's deposition testimony suggests that she was on actual notice of a fraud as early as January 2012, because "[Yu] began to worry that there was 'something wrong' with Premier[e], and that Premiere 'has some problem.'" (*Id.* at 7).

Alternatively, Defendants contend that various "storm warnings" were sufficient to place Yu on inquiry notice in early 2012. They assert that Dyche had promised Yu that she would receive $300,000 in profit and all of her $1.5 million principal investment in January 2012, which payments never materialized. (Jankovic Br. 8, 11). Defendants also point to, *inter alia*, (i) an alleged lack of documentation indicating to Yu that her various payments had been invested in Premiere; (ii) an inconsistency between the figures in the PIM (indicating that Yu would receive a 0.75% ownership stake in Premiere in exchange for a $1.5 million investment) and those in Yu's subscription agreement (which gave Yu a 0.60% ownership interest in exchange for her $1.5 million investment); (iii) the fact that Yu never received a Form K-1 or updates about her investment in Premiere; and (iv) the Morongo litigation. (*Id.* at 8-11.) Defendants claim that, in light of these "facts," Yu had a duty to investigate that began in January 2012.

The Court disagrees. In *Merck*, the Supreme Court held that, to trigger the two-year limitations period, a plaintiff must discover (or a reasonably diligent investor should have discovered) facts constituting the alleged violation. 559 U.S. at 648. The Second Circuit has explained that a plaintiff discovers a particular fact only when she "would have obtained sufficient information about that fact to adequately plead it in a complaint." *City of Pontiac*, 637 F.3d at 175. For a Section 10(b) claim, this includes facts "'giving rise to a strong inference that the defendant acted with the required state of mind' such that 'it is at least as likely as not that the defendant acted with the relevant knowledge or intent.'" *Id.* (quoting *Merck*, 559 U.S. at 649 (internal quotation marks omitted)). Here, the record does not establish as a matter of law that Yu had notice of sufficient facts to survive a motion to dismiss before September 2012.

Contrary to Defendants' suggestion, the record does not clearly show that Yu expected to receive her first payments in January 2012 such that, when those payments never materialized, she would have been on notice of the fraud. At best, the record is ambiguous on this point. Yu's testimony suggests that she expected payment as late as December 2012. The first time during her deposition that she was asked about the expected timing for Premiere's first payment, Yu said that she "was promised to get [her] profit within two to three years after [her] investment." (Yu Dep. 14:15-17). That corresponds to sometime between December 2011 and December 2012. And, despite several exchanges during which she suggested that she expected payment within two

years (i.e., by January 2012) — exchanges during which Yu answered "yes" to questions about whether she expected payment in January 2012 (*id.* at 131:2-133:25) — Yu also clarified that she had been told that she would first be paid during "[t]he first year after that two-year investment period," or sometime between December 2011 and December 2012 (*id.* at 16:15-16).[3] On this record, the Court cannot conclude as a matter of law that Yu was on actual notice of the facts constituting the fraudulent conduct as early as January 2012.

Even if Yu had been promised that she would receive payments in January 2012 — something that the record does not clearly establish — Yu would still not have been placed on actual notice given that, in early 2012, Defendant Lee told Yu that Premiere was experiencing project-level delays and that Yu should not expect to receive her first payment for some time. (Yu Dep. 134:23-24). Lee had introduced Yu to Premiere, worked closely with Dyche, and served as a broker for Premiere. (Jankovic Dep. 272:17-273:11; Pl. 56.1 ¶ 10). It was reasonable for Yu to trust Defendant Lee, who was more familiar with Premiere and more connected to Premiere's directors and officers

---

[3] Plaintiff Yu admitted that "[her] English is not perfect [and she] cannot understand a lot in English." (Yu Dep. 10:13-14). Given Yu's difficulties understanding the English language, the Court does not ascribe as much weight as it otherwise would to the inconsistencies that emerge from her responses to defense counsel's questions as to whether she expected to receive payment in January 2012. Separate and apart from Yu's language difficulties, the Court cannot not find that the inconsistencies in Yu's testimony rendered it "so lacking in credibility that no reasonable juror could find for the plaintiff." *Blake* v. *Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007). Nor does the Court find that the testimony was "replete with inconsistencies and improbabilities." *Id.* (internal citation omitted); *see also Fincher* v. *Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725-26 (2d Cir. 2010).

than was Yu.  Whatever concern Yu may have had in January 2012 about Premiere's failure to pay would have been, and were, assuaged by Defendant Lee's statements.

Similarly, the Court cannot conclude as a matter of law that the "storm warnings" that Defendants identify placed Yu on inquiry notice before September 2012.  To begin with, Defendants' claim that Yu did not receive any receipts or other papers documenting her investment in Premiere is contradicted by the record:  In January 2010, Yu received a share certificate indicating that she had invested $1.5 million in Premiere in exchange for a 0.60% ownership stake in the company.  (Pl. 56.1 ¶ 137).  And Defendants cite no authority suggesting that a one-month delay in receiving a share certificate constitutes a "storm warning."  Although Yu never received a Form K-1, Defendants have failed to establish that Yu knew, or that a reasonable investor with ordinary intelligence would have known, to expect to receive a Form K-1 after receiving a share certificate.

Defendants next assert that the inconsistency in ownership interests mentioned in the PIM and Yu's subscription agreement constitutes a "storm warning."  (Jankovic Br. 9).  Here, too, the Court disagrees with Defendants. Yu would have been aware of any such inconsistency *before* she signed the subscription agreement, and before she finalized her investment.  The subscription agreement clearly stated that Yu would be entitled to a 0.60% stake in the company — and, as evidenced by the share certificate that Yu received in January 2010, Yu was indeed accorded a 0.60% interest in

17

exchange for her investment. The fact that Yu decided to sign the subscription agreement strongly suggests that she was not troubled by any inconsistency between the subscription agreement and the PIM. And the Court cannot conclude on the record before it that the inconsistency between the PIM and the subscription agreement would have suggested to a reasonable investor that Premiere was engaged in a fraudulent scheme.

Defendants' claim that Premiere's failure to send updates constituted a "storm signal" similarly misses the mark. The record suggests that Yu did receive an update from Defendant Lee in the spring of 2012. As mentioned above, Lee told Yu that Premiere was experiencing some delays and that Yu should not expect to receive her first payments on time. (Yu Dep. 134:23-24). Although Lee may not have been a Premiere employee, she was a broker, working on Premiere's behalf, who introduced Yu to the company. (Jankovic Dep. 272:17-273:11; Dyche 56.1 ¶ 10).[4] As previously mentioned, it was not unreasonable for Yu to believe Lee's statement. Under these circumstances, the Court cannot conclude that the failure to receive updates from anyone other than Lee constituted a "storm warning" that placed Yu on inquiry notice.

Finally, Defendants argue that the Morongo litigation itself, and facts that arose out of that litigation, constituted "storm warnings" of which Yu should have been aware by January 2012. To support their view, Defendants

---

[4] Lee's close ties to Premiere help to reconcile Yu's deposition testimony about the update she received from Lee and her assertion that plaintiffs "have not received any update, formal or informal, written or oral, about their investment in Premiere Power." (Dkt. #86 ("SAC") ¶ 77). The Court understands the SAC to be referring to Premiere itself and Premiere employees, but not Defendant Lee, who served as a broker.

cite various cases where courts in this Circuit have held that other litigation, media reports, and public disclosures about securities fraud could constitute "storm warnings." For example, Defendants cite *Dietrich* v. *Bauer*, where a sister court in this District noted that storm warnings may include "public disclosures in the media about the financial condition of the corporation *and other lawsuits alleging fraud committed by the defendants*." 76 F. Supp. 2d 312, 343-44 (S.D.N.Y. 1999) (citation omitted) (emphasis added).

The cases that Defendants cite are distinguishable. In *NECA-IBEW Pension Trust Fund* v. *Lewis*, "the facts comprising the core of Plaintiffs' accounting-related claims were contained within [Bank of America's] 2008 financial disclosures." 607 F. App'x 79, 81 (2d Cir. 2015) (summary order). Here, by contrast, none of Premiere's disclosures mentioned the Morongo litigation, and the facts comprising Yu's claims were not contained in any public disclosures by Defendants. In *NYSA Series Trust* v. *ESPSCO Syracuse, LLC*, two of the named plaintiffs had themselves been party to an earlier lawsuit that, in the court's view, placed them on notice that the defendants were "not adequately capitalized" and "could not guarantee payments." No. 14 Civ. 1089 (DNH), 2015 WL 457691, at *6 (N.D.N.Y. Feb. 3, 2015). Here, neither Plaintiff Yu nor Plaintiff Kim was a party to the Morongo lawsuit.

On the record before it, the Court cannot conclude that a reasonably diligent investor would have discovered the Morongo litigation or other "storm warnings" before September 2012. Premiere was a small, privately held company. Defendants can point to no public disclosures or media reports

19

regarding the Morongo litigation or any other disclosures that explicitly address the fraudulent scheme at issue here or in Morongo. And Plaintiffs were not parties to the Morongo litigation. Under these circumstances, Yu cannot reasonably be expected to have discovered Morongo. Defendants note that, if Yu had run a Google search for "Dyche, Susan" starting in April 2011, she would have obtained information about the Morongo litigation. (Dyche Reply 7). Yet such a stylized search is too idiosyncratic to form the basis for inquiry notice.

Defendants have not established as a matter of law that Yu acted unreasonably in waiting until the fall of 2012 to investigate. To the contrary, on the record before the Court, a reasonable juror could find that Yu had acted reasonably. Yu expected to receive payments from Premiere sometime in 2012. (Yu Dep. 16:15-16). In early 2012, when she had not received any payments or updates from Premiere, she spoke with Defendant Lee, someone she trusted and who had close ties to Premiere. Lee informed her that the payments would be "a little late" (*id.* at 83:14-17), because "construction [was] getting delayed" (*id.* at 83:24-84:2). In light of Lee's statements, Yu decided to wait before launching an investigation; she spoke with Lee "continuously" thereafter. (*Id.* at 84:5-6).

By July or August 2012, Yu became increasingly suspicious, particularly after Lee herself expressed doubts about Premiere and even discussed the possibility of suing Dyche. (Yu Dep. 135:7-137:17). Yu was given the impression that Lee would investigate Dyche and Jankovic. (*Id.* at

264:23-265:25).  And sometime in the late summer or early fall of 2012, Yu

gave Lee $50,000 to have an attorney — Rosa Lee — inquire into the legitimacy

of Premiere and to pursue potential claims against Premiere.  (*Id.* at

183:9-184:11).  On September 18, 2012, Rosa Lee filed a claim against

Premiere and Dyche with the New Jersey Attorney General's Office.  (Dkt.

#158-8).[5]

These facts do not clearly establish that Yu failed to act with reasonable

diligence in investigating Premiere or that a reasonable investor would have

learned of facts constituting the violation before September 2012.  For this

reason, the Court rejects Defendants' argument that Yu's claims are

time-barred.

### 2.    A Genuine Dispute of Fact Exists as to Plaintiff Yu's Reliance on Statements Made by Dyche and Jankovic

The Court next assesses Defendants' argument that Plaintiff Yu's

Section 10(b) and Rule 10b-5 claims fail because she did not adequately

demonstrate reliance on Defendants' statements.  Jankovic claims that Yu

"cannot show that she *relied* on any … misrepresentations or omissions in

connection with at least $1 million of her total $1.5 million investment in

Premiere[, which] necessitates dismissal of that portion of Yu's [s]ecurities

---

[5]    The Court observes that the initial Complaint was filed on September 18, 2014, which is two years to the day from Rosa Lee's filing with the New Jersey Attorney General's Office.  The Court is appropriately skeptical that Attorney Lee obtained the information contained in her letter on the very day it was sent, and this may portend badly for the ultimate success of Plaintiff Yu's limitations arguments.  However, the Court is loath to find a time bar as a matter of law, particularly given the facts that (i) the information in the letter is arguably insufficient to demonstrate scienter and (ii) the letter focuses more on Dyche's dealings with brokers Anna Lee and Annie Kim, and far less on any dealings with Yu.

[f]raud [c]laim against Jankovic." (Jankovic Br. 22). After all, he notes, before he ever met Yu at the Investors Meeting, Defendants Lee and Dyche had already made promises to Yu regarding the returns she would enjoy if she invested $1.5 million. He further claims that "Yu had already made [the decision to invest] before she had ever heard a word from Jankovic." (*Id.*).

Dyche's claims mirror Jankovic's. She claims that before Yu met Dyche at the Seoul coffee shop in December 2009, Lee had already told Yu that, if she invested $1.5 million in Premiere, she would get a large return on her investment. Dyche seizes on Yu's statement that after speaking with Lee, and before meeting Dyche, Yu "thought she was going to invest $1 million in Premiere." (Dyche Br. 24 (citing Dyche 56.1 ¶¶ 12-14)). Dyche further claims that Yu had committed to investing the full $1.5 million when she signed her subscription agreement sometime before the Investors Meeting. (*Id.*).

Defendants' arguments fall short of the high bar for summary judgment. The fact that Jankovic never met Yu before the Investors Meeting does not prove that he did not make misstatements and omissions on which Yu relied. It proves only that Yu did not rely on statements that Jankovic made to her in person. And the evidence tells a different tale. At a minimum, Yu's deposition testimony creates a genuine dispute of fact as to whether Yu relied on the PIM's misstatements and omissions. Yu explicitly stated that she received the PIM, which Jankovic co-authored, before she finalized her decision to invest. (Yu Dep. 30:18-23). When asked if she relied on some of the PIM's contents, Yu stated that the PIM (and in particular the tables contained therein) provided

"additional proof" that she considered, even if she did not spend extensive time studying the PIM or its contents.  (*Id.* at 34:20-24, 37:16-18).  She further said that she "relied on these numbers."  (*Id.* at 37:19-23).

In *Janus Capital Group*, the Supreme Court explained that, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  564 U.S. at 142.  Although Jankovic was not the PIM's sole author, courts have consistently found that multiple persons can be considered to have made a statement.  *See, e.g., In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 287-88 (S.D.N.Y. 2012) ("*Janus*, which involved two separate entities and whether statements of one could be attributed to the other, cannot be used to shield [the defendant], who signed the documents at issue."); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012) ("*Janus* did not change the longstanding rule that corporate officials are liable for misstatements to which they give their imprimatur.").  Here, Jankovic was listed on the first page of the PIM as one of the document's authors; he was also the company's CEO.  Those facts strongly suggest that Jankovic may be considered to have made the statements contained in the PIM, *see, e.g., Levy* v. *Maggiore*, 48 F. Supp. 3d 428, 449 (E.D.N.Y. 2014), and nothing in Jankovic's submissions leads the Court to conclude the contrary.  Similarly, nothing in Jankovic's submissions or in the record more broadly convinces the Court, as a matter of law, that Yu would have invested in Premiere if Jankovic had not made the misstatements and

omissions in the PIM, which "lent to Premiere an imprimatur of legitimacy." *Jankovic*, 2017 WL 1067788, at \*11. And, of course, Yu invested her final $500,000 only after hearing Jankovic and Dyche speak at the Investors Meeting. (Pl. 56.1 ¶ 30; Yu Dep. 62:11-63:3).

A similar result obtains for Dyche's misstatements. The Court finds ample evidence that Yu relied on Dyche's representations. Yu specifically stated that she had not made a final decision to invest until she met Dyche at the coffee shop in early December 2009. (Yu Dep. 22:15-22). During that meeting, Dyche made several promises on which Yu relied: Dyche told Yu that she would receive $300,000 in profit and get her $1.5 million principal back "within two to three years after [her initial] investment," as well as an annual dividend of more than $300,000 for the next thirty years. (*Id.* at 14:12-17, 15:9-11, 15:25-16:19, 80:8-11). Dyche also provided Yu with an English version of the PIM, which provided Yu with "additional proof" regarding the promises that Dyche had made. (*Id.* at 18:14-20, 37:16-23).

For these reasons, the Court cannot conclude as a matter of law that Yu did not rely on Defendants' misstatements. Accordingly, the Court rejects Defendants' arguments that Yu's securities fraud claims should be dismissed, in whole or in part, for lack of reliance.

### 3. The Court Continues to Exercise Pendent Jurisdiction Over Plaintiff Kim's State-Law Claims

Plaintiff Kim has withdrawn his federal claims against Defendants (*see* Pl. Opp. 3), and for this reason, the Court must determine whether it may retain pendent jurisdiction over his state-law claims. Under 28 U.S.C.

§ 1367(a), district courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). To exercise supplemental jurisdiction, the "federal claim must have substance sufficient to confer subject matter jurisdiction on the court." *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 725 (1966). In addition, the "state and federal claims must derive from a common nucleus of operative fact," and "[the] plaintiff's claims [must be] such that he would ordinarily be expected to try them all in one judicial proceeding." *Id.*

In the present action, Plaintiff Yu's federal securities fraud claims confer subject matter jurisdiction on the Court, as those claims "aris[e] under the … laws … of the United States." 28 U.S.C. § 1331. Defendants cannot, and do not, suggest that the Court lacks subject matter jurisdiction over those claims. Because the Court has not dismissed Plaintiff Yu's federal claims against Defendants, none of the cases on which Defendants rely is applicable: In those cases, the courts had dismissed the federal claims before deciding whether to exercise pendent jurisdiction over the state claims. *See, e.g.*, *Pitchell* v. *Callan*, 13 F.3d 545, 549 (2d Cir. 1994) (affirming a decision not to exercise pendent jurisdiction over state claims after dismissal of the federal claim); *Robinson* v. *Zurich N. Am. Ins. Co.*, No. 10 Civ. 3926 (JFB) (AKT), 2012 WL 4320645, at *25 (E.D.N.Y. Sept. 21, 2012) (declining to exercise supplemental jurisdiction where no federal claim survived summary judgment).

The Court may exercise pendent jurisdiction if the "state and federal claims ... derive from a common nucleus of operative fact" and "plaintiff[s'] claims are such that [they] would ordinarily be expected to try them all in one judicial proceeding." *Gibbs*, 383 U.S. at 725. In this action, Plaintiff Kim's state-law claims against Defendants unquestionably derive from a common nucleus of operative facts as Plaintiff Yu's federal claims. The federal and state claims are all based on Defendants' fraudulent actions aimed at securing Plaintiffs' investment in Premiere. The claims involve identical misstatements and omissions, made by identical parties as part of a single fraudulent scheme. And Plaintiffs Yu and Kim continue to maintain federal claims against other Defendants in this case, including Defendants Lee, Kim, and Gudgel. On this record, the Court finds that Plaintiffs' state and federal claims "would ordinarily be expected to [be tried] in one judicial proceeding." *Id.* The Court therefore continues to assert pendent jurisdiction over Plaintiff Kim's state-law claims.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motions for summary judgment as to Plaintiff Yu. Although Plaintiff Kim has withdrawn his Section 10(b) and Rule 10b-5 claims against Defendants, the Court retains pendent jurisdiction over Plaintiff Kim's state-law claims.

The Clerk of Court is directed to terminate the motions at Docket Entries 150 and 154. The parties are hereby ORDERED to appear for a status conference on **February 14, 2018, at 4:00 p.m.**, in Courtroom 618 of the

Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, at which time trial will be scheduled.

SO ORDERED.

Dated:  January 17, 2018
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge